N O T I C E
- - - - - -

To:  Kelly Jean Beard, Esq.
     Meadows Ichter & Bowers
     14 Piedmont Center, Suite 1100
     3535 Piedmont Road, NE
     Atlanta, GA  30305


January 31, 2003


UNITED STATES DISTRICT COURT
for the
NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

Bounthan Saengsiphan,

                 plaintiff                    CIVIL ACTION

          v.                                  NO. 1:0-cv-1719-CC

World Championship Wrestling, Inc., et al,

                 defendant


NOTICE TO RESPOND TO SUMMARY JUDGMENT MOTION
--------------------------------------------

On 1/30/03, World Championship Wrestling, Inc., et al,
filed a motion for  summary judgment in this Court, case document
number 107.

Pursuant to this Court's order dated April 14, 1987, opposing coun-
sel is hereby notified that within 20 days from the date said motion was

served, filing of all materials, including any affidavits, depositions, answers to interrogatories, admissions on file and any other relevant materials to be considered in opposition to the motion for summary judgment, is required.    Federal  Rules of Civil Procedure,  Rule 56(c); Moore v. State of Florida, 703 F.2d 516, 519 (11th Cir. 1983).

Unless otherwise stated by the trial court,  the Court will take said motion for  summary judgment  under advisement immediately upon the close of  the aforesaid 20 day period.  Id. at 519.  See also Donaldson v. Clark, 786 F.2d 1570, 1575 (11th Cir. 1986);  Griffith v. Wainwright, 772 F.2d 822, 825 (11th Cir. 1985).

The entry  of a summary judgment  by the trial court  is a final judgment on the claim or claims decided.    Finn v. Gunter, 722 F.2d 711, 713 (11th Cir. 1984).  Whenever the non-moving party bears the burden of proof at trial on a  dispositive issue and the party  moving for summary judgment has demonstrated the absence of any genuine issue of fact,  the nonmoving party must go  beyond the pleadings and must designate, by affidavit or other materials,  "... specific facts showing that there is a genuine issue for trial."  Federal Rules of Civil Procedure, Rule 56(e); Celotex Corp. v. Catrett,  477 U.S. 317, 324; 106 S.Ct. 2548, 2552-53; 91 L.Ed.2d 265, 272-3.

Luther D. Thomas, Clerk<br>
United States District Court<br>
Northern District of Georgia

Copies to counsel of record

N O T I C E
- - - - - -


To: Merrick D. Bernstein, Esq.
    Meadows Ichter & Bowers
    14 Piedmont Center, Suite 1100
    3535 Piedmont Road, NE
    Atlanta, GA  30305


January 31, 2003


UNITED STATES DISTRICT COURT
for the
NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

Bounthan Saengsiphan,

                    plaintiff              CIVIL ACTION

        v.                                 NO. 1:0-cv-1719-CC

World Championship Wrestling, Inc., et al,

                    defendant


NOTICE TO RESPOND TO SUMMARY JUDGMENT MOTION
--------------------------------------------


    On 1/30/03, World Championship Wrestling, Inc., et al,

filed a motion for  summary judgment in this Court, case document

number 107.

    Pursuant to this Court's order dated April 14, 1987, opposing coun-

sel is hereby notified that within 20 days from the date said motion was

served, filing of all materials, including any affidavits, depositions, answers to interrogatories, admissions on file and any other relevant materials to be considered in opposition to the motion for summary judgment, is required. Federal Rules of Civil Procedure, Rule 56(c); Moore v. State of Florida, 703 F.2d 516, 519 (11th Cir. 1983).

Unless otherwise stated by the trial court, the Court will take said motion for summary judgment under advisement immediately upon the close of the aforesaid 20 day period. Id. at 519. See also Donaldson v. Clark, 786 F.2d 1570, 1575 (11th Cir. 1986); Griffith v. Wainwright, 772 F.2d 822, 825 (11th Cir. 1985).

The entry of a summary judgment by the trial court is a final judgment on the claim or claims decided. Finn v. Gunter, 722 F.2d 711, 713 (11th Cir. 1984). Whenever the non-moving party bears the burden of proof at trial on a dispositive issue and the party moving for summary judgment has demonstrated the absence of any genuine issue of fact, the nonmoving party must go beyond the pleadings and must designate, by affidavit or other materials, "... specific facts showing that there is a genuine issue for trial." Federal Rules of Civil Procedure, Rule 56(e); Celotex Corp. v. Catrett, 477 U.S. 317, 324; 106 S.Ct. 2548, 2552-53; 91 L.Ed.2d 265, 272-3.

Luther D. Thomas, Clerk
United States District Court
Northern District of Georgia

Copies to counsel of record

N O T I C E
- - - - - -


To:  Michelle Rothenberg, Esq.
     Meadows Ichter & Bowers
     14 Piedmont Center, Suite 1100
     3535 Piedmont Road, NE
     Atlanta, GA  30305


January 31, 2003


UNITED STATES DISTRICT COURT
for the
NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION


Bounthan Saengsiphan,

                    plaintiff              CIVIL ACTION

          v.                               NO. 1:0-cv-1719-CC

World Championship Wrestling, Inc., et al,

                    defendant


NOTICE TO RESPOND TO SUMMARY JUDGMENT MOTION
--------------------------------------------


On 1/30/03, World Championship Wrestling, Inc., et al,
filed a motion for  summary judgment in this Court, case document
number 107.

Pursuant to this Court's order dated April 14, 1987, opposing coun-
sel is hereby notified that within 20 days from the date said motion was

served, filing of all materials, including any affidavits, depositions, answers to interrogatories, admissions on file and any other relevant materials to be considered in opposition to the motion for summary judgment, is required. Federal Rules of Civil Procedure, Rule 56(c); Moore v. State of Florida, 703 F.2d 516, 519 (11th Cir. 1983).

Unless otherwise stated by the trial court, the Court will take said motion for summary judgment under advisement immediately upon the close of the aforesaid 20 day period. Id. at 519. See also Donaldson v. Clark, 786 F.2d 1570, 1575 (11th Cir. 1986); Griffith v. Wainwright, 772 F.2d 822, 825 (11th Cir. 1985).

The entry of a summary judgment by the trial court is a final judgment on the claim or claims decided. Finn v. Gunter, 722 F.2d 711, 713 (11th Cir. 1984). Whenever the non-moving party bears the burden of proof at trial on a dispositive issue and the party moving for summary judgment has demonstrated the absence of any genuine issue of fact, the nonmoving party must go beyond the pleadings and must designate, by affidavit or other materials, "... specific facts showing that there is a genuine issue for trial." Federal Rules of Civil Procedure, Rule 56(e); Celotex Corp. v. Catrett, 477 U.S. 317, 324; 106 S.Ct. 2548, 2552-53; 91 L.Ed.2d 265, 272-3.

Luther D. Thomas, Clerk
United States District Court
Northern District of Georgia

Copies to counsel of record

N O T I C E
- - - - - -


To:  John J. Dalton, Esq.
     Troutman Sanders
     Bank of America Plaza
     Suite 5200
     600 Peachtree Street, N.E.
     Atlanta, GA  30308-2216


January 31, 2003


                    UNITED STATES DISTRICT COURT
                              for the
                    NORTHERN DISTRICT OF GEORGIA
                          ATLANTA DIVISION

Bounthan Saengsiphan,

               plaintiff                    CIVIL ACTION

          v.                                NO. 1:0-cv-1719-CC

World Championship Wrestling, Inc., et al,

               defendant


            NOTICE TO RESPOND TO SUMMARY JUDGMENT MOTION
            ----------------------------------------------


     On 1/30/03, World Championship Wrestling, Inc., et al,

filed a motion for  summary judgment in this Court, case document

number 107.

     Pursuant to this Court's order dated April 14, 1987, opposing coun-

sel is hereby notified that within 20 days from the date said motion was

served, filing of all materials, including any affidavits, depositions, answers to interrogatories, admissions on file and any other relevant materials to be considered in opposition to the motion for summary judgment, is required. Federal Rules of Civil Procedure, Rule 56(c); Moore v. State of Florida, 703 F.2d 516, 519 (11th Cir. 1983).

Unless otherwise stated by the trial court, the Court will take said motion for summary judgment under advisement immediately upon the close of the aforesaid 20 day period. Id. at 519. See also Donaldson v. Clark, 786 F.2d 1570, 1575 (11th Cir. 1986); Griffith v. Wainwright, 772 F.2d 822, 825 (11th Cir. 1985).

The entry of a summary judgment by the trial court is a final judgment on the claim or claims decided. Finn v. Gunter, 722 F.2d 711, 713 (11th Cir. 1984). Whenever the non-moving party bears the burden of proof at trial on a dispositive issue and the party moving for summary judgment has demonstrated the absence of any genuine issue of fact, the nonmoving party must go beyond the pleadings and must designate, by affidavit or other materials, "... specific facts showing that there is a genuine issue for trial." Federal Rules of Civil Procedure, Rule 56(e); Celotex Corp. v. Catrett, 477 U.S. 317, 324; 106 S.Ct. 2548, 2552-53; 91 L.Ed.2d 265, 272-3.

Luther D. Thomas, Clerk
United States District Court
Northern District of Georgia

Copies to counsel of record

N O T I C E
- - - - - -

To: James Andrew Lamberth, Esq.
    Troutman Sanders
    Bank of America Plaza
    Suite 5200
    600 Peachtree Street, N.E.
    Atlanta, GA  30308-2216

January 31, 2003

UNITED STATES DISTRICT COURT
for the
NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

Bounthan Saengsiphan,

                    plaintiff              CIVIL ACTION

            v.                             NO. 1:0-cv-1719-CC

World Championship Wrestling, Inc., et al,

                    defendant

NOTICE TO RESPOND TO SUMMARY JUDGMENT MOTION
--------------------------------------------

On 1/30/03, World Championship Wrestling, Inc., et al,
filed a motion for  summary judgment in this Court, case document
number 107.

Pursuant to this Court's order dated April 14, 1987, opposing coun-
sel is hereby notified that within 20 days from the date said motion was

served, filing of all materials. including any affidavits, depositions, answers to interrogatories, admissions on file and any other relevant materials to be considered in opposition to the motion for summary judgment, is required. Federal Rules of Civil Procedure, Rule 56(c); Moore v. State of Florida, 703 F.2d 516, 519 (11th Cir. 1983).

Unless otherwise stated by the trial court, the Court will take said motion for summary judgment under advisement immediately upon the close of the aforesaid 20 day period. Id. at 519. See also Donaldson v. Clark, 786 F.2d 1570, 1575 (11th Cir. 1986); Griffith v. Wainwright, 772 F.2d 822, 825 (11th Cir. 1985).

The entry of a summary judgment by the trial court is a final judgment on the claim or claims decided. Finn v. Gunter, 722 F.2d 711, 713 (11th Cir. 1984). Whenever the non-moving party bears the burden of proof at trial on a dispositive issue and the party moving for summary judgment has demonstrated the absence of any genuine issue of fact, the nonmoving party must go beyond the pleadings and must designate, by affidavit or other materials, "... specific facts showing that there is a genuine issue for trial." Federal Rules of Civil Procedure, Rule 56(e); Celotex Corp. v. Catrett, 477 U.S. 317, 324; 106 S.Ct. 2548, 2552-53; 91 L.Ed.2d 265, 272-3.

Luther D. Thomas, Clerk
United States District Court
Northern District of Georgia

Copies to counsel of record

N O T I C E
- - - - - -


To:  Evan H. Pontz, Esq.
     Troutman Sanders
     Bank of America Plaza
     Suite 5200
     600 Peachtree Street, N.E.
     Atlanta, GA  30308-2216


January 31, 2003


                    UNITED STATES DISTRICT COURT
                             for the
                    NORTHERN DISTRICT OF GEORGIA
                          ATLANTA DIVISION

Bounthan Saengsiphan,

             plaintiff                    CIVIL ACTION

        v.                                NO. 1:0-cv-1719-CC

World Championship Wrestling, Inc., et al,

             defendant


            NOTICE TO RESPOND TO SUMMARY JUDGMENT MOTION
            --------------------------------------------


       On 1/30/03, World Championship Wrestling, Inc., et al,

filed a motion for  summary judgment in this Court, case document

number 107.

       Pursuant to this Court's order dated April 14, 1987, opposing coun-

sel is hereby notified that within 20 days from the date said motion was

served, filing of all materials, including any affidavits, depositions, answers to interrogatories, admissions on file and any other relevant materials to be considered in opposition to the motion for summary judgment, is required. Federal Rules of Civil Procedure, Rule 56(c); Moore v. State of Florida, 703 F.2d 516, 519 (11th Cir. 1983).

Unless otherwise stated by the trial court, the Court will take said motion for summary judgment under advisement immediately upon the close of the aforesaid 20 day period. Id. at 519. See also Donaldson v. Clark, 786 F.2d 1570, 1575 (11th Cir. 1986); Griffith v. Wainwright, 772 F.2d 822, 825 (11th Cir. 1985).

The entry of a summary judgment by the trial court is a final judgment on the claim or claims decided. Finn v. Gunter, 722 F.2d 711, 713 (11th Cir. 1984). Whenever the non-moving party bears the burden of proof at trial on a dispositive issue and the party moving for summary judgment has demonstrated the absence of any genuine issue of fact, the nonmoving party must go beyond the pleadings and must designate, by affidavit or other materials, "... specific facts showing that there is a genuine issue for trial." Federal Rules of Civil Procedure, Rule 56(e); Celotex Corp. v. Catrett, 477 U.S. 317, 324; 106 S.Ct. 2548, 2552-53; 91 L.Ed.2d 265, 272-3.

> Luther D. Thomas, Clerk
> United States District Court
> Northern District of Georgia

Copies to counsel of record

N O T I C E
- - - - - -

To:  Eric Allen Richardson, Esq.
     Troutman Sanders
     Bank of America Plaza
     Suite 5200
     600 Peachtree Street, N.E.
     Atlanta, GA  30308-2216


January 31, 2003


                    UNITED STATES DISTRICT COURT
                              for the
                    NORTHERN DISTRICT OF GEORGIA
                          ATLANTA DIVISION

Bounthan Saengsiphan,

                plaintiff              CIVIL ACTION

        v.                             NO. 1:0-cv-1719-CC

World Championship Wrestling, Inc., et al,

                defendant


            NOTICE TO RESPOND TO SUMMARY JUDGMENT MOTION
            -------------------------------------------

     On 1/30/03, World Championship Wrestling, Inc., et al,

filed a motion for  summary judgment in this Court, case document

number 107.

     Pursuant to this Court's order dated April 14, 1987, opposing coun-

sel is hereby notified that within 20 days from the date said motion was

served, filing of all materials, including any affidavits, depositions, answers to interrogatories, admissions on file and any other relevant materials to be considered in opposition to the motion for summary judgment, is required. Federal Rules of Civil Procedure, Rule 56(c); Moore v. State of Florida, 703 F.2d 516, 519 (11th Cir. 1983).

Unless otherwise stated by the trial court, the Court will take said motion for summary judgment under advisement immediately upon the close of the aforesaid 20 day period. Id. at 519. See also Donaldson v. Clark, 786 F.2d 1570, 1575 (11th Cir. 1986); Griffith v. Wainwright, 772 F.2d 822, 825 (11th Cir. 1985).

The entry of a summary judgment by the trial court is a final judgment on the claim or claims decided. Finn v. Gunter, 722 F.2d 711, 713 (11th Cir. 1984). Whenever the non-moving party bears the burden of proof at trial on a dispositive issue and the party moving for summary judgment has demonstrated the absence of any genuine issue of fact, the nonmoving party must go beyond the pleadings and must designate, by affidavit or other materials, "... specific facts showing that there is a genuine issue for trial." Federal Rules of Civil Procedure, Rule 56(e); Celotex Corp. v. Catrett, 477 U.S. 317, 324; 106 S.Ct. 2548, 2552-53; 91 L.Ed.2d 265, 272-3.

Luther D. Thomas, Clerk
United States District Court
Northern District of Georgia

Copies to counsel of record

N O T I C E
- - - - - -


To: Bridget Bobick, Esq.
    Troutman Sanders
    Bank of America Plaza
    Suite 5200
    600 Peachtree Street, N.E.
    Atlanta, GA 30308-2216


January 31, 2003


UNITED STATES DISTRICT COURT
for the
NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

Bounthan Saengsiphan,

                    plaintiff                    CIVIL ACTION

          v.                                     NO. 1:0-cv-1719-CC

World Championship Wrestling, Inc., et al,

                    defendant


NOTICE TO RESPOND TO SUMMARY JUDGMENT MOTION
--------------------------------------------

     On 1/30/03, World Championship Wrestling, Inc., et al,
filed a motion for  summary judgment in this Court, case document
number 107.

     Pursuant to this Court's order dated April 14, 1987, opposing coun-
sel is hereby notified that within 20 days from the date said motion was

served, filing of all materials, including any affidavits, depositions, answers to interrogatories, admissions on file and any other relevant materials to be considered in opposition to the motion for summary judgment, is required. Federal Rules of Civil Procedure, Rule 56(c); Moore v. State of Florida, 703 F.2d 516, 519 (11th Cir. 1983).

Unless otherwise stated by the trial court, the Court will take said motion for summary judgment under advisement immediately upon the close of the aforesaid 20 day period. Id. at 519. See also Donaldson v. Clark, 786 F.2d 1570, 1575 (11th Cir. 1986); Griffith v. Wainwright, 772 F.2d 822, 825 (11th Cir. 1985).

The entry of a summary judgment by the trial court is a final judgment on the claim or claims decided. Finn v. Gunter, 722 F.2d 711, 713 (11th Cir. 1984). Whenever the non-moving party bears the burden of proof at trial on a dispositive issue and the party moving for summary judgment has demonstrated the absence of any genuine issue of fact, the nonmoving party must go beyond the pleadings and must designate, by affidavit or other materials, "... specific facts showing that there is a genuine issue for trial." Federal Rules of Civil Procedure, Rule 56(e); Celotex Corp. v. Catrett, 477 U.S. 317, 324; 106 S.Ct. 2548, 2552-53; 91 L.Ed.2d 265, 272-3.

Luther D. Thomas, Clerk
United States District Court
Northern District of Georgia

Copies to counsel of record

# ORIGINAL

FILED IN OFFICE
U.S.D.C. ATLANTA

JAN 30 2001

Luther D. Thomas, CLERK
By: _____ Deputy Clerk

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | |
|---|---|
| BOUNTHAN SAENGSIPHAN,<br><br>              Plaintiff,<br><br>v.<br><br>WORLD CHAMPIONSHIP WRESTLING, INC.,<br>TURNER SPORTS, INC. and TURNER<br>BROADCASTING SYSTEM, INC.,<br><br>Defendants. | CIVIL ACTION FILE<br><br>NO. 1:00-CV-1719-CC |

## DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

Pursuant to Rule 56 of the Federal Rules of Civil Procedure and the Local Rules of this Court, Defendants Universal Wrestling Corporation (f/k/a World Championship Wrestling, Inc.)("WCW"), Turner Sports, Inc. ("TSI") and Turner Broadcasting System, Inc. ("TBS")(collectively "Defendants") hereby move this Court for an order granting summary judgment in their favor because as a matter of law no genuine issue of material fact exists to be tried in this case.

Defendants base this Motion on the following documents and record evidence filed contemporaneously herewith:

1. Defendants' Memorandum of Law in Support of Defendants' Motion for Summary Judgment;

2. Deposition testimony of Bounthan Saengsiphan;

3. Deposition testimony of Joseph N. Hamilton;

107

4.   Deposition testimony of Dewayne E. Bruce;

5.   Deposition testimony of Paul Orndorff;

6.   Affidavit of Diana Myers;

7.   Affidavit of Joseph Hamilton; and

8.   Defendants' Statement of Undisputed Material Facts.

This 30th day of January, 2003.

_JOHN J. DALTON_
Georgia Bar No. 203700
JAMES A. LAMBERTH
Georgia Bar No. 431851
ERIC A. RICHARDSON
Georgia Bar No. 233873
EVAN H. PONTZ
Georgia Bar No. 583577

Attorneys for Defendants

TROUTMAN SANDERS LLP
5200 Bank of America Plaza
600 Peachtree Street, N.E.
Atlanta, GA 30308-2216
(404) 885-3000 (voice)
(404) 885-3995 (facsimile)

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

BOUNTHAN SAENGSIPHAN,          )
                               )
              Plaintiff,       )
                               )        CIVIL ACTION FILE
v.                             )
                               )        NO. 1:00-CV-1719-CC
WORLD CHAMPIONSHIP WRESTLING, INC.,)
TURNER SPORTS, INC. and TURNER )
BROADCASTING SYSTEM, INC.,     )
                               )
Defendants.                    )

## CERTIFICATE OF SERVICE

I hereby certify that I have this day served a copy of

*DEFENDANTS' MOTION FOR SUMMARY JUDGMENT* upon the interested

parties by hand delivery to:

> Cary Ichter
> Kelly Jean Beard
> Charles Gernazian
> Michelle M. Rothenberg-Williams
> MEADOWS, ICHTER AND BOWERS, P.C.
> Fourteen Piedmont Center, Suite 1100
> 3535 Piedmont Road
> Atlanta, GA 30305

This 30th day of January, 2003.

EVAN H. PONTZ
Georgia Bar No. 583577

TROUTMAN SANDERS LLP
Bank of America Plaza
600 Peachtree Street, N.E.
Suite 5200
Atlanta, GA 30308-2216
(404) 885-3000 (voice)
(404) 885-3995 (facsimile)

1108190_1.DOC

# ORIGINAL

FILED IN ─── OFFICE

JAN ── 2003

──THER L. ─── ..S, Clerk

By: ─── Deputy Clerk

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

BOUNTHAN SAENGSIPHAN,           )
                                )
              Plaintiff,        )
                                )       CIVIL ACTION FILE
v.                              )
                                )       NO. 1:00-CV-1719-CC
WORLD CHAMPIONSHIP WRESTLING, INC.,)
TURNER SPORTS, INC. and TURNER  )
BROADCASTING SYSTEM, INC.,      )
                                )
              Defendants.       )

## MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS'
## MOTION FOR SUMMARY JUDGMENT

Defendants Universal Wrestling Corporation (f/k/a World

Championship Wrestling, Inc.) ("WCW"), Turner Sports, Inc. ("TSI")

and Turner Broadcasting System, Inc. ("TBS") (collectively

"Defendants") submit this memorandum in support of their Motion

for Summary Judgment on all claims brought by Plaintiff Bounthan

Saengsiphan ("Saengsiphan").

### INTRODUCTION

Saengsiphan filed this action on July 10, 2000, alleging

claims of race discrimination under Title VII of the Civil Rights

Act of 1964, 42 U.S.C. § 2000e et seq., and under the Civil Rights

Act of 1866, 42 U.S.C. § 1981; alleging failure to pay overtime

and minimum wage, as required by the Fair Labor Standards Act

(FLSA), 29 U.S.C. § 201 et seq.; and alleging a state law claim of

intentional infliction of emotional distress.  With respect to

Saengsiphan's race discrimination claims, he alleges that WCW (i) discriminated against him because of his race (Asian-American) with regard to wrestling opportunities; (ii) subjected him to a racially hostile work environment; and (iii) retaliated against him for raising concerns about purported racially discriminatory practices. Saengsiphan also alleges that by engaging in such discriminatory conduct, WCW intentionally caused him emotional distress. With respect to Saengsiphan's FLSA claims, he alleges that he provided clean-up and training services to WCW for which he was not paid minimum wage and/or overtime. Based upon principles of agency and vicarious liability, Saengsiphan seeks not only to hold WCW liable for these alleged acts, but to hold TSI and TBS liable as well.

Saengsiphan's claims are without merit. Saengsiphan cannot present any evidence showing that he was treated differently because of his race. To the contrary, the undisputed evidence establishes that he was given wrestling opportunities and treated like other similarly-situated white wrestlers and/or trainees at WCW and that it was his lack of experience, and physical injuries that limited his ability to perform, that precluded his further advancement at WCW. In addition, the uncontroverted record evidence shows that Saengsiphan was not subjected to a racially hostile work environment, and that he did not provide services to

WCW for which compensation was required but not paid.  Further, WCW did not retaliate against Saengsiphan because, as the record shows, Saengsiphan did not complain to WCW about any alleged discriminatory treatment.

Because WCW's decisions and actions taken with regard to Saengsiphan were based on legitimate, non-discriminatory business reasons that had nothing to do with Saengsiphan's race, and because Saengsiphan is not entitled to recover overtime or any other type of compensation under the FLSA for services allegedly provided to WCW, summary judgment should be entered on all of Saengsiphan's claims.  Moreover, because Saengsiphan's claims against TSI and TBS derive solely from Saengsiphan's claims against WCW and are based on principles of agency and vicarious liability, summary judgment also should be entered on behalf of TSI and TBS on all of Saengsiphan's claims.

**STATEMENT OF FACTS**

**WCW's Business**

WCW created, produced, and marketed professional wrestling events during the 1990s and through March 2001.  (Affidavit of Diana Myers ("Myers Aff.") ¶ 3, a true and correct copy of which is attached hereto as Exhibit A).  WCW's wrestling events were seen by live audiences and/or aired on various television networks and pay-per-view cable and satellite systems.  (Id.)  The

wrestlers and other on-screen talent who appeared in WCW's wrestling events provided their services to WCW as independent contractors, either through formal written contracts or without written agreements. (Id. at ¶ 4). A creative team of writers and producers at WCW created WCW's wrestling events, both live and taped, with the goal of entertaining wrestling fans and general audiences nationwide. (Id. at ¶ 3).

After having much commercial and financial success in the mid-to-late 1990s, WCW's business suffered a sharp downturn in late 1998 into 1999. (Myers Aff. at ¶ 6). As a result of this business downturn, WCW began to significantly restructure many of its operations, including its training facility, known as the "Power Plant." (Id.; Affidavit of Joseph Hamilton ("Hamilton Aff."), ¶ 6, a true and correct copy of which is attached hereto as Exhibit B).

Despite WCW's restructuring efforts, WCW's business downturn continued, and in March 2001, WCW sold certain of its assets and completely ceased its operations. (Myers Aff. at ¶ 8). After the sale of its assets was completed, WCW changed its name to Universal Wrestling Corporation. (Id.)

**Saengsiphan's Background And Relationship With WCW**

Saengsiphan first became involved with professional wrestling and WCW in 1997, after he saw a television commercial about the

Power Plant. (Deposition of Bounthan Saengsiphan ("Saengsiphan Dep."), at 21-22).[1] Despite having no experience of any kind in wrestling, Saengsiphan decided that he wanted to wrestle for WCW and contacted the Power Plant to inquire about a tryout. (Id. at 22).

Saengsiphan was invited to a three day tryout, for which he paid a $250 fee. (Id. at 21). Based upon Saengsiphan's tryout, WCW trainers believed that Saengsiphan had some potential, and WCW invited Saengsiphan to train in WCW's full time professional wrestling training program. (Id. at 23-26). The purpose behind this training program was to help Saengsiphan develop not only the physical and wrestling skills necessary to wrestle professionally with WCW, but also the charisma, acting ability, and uniqueness necessary both to appeal to the masses and to compete in wrestling matches with minimal instruction. (Hamilton Aff. at ¶ 5). Saengsiphan began to train at the Power Plant in January 1998.[2] (Saengsiphan Dep. at 26).

During his tryout and training at the Power Plant, however, WCW was concerned about Saengsiphan's size. (Hamilton Aff. at

---

[1] Excerpts of deposition testimony and copies of deposition exhibits referenced herein are included in the Appendix, filed simultaneously herewith.
[2] Saengsiphan was required to pay $3,000 to train at the Power Plaint. (Saengsiphan Dep. at 34). He paid one thousand dollars initially and then paid the balance in installments. (Saengsiphan Dep. at 34).

¶ 5). Saengsiphan is very small by WCW standards at 5 foot 8 inches, and only one hundred and eighty pounds. (Id.; Deposition of Paul Orndorff ("Orndorff Dep."), at 55; Deposition of Dewayne E. Bruce ("Bruce Dep."), at 62; Saengsiphan Dep. at 38-39).[3] Because Saengsiphan was so small, for him to be successful as a WCW wrestler, it was necessary for him to be acrobatic and to have additional skills not required of larger wrestlers. (Hamilton Aff. at ¶ 5; Orndorff Dep. at 55).

In June 1998, Saengsiphan suffered an injury to his back. (Saengsiphan Dep. at 82-83, Exh. 6). As a result of this back injury, Saengsiphan received treatment for over a month at two different rehabilitation facilities. (Id.) As Saengsiphan rehabilitated, he returned to training and wrestling slowly and progressively. (Id.) Consequently, Saengsiphan was severely limited in his ability to wrestle in June and July of 1998. (Id.) Saengsiphan admits that under those circumstances it took some time to return to a normal training regimen. (Saengsiphan Dep. at 83).

In May 1999, Saengsiphan tore his anterior cruciate ligament in his right knee while training at the Power Plant. (Saengsiphan Dep. at 84-89). Saengsiphan had previously suffered the same injury prior to training at WCW, and underwent surgery to repair

---

[3] Saengsiphan admits that he was only "slightly" above the WCW weight minimum. (Saengsiphan Dep. at 39).

his knee at that time. (Id.) After the injury in May 1999, Saengsiphan's doctors instructed him not to lift more than twenty pounds and not to wrestle. (Id. at Exh. 7). On June 3, 1999, Saengsiphan again underwent surgery on his injured knee. (Id.). Following Saengsiphan's surgery, he continued to receive rehabilitation treatment from June until August 1999, during which time he was instructed not to wrestle. (Id. at 84-89, Exh. 7). After August 1999, Saengsiphan was allowed to resume training with restrictions, including that he not lift more than seventy pounds, and that he avoid twisting his knee. (Id.) Saengsiphan admits that these restrictions precluded him from performing wrestling moves. (Saengsiphan Dep. at 87-88). Even with these restrictions, Saengsiphan continued to have problems with his knee and required additional surgery in February 2000. (Id. at 88, Exh. 7).

**WCW Relocates And Restructures Its Training Program**

As part of the restructuring at WCW at the end of 1998 and into 1999, WCW transferred its Power Plant facility from its previous location to a new location on Log Cabin Drive, in Smyrna, Georgia. (Hamilton Aff. at ¶ 6). WCW established this new facility to serve as WCW's training facility for a smaller group of wrestler trainees than the group who had previously been training at the former Power Plant location. (Id.) WCW planned

to and did enter into written independent contractor agreements with the wrestlers selected to train at this new facility. (Id.)

## Saengsiphan Is Not Selected To Receive An Independent Contractor Agreement

To select the individuals who would be signed to independent contractor agreements, WCW training officials spent roughly six to eight weeks evaluating the skills and talents of the approximately forty individuals who were then training at the Power Plant. (Hamilton Aff. at ¶ 7). At the end of this period, WCW conducted "tryout" sessions and matches among all of the trainees. (Id.) Saengsiphan participated in the tryout matches. (Saengsiphan Dep. at 64). However, during this period, as WCW made its decisions regarding which Power Plant trainees would be offered written agreements, Saengsiphan was still suffering from his knee injury and was limited in his ability to wrestle and train at the Power Plant. (Hamilton Aff. at ¶ 8; Hamilton Dep. at 58-59).

Although WCW believed that Saengsiphan may have had potential, WCW ultimately concluded that Saengsiphan was too inexperienced and unskilled, particularly given his small size, to deserve a contract over other trainees at the Power Plant. (Hamilton Aff. at ¶¶ 8-9; Orndorff Dep. at 55-56; Bruce Dep. at 62). Moreover, Saengsiphan was injured and was unable to fully wrestle or train at the Power Plant when WCW made contract decisions regarding trainees. (Hamilton Aff. at ¶ 8; Hamilton

Dep. at 58-59; Orndorff 55-56).  In fact, Saengsiphan failed a physical given to him by WCW at about the time WCW made the trainee contract decisions.  (Hamilton Dep. 58-59).  Accordingly, WCW decided not to offer Saengsiphan a contract to train at the new facility.  (Hamilton Aff. at ¶ 9; Hamilton Dep. at 58-59; Orndorff Dep. at 55-56).

## ARGUMENT AND CITATION OF AUTHORITY

### I.   THE SUMMARY JUDGMENT STANDARD.

Summary judgment is appropriate if the evidence before the Court shows that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c); see Vason v. City of Montgomery, 240 F.3d 905, 907 (11th Cir. 2001).  To survive summary judgment, the nonmoving party must come forward with concrete evidence in the form of "*specific facts* showing that there is a genuine issue for trial."  Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587, 106 S. Ct. 1348, 89 L. Ed. 2d 538 (1986) (emphasis added).

The summary judgment rule applies with equal force in discrimination cases.  The Eleventh Circuit recently held:

> While acknowledging that questions of fact in job discrimination cases are "both sensitive and difficult" and "[t]here will seldom be 'eyewitness' testimony as to the employer's mental processes," the [U.S.] Supreme Court has told us that "none of this means that trial courts or reviewing courts should treat discrimination

differently from other ultimate questions of fact." St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 524 (1993)...And quite recently, the [U.S. Supreme] Court rejected a rule which would have made it easier for job discrimination plaintiffs to get their case to a jury, explaining that "[t]o hold otherwise would be effectively to insulate an entire category of employment discrimination cases from [appropriate] review..., and we have reiterated that trial courts should not treat discrimination differently from other ultimate questions of fact." Reeves, 120 S. Ct. at 2109. ...The long and short of it is that the summary judgment rule applies in job discrimination cases just as in other cases. No thumb is to be placed on either side of the scale.

Chapman v. Al Transport, 229 F.3d 1012, 1026 (11th Cir. 2000). As demonstrated herein, Saengsiphan cannot present evidence sufficient to create a genuine issue of material fact on any of his claims. Accordingly, Defendants are entitled to summary judgment on all of Saengsiphan's claims.[4]

## II. SUMMARY JUDGMENT SHOULD BE GRANTED AS TO SAENGSIPHAN'S § 1981 CLAIMS BECAUSE SAENGSIPHAN CANNOT ESTABLISH THAT WCW DISCRIMINATED AGAINST HIM ON THE BASIS OF HIS RACE.

In a disparate treatment case such as this one, Saengsiphan must prove "intentional discrimination" to prevail. See Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 153, 120 S. Ct.

---

[4]Saengsiphan's claims against TSI and TBS are based solely on theories of derivative liability. (Third Amended Complaint ¶¶ 40-52). Saengsiphan does not claim that either TSI or TBS took any improper actions against Saengsiphan or violated any law as to Saengsiphan. Rather, Saengsiphan claims that WCW took such actions, and that TSI and TBS should be held accountable because of their purported relationship with WCW. (Id.) Because Saengsiphan's claims against WCW fail as a matter of law, Saengsiphan's derivative claims against TSI and TBS also fail.

2097, 147 L. Ed. 2d 105 (2000); Texas Dep't of Community Affairs v. Burdine, 450 U.S. 248, 256, 101 S. Ct. 1089, 67 L. Ed. 2d 207 (1981). Because Saengsiphan cannot present direct evidence of discrimination, the proof scheme articulated in McDonnell Douglas Corp. v. Green, 411 U.S. 792, 93 S. Ct. 1817, 36 L. Ed. 2d 668 (1973), applies to his claim of disparate treatment. See Burdine, 450 U.S. at 254. Under the McDonnell Douglas proof scheme, Saengsiphan must present circumstantial evidence sufficient to establish a prima facie case of discrimination. Farrior v. H.J. Russell & Co., 45 F. Supp. 2d 1358, 1366 (N.D. Ga. 1999).

The mere presentation of circumstantial evidence is not sufficient to defeat a motion for summary judgment. Even if a plaintiff can establish a prima facie case of race discrimination, the burden then shifts to the defendant to articulate a legitimate, nondiscriminatory reason for its actions regarding the plaintiff. Reeves, 530 U.S. at 142. The defendant is not required to prove absence of discriminatory motive, but merely to articulate some legitimate reason for its actions. Moreover, the defendant's burden is one of production and not persuasion. See Id.; Burdine, 450 U.S. at 253.

Once such a reason is articulated, any presumption of discrimination arising out of the prima facie case "simply drops out of the picture." St. Mary's Honor Ctr. v. Hicks, 509 U.S.

502, 510-511, 113 S. Ct. 2742, 125 L. Ed. 2d 407 (1993). The plaintiff must then "prove by a preponderance of the evidence that the legitimate reasons offered . . . were not [the] true reasons, but were a pretext for discrimination." Burdine, 450 U.S. at 253; see Reeves, 530 U.S. at 143. The plaintiff must present "concrete evidence in the form of specific facts which show that the defendant's proffered reason is mere pretext. Mere conclusory allegations and assertions will not suffice." Earley v. Champion Int'l Corp., 907 F.2d 1077, 1081 (11th Cir. 1990). "The ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff." St. Mary's Honor Center, 509 U.S. at 507 (quoting Burdine, 450 U.S. at 253).

Saengsiphan cannot establish that WCW intentionally discriminated against him because of his race by purportedly failing to provide him with additional wrestling opportunities. Moreover, Saengsiphan's hostile work environment and retaliation claims lack legal and factual support. Accordingly, Defendants are entitled to summary judgment on Saengsiphan's § 1981 claims.

## A. Saengsiphan Cannot Establish That He Was Denied Wrestling Opportunities Because of Race.

Most of Saengsiphan's allegations boil down to a "failure-to-promote" or "failure-to-advance" type claim. Saengsiphan alleges that WCW denied him opportunities by not offering him a wrestling

contract and by not permitting him to wrestle in matches. (Third Amended Complaint ¶ 35; Saengsiphan Dep. at 98, 112). Saengsiphan, however, has not produced and cannot produce any evidence that WCW _actually_ and _intentionally_ refused to give him additional wrestling positions "_because of_" his race. Oncale v. Sundowner Offshore Services, Inc. 523 U.S. 75, 78, 118 S. Ct. 998, 140 L. Ed. 2d 201 (1998) (quoting 42 U.S.C. § 2000e-2(a)(1)) (emphasis added).

Saengsiphan cannot establish a prima facie case of failure to promote on account of his race. To do so under the McDonnell Douglas framework, Saengsiphan must show: (1) that he was a member of a protected class; (2) that he sought or applied for one or more positions; (3) that he was otherwise qualified for the positions sought; and (4) that, after his rejection, the positions remained open or were filled by a person outside his protected class. See Schoenfield v. Babbitt, 168 F.3d 1257, 1267 (11th Cir. 1999). The record is devoid of any evidence establishing that Saengsiphan was _qualified_ for the wrestling positions or opportunities about which he complains.

Because wrestling matches are a scripted form of entertainment, factors such as charisma, crowd appeal, uniqueness, wrestling skill, physical capabilities, persona and acting ability are essential prerequisites for a wrestler to receive consistent

wrestling opportunities on WCW's more popular events. (Hamilton Aff. at ¶ 4).

The undisputed evidence establishes that Saengsiphan did not have any wrestling experience before he began training at WCW's Power Plant, and only trained to be a professional wrestler with WCW for about a year and a half. (Saengsiphan Dep. at 21-22, 92). During this limited time period, Saengsiphan was injured and unable to train for significant periods of time. (Id. at 79-81, 84-89, Exhs. 6, 7). As a result, Saengsiphan had not spent the time necessary for him to develop the skills required for him to be a successful professional wrestler, particularly at his size. (Hamilton Aff. at ¶¶ 5, 8; Orndorff Dep. at 55-56).

Moreover, at the time that WCW selected trainees to receive contracts to wrestle at the new facility, Saengsiphan was still suffering from his knee injury and had failed a WCW physical. (Hamilton Aff. at ¶ 8; Hamilton Dep. at 58-60; Orndorff Dep. at 55-56; Saengsiphan Dep. at Exh. 7). Even if Saengsiphan had received a training contract, he would have been unable to wrestle or train for several additional months because of his knee injury. (Saengsiphan Dep. at Exh. 7). In addition, there is no evidence that Saengsiphan possessed any acting, speaking or microphone ability, all attributes that Saengsiphan admits are necessary for

a trainee to become a successful professional wrestler.
(Saengsiphan Dep. at 136).

Because of Saengsiphan's lack of experience and ability, and
the fact that injuries limited his ability to physically perform,
WCW determined that Saengsiphan was not qualified to receive a
wrestling contract. (Hamilton Aff. at ¶¶ 8-9; Hamilton Dep. at
58-60; Orndorff Dep. at 55-56). Because Saengsiphan cannot
establish that he was qualified to receive the wrestling contract
he claims he was denied, his failure to promote claim fails.

Saengsiphan's contention that WCW somehow denied him
opportunities because he did not receive "TV time" or wrestle in a
"TV taping [or] house show" does not salvage his claim.
(Saengsiphan Dep. at 112). As stated above, the undisputed record
evidence demonstrates that Saengsiphan was inexperienced,
undersized, did not possess the skills required of a professional
wrestler, and was often unable to physically perform because of
injuries. (Hamilton Aff. at ¶ 8; Hamilton Dep. at 58-60; Orndorff
Dep. 55-56, Saengsiphan Dep. at Exh. 7). As a result, Saengsiphan
was not qualified to be offered the opportunity to wrestle in
televised matches or house shows. (Hamilton Aff. at ¶ 9).
Because Saengsiphan cannot establish that he was qualified to
receive the opportunities he contends he was owed, Saengsiphan's
failure to promote claim fails.

Saengsiphan has also failed to make out a prima facie case of disparate treatment with respect to advancement opportunities because he cannot point to any **similarly situated** white wrestler within WCW who was given more and better wrestling opportunities than Saengsiphan was given.

To succeed on a disparate treatment claim for failure to promote, Saengsiphan must establish "that similarly situated or less qualified [individuals] were promoted or transferred" to the position about which he complains. Pashoian v. GTE Directories, 208 F. Supp. 2d, 1293, 1308 (M.D. Fla. 2002). Saengsiphan summarily claims that trainees Shannon Moore, Shane Helms, and David Flair received "opportunities" which Saengsiphan believes he should have received.[5] (Saengsiphan Dep. at 70). In making this assertion, however, Saengsiphan relies on nothing more than his own subjective opinion. Saengsiphan's subjective opinion that he was similarly situated to or better qualified than other wrestlers who received contracts or were given other opportunities that he did not receive, is insufficient. See Lee v. GTE Florida, Inc., 226 F.3d 1249, 1254 (11th Cir. 2000) (explaining that "an employee's own opinions about his . . . qualifications do not give rise to a material factual dispute") (quoting Simms v. Oklahoma ex

---

[5] Saengsiphan does not specifically identify the alleged opportunities that these trainees received which he was purportedly denied.

rel. Dept. of Mental Health and Substance Abuse Svcs., 165 F.3d
1321, 1329-30 (10th Cir. 1999), cert. denied, 528 U.S. 815, 120 S.
Ct. 53 (1999)); see also Ramsey v. Leath, 706 F.2d 1166, 1170
(11th Cir. 1983) (instructing that an employee's subjective belief
does not establish a jury issue).

In any event, to sustain a claim of discrimination,
Saengsiphan must do more than show that he was better qualified
than another individual who received the position that he wanted.
Denney v. City of Albany, 247 F.3d 1172, 1187 (11th Cir. 2001)
(quoting Lee v. GTE Florida, Inc., 226 F.3d 1249, 1253-54 (11th
Cir. 2000 (quotations omitted). "Disparities in qualifications
are not enough in and of themselves to demonstrate discriminatory
intent unless these disparities are so apparent as virtually to
jump off the page and slap you in the face." Id.; see also Miller
v. Bed, Bath & Beyond, Inc., 185 F. Supp. 2d 1253, 1271 (N.D. Ala.
2002). Here, Saengsiphan cannot even establish that the trainees
that he points to or any other trainees at WCW were similarly
situated to him.[6]  Because he is unable to meet this lesser burden
as to these other trainees, he most certainly cannot establish
that he was obviously *more qualified* than they were. Accordingly,

---

[6] Saengsiphan admits that he does not know the experience level or
background of the trainees or wrestlers to which he cites.
(Saengsiphan at Dep. 76-77).

Saengsiphan cannot establish a prima facie case of discrimination in denial of opportunities, and this claim fails.

**B.  WCW Has Articulated Legitimate, Nondiscriminatory Reasons For Not Providing Saengsiphan With Additional Wrestling Opportunities.**

Saengsiphan's failure to promote/advance claim also fails because WCW has established that it had legitimate, nondiscriminatory reasons for not offering Saengsiphan a contract to continue training with WCW or giving him any other wrestling opportunities that he alleges he was owed.

The record shows that at the end of 1998 and into 1999, WCW was experiencing and responding to a business downturn, and began to restructure its business operations and reduce the number of wrestling shows that it produced.  Consequently, WCW had less need for mediocre wrestling talent, and terminated numerous wrestlers and other talent as a cost-cutting measure.  (Myers Aff. at ¶ 6).  Because there was less need for less talented wrestlers, WCW restructured its training program and significantly reduced the number of trainees.  (Hamilton Aff. at ¶ 6).

To effectively reduce the number of trainees, WCW evaluated the trainees at the Power Plant and held tryouts to determine which trainees would receive written contracts.  (Id. at 7).  It is undisputed that at the time WCW was going through this process, Saengsiphan's injuries limited his ability to wrestle or train.

(Hamilton Aff. at ¶ 8; Hamilton Dep. at 58-60; Orndorff Dep. at 55-56; Saengsiphan Dep. at 84-89, Exh. 7). WCW did not offer Saengsiphan a written contract or any additional opportunities because he was inexperienced and had not developed the skills necessary to be successful at WCW, particularly at his size; he was unable to effectively train for significant periods because of injury; and he failed a WCW physical at approximately the same time as WCW was selecting trainees for contracts. (Hamilton Aff. at ¶ 8; Hamilton Dep. at 58-60; Orndorff Dep. at 55-56, Bruce Dep. at 62, Saengsiphan Dep. at 84-89, Exh. 6, 7).

Given the undisputed evidence that there was a business downturn at WCW, that WCW had less need for less talented and inexperienced wrestlers, and that Saengsiphan was considered less deserving of a contract or any other opportunities which he contends he was denied, he cannot establish that the nondiscriminatory reasons offered by WCW are a pretext for discrimination. Accordingly, Saengsiphan's discrimination claims fail. See Burdine, 450 U.S. at 256 (to survive summary judgment, a plaintiff must directly persuade the court that a "discriminatory reason more likely motivated [WCW] or indirectly [prove discrimination] by showing that [WCW]'s proffered explanation is [pretextual and] unworthy of credence.").

**C. Saengsiphan Cannot Establish That He Was Subjected To A Racially Hostile Work Environment.**

Saengsiphan also alleges that while he was with WCW he was subjected to a racially hostile environment. (Third Amended Complaint ¶ 57). Saengsiphan bases this claim on his contention that, while he was training at WCW, he was allegedly subjected to derogatory comments, he was "required" to assist in cleaning the Power Plant facility, and he was "required" to help assemble and disassemble the wrestling ring. (Saengsiphan Dep. at 120-123).

With respect to the alleged comments, Saengsiphan offers only his own conclusory, self-serving, and unsubstantiated testimony that individuals at WCW purportedly called him derogatory names on a daily basis. (Id. at 119-120). Even assuming that these allegations could be established and reduced to non-hearsay or admissible evidence, Saengsiphan's hostile work environment claim fails because he cannot support his allegation with "any specific examples of how [the alleged] discriminatory conduct . . . had a deleterious effect on his [work] performance." See Mitchell v. Carrier Corp., 954 F. Supp. 1568, 1578 (M.D. Ga. 1995), aff'd, 108 F.3d 343 (11th Cir. 1997).

In this case, not only has Saengsiphan failed to establish that his performance declined because of any alleged acts of discrimination, he has, to the contrary, claimed that his performance at WCW was so exemplary as to warrant a contract or

other additional wrestling opportunities. (Saengsiphan Dep. at 98-99). Because Saengsiphan cannot establish that his performance was affected by any alleged comment or purported harassment, his hostile work environment claim fails. See Evans v. Pemco Aeroplex, 1998 WL 1048470, No. CIVACV96-S-2801-S (N.D. Ala. Feb. 23, 1998) (explaining in case in which five incidents of racist conduct occurred, including the use of nooses and the letters "KKK," that without evidence that the incidents affected [the plaintiff's] work performance, the court could not conclude that the alleged harassment was sufficiently severe and pervasive to alter a term or condition of employment).

Saengsiphan's assertions that he was required to help clean up the Power Plant and to help assemble and take down the wrestling ring (Third Amended Complaint ¶ 35; Saengsiphan Dep. at 123) do not salvage his claim. Saengsiphan admitted that WCW also instructed white wrestler/trainees at the Power Plant to help clean up the Power Plant and to help assemble and take down the wrestling ring as part of the training program. (Saengsiphan Dep. at 61). Because cleaning up the Power Plant and assembling the wrestling ring were race-neutral incidents of training at the Power Plant, Saengsiphan cannot rely on that evidence in support of his hostile environment claim, and his claim fails. Smith v. Mount Sinai Medical Ctr. of Greater Miami, Inc., 36 F. Supp. 2d

1341, 1346 (S.D. Fla. 1998). Accordingly, summary judgment should be entered on Saengsiphan's hostile work environment claim.

**D.    Saengsiphan Cannot Establish A Claim For Retaliation.**

Saengsiphan contends that WCW "refused to promote" him in retaliation for his bringing concerns of racial discrimination to the attention of WCW employees. (Third Amended Complaint at ¶¶ 60-63). However, there is no evidence that Saengsiphan complained to <u>anyone</u> at WCW about any alleged discriminatory conduct.

To make out a prima facie case for retaliation, Saengsiphan must show that an adverse employment decision was made after an internal complaint to management or after he filed an EEOC charge. <u>Standard v. A.B.E.L. Services, Inc.</u>, 161 F.3d 1318 (11th Cir. 1998); <u>Pipkins v. City of Temple Terrace</u>, 267 F.3d 1197, 1201 (2001). Saengsiphan admits that **he never complained to anyone** at WCW about any of the alleged discriminatory conduct for which he complains in his lawsuit. (Saengsiphan Dep. at 112-113, 120-121). Further, Saengsiphan filed his EEOC charge on May 18, 2000, **after** he had stopped training at the Power Plant and WCW made its decisions regarding the trainee contracts. (Third Amended Complaint ¶ 9). Because Saengsiphan has not presented and cannot present any evidence to sustain his claim for retaliation, summary judgment should be entered on this claim.

**III. SUMMARY JUDGMENT SHOULD BE GRANTED AS TO SAENGSIPHAN'S TITLE VII CLAIMS BECAUSE NO EMPLOYER-EMPLOYEE RELATIONSHIP EXISTED BETWEEN SAENGSIPHAN AND WCW.**

Saengsiphan also asserts claims of race discrimination under Title VII of the Civil Rights Act of 1964. (Third Amended Complaint ¶¶ 53-59). The undisputed facts of record conclusively establish that Saengsiphan cannot maintain a discrimination claim under Title VII.

A Title VII race discrimination claim requires that an **employment relationship** exist between the plaintiff and the defendant. Holloman v. Northeast Georgia Area Development Comm'n, 740 F. Supp. 1571, 1575 (M.D. Ga. 1990). Independent contractor relationships are outside the statute's scope. See Cobb v. Sun Papers, Inc., 673 F.2d 337, 339-42 (1982), cert. denied, 459 U.S. 874, 103 S. Ct. 163, 74 L. Ed. 2d 135 (1982); see also Holloman, 740 F. Supp. at 1575 (explaining that if the plaintiff "were an independent contractor, and not an agent or employee [of the defendant], then there would be no 'employment relationship' between the two and [the plaintiff] would not be subject to Title VII's protections").

To determine whether a particular individual is an employee or an independent contractor, courts employ common law principles of agency. See Cobb, 673 F.2d at 341. Among the factors to be considered in determining whether an individual is an employee or

an independent contractor are the purported hiring party's right to control, the level of skill required, the source of equipment and tools, the duration of the relationship, the method of payment, the provision of employee benefits, the tax status of the parties and the intent of the parties. Nationwide Mutual Ins. Co. v. Darden, 503 U.S. 318, 323-24, 112 S. Ct. 1344, 117 L. Ed. 2d 581, 589-90 (1992) (citing Community for Creative Non-Violence v. Reid, 490 U.S. 730, 751-52, 109 S. Ct. 2166, 104 L. Ed. 811 (1989)). Applying the above factors, the uncontroverted evidence establishes that Saengsiphan was an independent contractor with WCW, and not an employee.

First, WCW exercised minimal control over the means and the manner of Saengsiphan's performance as a trainee at WCW. Saengsiphan was able to develop his own wrestling character and persona. (Saengsiphan Dep. at 55-56). Further, Saengsiphan was able to decide which costumes to wear, had to purchase the costumes, and was responsible for all expenses he incurred in training at WCW. (Id. at 51-52). When WCW compensated Saengsiphan, he was paid by the job and WCW did not withhold taxes, and Saengsiphan did not receive any employee benefits. (Id. at 45-46). These factors demonstrate that Saengsiphan was an independent contractor at WCW.

Further, the parties indisputably understood and intended an independent contractor relationship. Saengsiphan admitted that he signed a release to wrestle as an independent contractor with WCW and that he in fact understood himself to be an independent contractor. (Id. at 51, Exh. 4).

This Court has previously considered the issue of whether a professional wrestler for WCW was an independent contractor for purposes of Title VII. In Ranger Ross v. World Championship Wrestling, Inc., Civil No. 1:93-CV-1206-JEC (N.D. Ga. 1994) (unpublished opinion),[7] the Court concluded that, because the plaintiff professional wrestler had a certain level of control over his performance in matches and creativity for his character, he was an independent contractor and not an employee for purposes of Title VII. (Id. at 15-16). Likewise, in this case, given the control Saengsiphan had over his wrestling character, training and performance, and all of the factors noted above, the requisite employment relationship did not exist between Saengsiphan and WCW for Title VII to apply. Therefore, summary judgment should be granted as to all of Saengsiphan's Title VII claims.[8]

---

[7] A copy of the Court's opinion is attached hereto as Exhibit C.
[8] Even assuming, arguendo, that the requisite employer-employee relationship did exist between Saengsiphan and WCW, Saengsiphan's Title VII claim still fails for all of the same reasons that Saengsiphan's § 1981 claims fail. See Standard v. A.B.E.L. Servs., Inc., 161 F.3d 1318, 1330 (11th Cir. 1998) (explaining that

**IV. SUMMARY JUDGMENT SHOULD BE GRANTED AS TO SAENGSIPHAN'S FLSA CLAIMS BECAUSE NO EMPLOYER-EMPLOYEE RELATIONSHIP EXISTED BETWEEN SAENGSIPHAN AND WCW.**

Saengsiphan asserts that WCW failed to pay him minimum wage and overtime, as required by the FLSA, during the time that he was training at the Power Plant and providing wrestling services to WCW. (Third Amended Complaint 67-78; Saengsiphan Dep. 129-130). However, the FLSA provides minimum wage and overtime pay requirements only for **employees** as defined therein. 29 U.S.C. §§ 203(e)(1) and (g), 206(a), and 207(a). Because Saengsiphan cannot demonstrate that he was an "employee" of WCW during the time for which he asserts claims for minimum wage and overtime pay, Saengsiphan's FLSA claims fail.

To determine whether an FLSA-covered employer-employee relationship exists, courts "look not to the common law definitions of those terms, . . . but rather to the 'economic reality' of all the circumstances concerning whether the putative employee is economically dependent upon the alleged employer." Aimable v. Long and Scott Farms, 20 F.3d 434, 439 (11th Cir. 1994) (emphasis added) (citing Rutherford Food Corp. v. McComb, 331 U.S. 722, 730 (1947)), cert. denied, 513 U.S. 943, 115 S. Ct. 351, 130 L. Ed. 2d 306 (1994). Where an individual provides services to several different companies, performs his services by the job,

"both Title VII and Section 1981 have the same requirement of proof and use the same analytical framework").

rather than on a more permanent basis, uses his own material, and
exercises control over the manner in which he performs his
services, he is, in "economic reality," an independent
businessman, not an employee covered by the FLSA. Donovan v.
Tehco, Inc., 542 F.2d 141, 143-44 (5th Cir. 1981).

Application of the "economic reality" test to Saengsiphan
conclusively establishes that, during the time he was training at
the Power Plant and providing services to WCW as a wrestler,
Saengsiphan was an independent businessman and not an employee.
As stated above, when Saengsiphan was paid, it was by the job; he
developed his own wrestling persona; and he was responsible for
deciding which costumes he was going to wear and for obtaining his
costumes. (Id. at 45, 51-52). The fact that Saengsiphan was paid
by the job and had creative control over his work at WCW
establishes that he was not an employee of WCW.[9] Further,
Saengsiphan admits that he signed a release to wrestle as an
independent contractor with WCW and that he in fact performed
services for WCW as an independent contractor. (Id. at 51, Exh.
4). Therefore, as a matter of economic reality, Saengsiphan was
not an "employee" under the FLSA, and Defendants are entitled to

---

[9] See Donovan, 542 F.3d at 140 (holding that plaintiff was not an
employee where he "worked by the job rather than by the hour,
supplied his own materials . . ., and possessed . . . independence
and creative freedom in" deciding the manner in which he would
achieve the desired results in his employment).

summary judgment on Saengsiphan's FLSA claim.  See <u>Donovan</u>, 542
F.2d at 143-44.[10]

## V. SUMMARY JUDGMENT SHOULD BE GRANTED ON SAENGSIPHAN'S INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS CLAIM BECAUSE WCW DID NOT ENGAGE IN ANY OUTRAGEOUS CONDUCT.

Saengsiphan contends that WCW, by allegedly engaging in
racially discriminatory conduct, intentionally inflicted severe
emotional distress on him.  (Third Amended Complaint ¶¶ 64-66;
Saengsiphan Dep. at 127).  This claim is baseless.

To establish a claim for intentional infliction of emotional
distress under Georgia law, a plaintiff must establish:   (1)
intentional or reckless conduct; (2) extreme and outrageous
conduct by the defendant; (3) severe emotional distress suffered
by the plaintiff; and (4) a causal connection between the conduct
and the emotional distress.  <u>Hendrix v. Phillips</u>, 207 Ga. App.
394, 395, 428 S.E.2d 91, 92-93 (1993).

To be "extreme and outrageous," the alleged conduct must be
so "terrifying or insulting as naturally to humiliate, embarrass
or frighten" the plaintiff and so severe that "no reasonable man
could be expected to endure" these actions.  <u>Beck v. Interstate</u>

---

[10] Saengsiphan's claim with respect to overtime under the FLSA also
fails because Saengsiphan has failed to establish that he worked
in excess of forty (40) hours in any given week that he provided
services to WCW.  Likewise, because the statute of limitations on
FLSA claims is two (2) years, any conduct on which Saengsiphan
bases his FLSA claims that occurred prior to July 10, 1998 is
time-barred.  <u>See</u>, e.g., <u>Reich v. Department of Conservation &
Natural Resources</u>, 28 F.3d 1076, 1084 (11th Cir. 1994).

Brands Corp., 953 F.2d 1275, 1276 (11th Cir. 1992). Liability for intentional infliction of emotional distress does not extend to "mere insults, indignities, threats, annoyances, petty oppressions, or other trivialities." Ward v. Papa's Pizza To Go, Inc., 907 F. Supp. 1535, 1540 (S.D. Ga. 1995). Thus, when a plaintiff alleges that conduct such as race discrimination constitutes intentional infliction of emotional distress, the alleged conduct must be severe, such as an on-going pattern of explicit and oppressive harassment that includes or resembles a physical assault. See Coleman v. Housing Auth. of Americus, 191 Ga. App. 166, 381 S.E.2d 303 (1989). When the alleged conduct is racial epithets and race-based decisions in providing opportunities, it must be combined with extreme and graphic threats such as threats of bodily harm, dismemberment and death. See Brown v. Manning, 764 F. Supp. 183, 185 (M.D. Ga. 1991). Saengsiphan cannot even come close to meeting this standard.

In this case, Saengsiphan cannot provide any evidence of conduct by WCW that satisfies the requirements of "extreme and outrageous" behavior. Rather, Saengsiphan testified that there is nothing other than WCW's alleged acts of discrimination that caused him emotional harm. (Saengsiphan Dep. at 127).[11] Because

---

[11] There is no evidence that Saengsiphan suffered severe emotional distress. Saengsiphan admits that he was never under any threat

the undisputed evidence shows that Saengsiphan was not subjected

to discriminatory treatment, and because Saengsiphan must

establish more than just alleged discriminatory conduct to sustain

his intentional infliction of emotional distress claim, summary

judgment should be entered on this claim.  See Beck, 953 F.2d at

1276 (determining that discharge of employee for allegedly

discriminatory reasons was insufficient to support intentional

infliction of emotional distress claim); Ward, 907 F. Supp. at

1542 (concluding that repeated refusal to hire an individual under

circumstances that could constitute unlawful discrimination was

insufficient to establish an intentional infliction of emotional

distress claim); Borden v. Johnson, 196 Ga. App. 288, 395 S.E.2d

628 (1990) (establishing that the demotion or discharge for

whatever reason, even discriminatory reason, does not give rise to

an intentional infliction of emotional distress claim).

Accordingly, Saengsiphan's claim for intentional infliction of

emotional distress must be denied.

### CONCLUSION

For all of the foregoing reasons, Defendants' Motion for

Summary Judgment on all of Saengsiphan's claims asserted in this

---

of physical harm.  (Saengsiphan Dep. at 127).  Saengsiphan also
testified that he never sought or received any medical treatment
or counseling for his alleged emotional distress.  (Id. at 157).

action should be granted, and all of Saengsiphan's claims should be dismissed.

This 30th day of January, 2003.

TROUTMAN SANDERS LLP

JOHN J. DALTON
Georgia Bar No. 203700
JAMES A. LAMBERTH
Georgia Bar No. 431851
ERIC A. RICHARDSON
Georgia Bar No. 233873
EVAN H. PONTZ
Georgia Bar No. 583577

Suite 5200, Bank of America Plaza
600 Peachtree Street, N.E.
Atlanta, GA  30308-2216
(404) 885-3000

Attorneys for Defendants

## CERTIFICATION

Pursuant to Local Rule 7.1(D), I certify that this Memorandum of Law has been prepared with one of the fonts and point selections ("Courier New 12") approved by the Court in Local Rule 5.1(B).

This 30th day of January, 2003.

Evan H. Pontz
TROUTMAN SANDERS LLP
Suite 5200, Bank of America Plaza
600 Peachtree Street, N.E.
Atlanta, GA 30308-2216
(404) 885-3000



# EXHIBIT / ATTACHMENT

## A

(To be scanned in place of tab)

THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

Walker v. World Championship Wrestling, Inc., Turner Sports,
    Inc. and Turner Broadcasting System, Inc., Civ. File No.
    1:00-CV-0367-CC
Onoo v. World Championship Wrestling, Inc., Turner Sports, Inc.
    and Turner Broadcasting System, Inc., Civ. File No. 1:00-
    CV-0368-CC
Norris v. World Championship Wrestling, Inc., Turner Sports,
    Inc. and Turner Broadcasting System, Inc., Civ. File No.
    1:00-CV-0369-CC
Easterling v. World Championship Wrestling, Inc. and Turner
    Sports, Inc. and Turner Broadcasting System, Inc., Civ.
    File No. 1:00-CV-1715-CC
Davis v. World Championship Wrestling, Inc. and Turner Sports,
    Inc. and Turner Broadcasting System, Inc., Civ. File No.
    1:00-CV-1716-CC
Worthen v. World Championship Wrestling, Inc. and Turner Sports,
    Inc. and Turner Broadcasting System, Inc., Civ. File No.
    1:00-CV-1717-CC
Speight v. World Championship Wrestling, Inc. and Turner Sports,
    Inc. and Turner Broadcasting System, Inc., Civ. File No.
    1:00-CV-1718-CC
Saengsiphan v. World Championship Wrestling, Inc. and Turner
    Sports, Inc. and Turner Broadcasting System, Inc., Civ.
    File No. 1:00-CV-1719-CC
Reeves v. World Championship Wrestling, Inc. and Turner Sports,
    Inc. and Turner Broadcasting System, Inc., Civ. File No.
    1:00-CV-1720-CC
Patterson v. World Championship Wrestling, Inc., Turner Sports,
    Inc., Turner Entertainment Group, Inc. and Turner
    Broadcasting System, Inc., Civ. File No. 1:01-CV-1152-CC

**AFFIDAVIT OF DIANA MYERS**

DIANA MYERS, who having personally appeared before the
undersigned officer duly authorized to administer oaths and
having been first duly sworn according to law, deposes and
states the following:

1.  My name is Diana Myers. I am of majority age, and I give this testimony of my own free will. I have personal knowledge of and am competent to testify to the facts stated herein. The facts stated herein are true and correct.

2.  I was employed by Universal Wrestling Corporation (f/k/a/ World Championship Wrestling, Inc. and hereinafter referred to as "WCW") beginning in October 1997 and most recently held the title of Vice President of Business and Legal Affairs. In my position at WCW, I was familiar with virtually all aspects of WCW's business and legal affairs.

3.  WCW created, produced, and marketed professional wrestling programs during the 1990s and through March 2001. WCW's wrestling programs were both witnessed by live audiences and aired on various television networks and pay-per-view cable and satellite systems. WCW's wrestling programs, both live and taped, were created by writers and producers at WCW, with the goal of entertaining wrestling fans and general audiences nationwide. The individuals responsible for writing WCW's wrestling programs were often referred to as "bookers".

4.  WCW's wrestling programs included appearances by many types of live or "on-screen" talent, including wrestlers, match

referees, and other wrestling talent appearing on camera or at live (but non-televised) events. These individuals appearing in wrestling programs provided their services to WCW as independent contractors, either through formal written contracts or without written agreements.

5. Wrestlers, referees and other wrestling talent were aware of the planned outcome of each wrestling match or appearance and provided appropriate services to attempt to convincingly carry out that pre-determined outcome of the event for the audience.

6. WCW had much commercial and financial success during the mid to late 1990s. In 1999, WCW's business suffered from a sharp downturn and WCW was losing significant sums of money. Therefore, WCW began downsizing its operations by reducing the number of talent it contracted with, reducing the compensation of existing talent, and producing fewer and fewer wrestling programs. As part of the downsizing, WCW considered canceling some of its shows. In early 2000, WCW in fact terminated some of its programs, including a taped show commonly referred to as its "Saturday Night" show. Before it was canceled, the task of writing or "booking" the Saturday Night wrestling show was being performed by individuals experienced in booking wrestling

programs. At the same time, WCW also reduced the length of some of its other remaining wrestling programs.

7. Due to these business circumstances and WCW's downsizing efforts, in 1999 and over the next two years, WCW had less and less need for wrestling services, including on-screen talent, trainers, referees and writers or "bookers". Specifically, in and after 1999, there were no open opportunities available for a position solely as a booker of WCW's Saturday Night wrestling program and WCW was not actively seeking bookers solely for its Saturday Night show.

8. The downsizing efforts did not stop WCW's business downturn, and in March 2001, WCW sold certain of its assets and completely closed down its operations. After the sale of assets was completed, WCW changed its name to Universal Wrestling Corporation to close up remaining corporate operations.

9. In my capacity as Vice President of Business and Legal Affairs for WCW, I was responsible for reviewing and documenting merchandizing agreements in which WCW was a party.

10. In 1998, WCW entered into a merchandizing agreement with Toshiba in Japan to produce and distribute a music compact

disc in Japan entitled "New World Order" containing WCW entrance music. Mr. Kazuo "Sonny" Onoo was involved in this agreement. Mr. Onoo was paid all money he was due from WCW regarding this New World Order compact disc.

11.   WCW also entered into a different agreement with Tommy Boy Records.   Pursuant to the terms of this agreement, Tommy Boy Records developed and distributed a music CD entitled "WCW Mayhem."   WCW Mayhem was a compilation of WCW music along with material created by Tommy Boy artists.

12.   Kazuo "Sonny" Onoo was not a party to or involved in WCW's merchandizing agreement with Tommy Boy Records regarding the WCW Mayhem CD.   Mr. Onoo did not have a financial interest in the CD's creation, marketing or sales, nor was he entitled to any profits or other compensation from the sale of this CD.

13.   As a result of my position at WCW, I also have personal knowledge regarding how on-air talent was compensated by WCW and the basis of their level of compensation.   Further, I have personal knowledge regarding how on-air talent was generally utilized by WCW.

14. At WCW, Wrestlers were compensated and given wrestling opportunities that were commensurate with their skill level and crowd appeal. Mr. Walker was no exception.

15. Mr. Walker wrestled in over eighty (80) matches while he was under contract with WCW. In some of these matches, he prevailed over his opponent. In other instances, the match was scripted in Mr. Walker's opponent's favor.

FURTHER AFFIANT SAYETH NAUGHT.

This 12th day of December, 2002.

_____
DIANA MYERS

Sworn to and subscribed
before me this 12th day
of December, 2002.

_____
Notary Public

My Commission Expires:
March 31, 2005

Sandra M. Gaudet
Commission # DD 002932
Expires March 31, 2005
Bonded Thru
Atlantic Bonding Co., Inc.



# EXHIBIT / ATTACHMENT

## B

(To be scanned in place of tab)

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | |
|---|---|
| BOUNTHAN SAENGSIPHAN, ) | |
| ) | |
| Plaintiff, ) | |
| ) | CIVIL ACTION FILE |
| v. ) | |
| ) | NO. 1:00-CV-1719-CC |
| WORLD CHAMPIONSHIP WRESTLING, INC.,) | |
| TURNER SPORTS, INC. and TURNER ) | |
| BROADCASTING SYSTEM, INC., ) | |
| ) | |
| Defendants. ) | |

## **AFFIDAVIT OF JOSEPH HAMILTON**

JOSEPH HAMILTON, who having personally appeared before the undersigned officer duly authorized to administer oaths and having been first duly sworn according to law, deposes and states the following:

1.　My name is Joseph Hamilton.　I am of majority age, and I give this testimony of my own free will.　I have personal knowledge of and am competent to testify to the facts stated herein.　The facts stated herein are true and correct.

2.　I first began providing services to Universal Wrestling Corporation (f/k/a World Championship Wrestling, Inc. and hereinafter referred to as "WCW") in 1989 as a member of the creative staff.　After working with the organization in various

capacities, I eventually became the Director of the Power Plant, WCW's training facility.

3. As part of my duties as Director of the Power Plant, I worked with WCW's professional wrestlers and trainees. At times, members of the creative staff and I would discuss my opinion with respect to wrestling and training talent.

4. Based on my experience in the wrestling industry and at WCW, the creators, producers, bookers and marketers of professional wrestling programming such as WCW's use their better performers with greater frequency in their wrestling programs. Factors considered by the creators, producers, bookers and marketers of these programs in determining who the better wrestlers are include the wrestler's crowd appeal, stage presence, charisma, uniqueness, wrestling ability and physique. In light of these factors, I periodically evaluated wrestlers and trainees at the Power Plant, to determine how well they were progressing.

5. Bounthan Saengsiphan first became affiliated with WCW in late 1997 when he was accepted in the professional wrestling training program at the Power Plant facility. The goal in including Mr. Saengsiphan in the training program was to help him develop the physical skills, charisma, acting ability, stage presence and other characteristics necessary to be a successful

wrestler with WCW. Mr. Saengsiphan was invited to train at the
Power Plant because WCW believed that he had potential and a
compelling personal story. Because of his background, WCW
thought that if Mr. Saengsiphan developed the requisite
professional wrestling skills, he might be successful. However,
WCW had concerns about Mr. Saengsiphan's size as he is small by
WCW's standards. Because Mr. Saengsiphan was so small, in order
for him to be successful at WCW it was necessary that he develop
additional skills beyond those developed by other wrestlers,
including acrobatic moves.

6.     At the end of 1998 and into 1999, WCW began to
restructure much of its operations, including the professional
wrestling training program located at the Power Plant. WCW
transferred its Power Plant facility from its previous location
on Carroll Drive, to a new location on Log Cabin Drive, in
Smyrna, Georgia. This new establishment was to serve as the
training facility for a smaller group of wrestler trainees than
the group that had previously been training at the old Power
Plant location. Each wrestler selected to train at the new
Power Plant facility was to be signed to a trainee independent
contractor agreement.

7.     To determine which wrestler trainees would receive
agreements, I, along with other WCW training officials, spent

roughly six to eight weeks evaluating the talent of approximately forty individuals who were then training at the Power Plant. At the end of this evaluation period, WCW conducted "try outs" for all of the wrestler trainees.

8.    During this restructuring and the evaluation process at the Power Plant, Mr. Saengsiphan had been training at WCW for only a year and half and had missed substantial training time due to injuries and due to other personal and family-related reasons. Mr. Saengsiphan was inexperienced and lacked the necessary training and wrestling skills, particularly for his small size, and the persona and other attributes necessary to be a successful professional wrestler. Further, Mr. Saengsiphan was often injured and unable to train. Mr. Saengsiphan was still suffering from his knee injury and limited in his ability to train at the time trainee contract decisions were made.

9.    Based on this evaluation of Mr. Saengsiphan, WCW concluded that Mr. Saengsiphan was not qualified to wrestle in televised events or house shows and WCW decided not to offer Mr. Saengsiphan a contract to train at the new facility. These decisions had nothing to do with Mr. Saengsiphan's race.

FURTHER AFFIANT SAYETH NAUGHT.

This _29TH_ day of January, 2003.

_Joseph Hamilton_
JOSEPH HAMILTON

Sworn to and subscribed
Before me this _29TH_ day
Of January, 2003.

_____
Notary Public

My Commission Expires:
Notary Public, Hall County, Georgia
My Commission Expires June 29, 2003



# EXHIBIT / ATTACHMENT

## _____ C _____

(To be scanned in place of tab)

ROBERT L. ROSS, JR.,          :
                              :
            Plaintiff,        :
                              :
vs.                           :          CIVIL NO. 1:93-CV-1206-JEC
                              :
WORLD CHAMPIONSHIP WRESTLING, :
INC.,                         :
                              :
            Defendant.        :

### ORDER

The above entitled action is presently before the Court on the Magistrate Judge's Report and Recommendation [15] granting defendant's Motion For Summary Judgment [11] and denying as moot plaintiff's Motion to Extend Time To April 25, 1994 To Respond To Defendant's Motion For Summary Judgment [12]. Plaintiff has filed no objection(s) to the Magistrate Judge's Report and Recommendation. The Court has reviewed the record and arguments of the parties and concludes that the Magistrate Judge's Report and Recommendation should be received with approval and adopted as the opinion and order of the Court.

ACCORDINGLY, the Court **ADOPTS** the Magistrate Judge's Report and Recommendation [15] **GRANTING** defendant's Motion For Summary Judgment [11] and **DENYING AS MOOT** plaintiff's Extension Of Time [12].

SO ORDERED, this 19 day of October, 1994.

_____
JULIE E. CARNES
UNITED STATES DISTRICT JUDGE

ENTERED ON DOCKET

OCT 21 1994

U.S.T. CLERK

DEPUTY CLERK

2

FILED IN CLERK'S OFFICE
U.S.D.C. - Atlanta

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA MAY 1 7 1994
ATLANTA DIVISION

LUTHER D. THOMAS, Clerk
By: _____
Deputy Clerk

ROBERT ROSS, JR.,                    :    CIVIL ACTION

    Plaintiff,                       :    NO. 1:93-CV-1206-JEC

    vs.                              :    *Adopted by Judge Carnes*
                            *via order dated*
WORLD CHAMPIONSHIP WRESTLING, INC., :    *10-19-94*

    Defendant.                       :

## ORDER FOR SERVICE OF REPORT AND RECOMMENDATION

Attached is the report and recommendation of the United States Magistrate Judge made in this action in accordance with 28 U.S.C. § 636 and this Court's Local Rule 260-2. Let the same be filed and a copy, together with a copy of this Order, be served upon counsel for the parties.

Pursuant to 28 U.S.C. § 636(b)(1), each party may file written objections, if any, to the report and recommendation within ten (10) days of the receipt of this Order. Should objections be filed, they shall specify with particularity the alleged error or errors made (including reference by page number to the transcript if applicable) and shall be served upon the opposing party. The party filing objections will be responsible for obtaining and filing the transcript of any evidentiary hearing for review by the district court. If no

1

objections are filed, the report and recommendation may be adopted as the opinion and order of the district court and any appellate review of factual findings will be limited to a plain error review. United States v. Slay, 714 F.2d 1093 (11th Cir. 1983), cert. denied, 464 U.S. 1050, 104 S.Ct. 729, 79 L.Ed.2d 189 (1984).

The Clerk is directed to submit the report and recommendation with objections, if any, to the district court after expiration of the above time period.

IT IS SO ORDERED, this _17th_ day of May, 1994.

William L. Harper

WILLIAM L. HARPER
UNITED STATES MAGISTRATE JUDGE

FILED IN CLERK'S OFFICE
U.S.D.C. - Atlanta

MAY 17 1994

LUTHER D. THOMAS, Clerk
By:
Deputy Clerk

ROBERT ROSS, JR.,        :    CIVIL ACTION

    Plaintiff,        :    NO. 1:93-CV-1206-JEC

      vs.        :

WORLD CHAMPIONSHIP WRESTLING, INC., :

    Defendant.        :


## MAGISTRATE JUDGE'S ORDER, REPORT AND RECOMMENDATION


The above-styled employment discrimination action is presently before the undersigned Magistrate Judge for consideration of defendant's motion for summary judgment. For the reasons set forth below, the undersigned Magistrate Judge hereby RECOMMENDS that defendant's motion for summary judgment be GRANTED.


Defendant filed its motion for summary judgment on March 25, 1994. (Docket No. 11). In a letter dated March 30, 1994, the Clerk of Court notified plaintiff of the filing of defendant's summary judgment motion, of his duty to respond, and of the possible consequences of a failure to respond. On April 14, 1994, plaintiff filed a motion for an extension of time within which to respond to defendant's motion, seeking an extension through and including April 25, 1994. (Docket No. 12). Without the benefit of a ruling on this motion,

plaintiff filed an untimely response to defendant's motion for summary judgment on April 26, 1994. (Docket No. 13). Defendant has subsequently filed a reply brief. (Docket No. 14).

As plaintiff's response was not filed until April 26, 1994, this response would be untimely even if the court were to grant plaintiff's motion for an extension of time. Accordingly, plaintiff's motion for an extension of time is hereby DENIED as moot.

Local Rule 220-1(b)(1) provides in relevant part that "[f]ailure to file a response [to a motion] shall indicate that there is no opposition to the motion." Accordingly, as no timely response was filed to defendant's motion for summary judgment, the undersigned Magistrate Judge deems this motion to be unopposed.

The applicability of Local Rule 220-1(b)(1) in the specific context of a motion for summary judgment was considered by the Eleventh Circuit Court of Appeals in Dunlap v. Transamerica Occidental Life Insurance, 858 F.2d 629 (11th Cir. 1988). In upholding the District Court's grant of summary judgment in favor of defendant, the court noted:

O 72A
(ev. 8/82)

In _Simon v. Kroger Company_, 743 F.2d 1544 (11th Cir. 1984) this court upheld the entry of summary judgment under similar circumstances. The result in _Simon_ was based upon both a finding that the summary judgment motion was well supported and a finding that a local rule in the Northern District of Georgia--which apparently was the predecessor to one of these local rules--was properly applied.

Had the district court based its entry of summary judgment solely on Local Rule 220-1(b), a different question would be presented. Local Rule 220-1(b)(1) might well be inconsistent with Fed.R.Civ.P. 56 if it were construed to mean that summary judgment could be granted as a sanction for failure to respond to a motion for summary judgment. _Cf. Arundar v. DeKalb Cty. School Dist._, 620 F.2d 493 (5th Cir. 1980). In this case, however, Transamerica's motion was supported by evidentiary materials of record, and the district court's orders indicate that the merits of the motion were addressed.

_Dunlap_, 858 F.2d at 632. _See also_, _Kinder v. Carson_, 127 F.R.D. 543, 545 (S.D. Fla. 1989).

The proper approach, therefore, given the applicability of Local Rule 220-1(b)(1) to the present case is succinctly stated by the court in _Kelly v. United States_, 924 F.2d 355, 358 (1st Cir. 1991):

3

In the precincts patrolled by Rule 56, the decision to sit idly by and allow the summary judgment proponent to configure the record is likely to prove fraught with consequence. This case is no exception. Given appellant's failure to contest either the government's affidavits or the Statement, the jurisprudence of both Rule 56 and Local Rule 18 demands that the movant's version of the facts be taken as true.

Of course, the district court was still obliged to consider the motion on its merits, in light of the record as constituted, in order to determine whether judgment would be legally appropriate. See Mendez v. Banco Popular, 900 F.2d 4, 7 (1st Cir. 1990); Jaroma v. Massey, 873 F.2d 17, 19-20 (1st Cir. 1989) (per curiam); see generally Amsden, 904 F.2d at 753 (court of appeals may reverse a grant of summary judgment, regardless of uncontroverted nature of facts, if "the district court erred in expounding the law").

See also, Anchorage Associates v. Virgin Islands Board of Tax Review, 922 F.2d 168 (3rd. Cir. 1990); Mendez v. Banco Popular de Puerto Rico, 900 F.2d 4, 7-8 (1st. Cir. 1990).

Additionally, the procedural deficiency of plaintiff's response likewise compels this court to accept defendant's statement of material facts not in dispute as true for purposes of ruling on the merits of defendant's motion for

4

summary judgment. Local Rule 220-5(b)(2) of the Local Rules of Practice—for the United States District Court for the Northern District of Georgia provides:

> The respondent to a motion for summary judgment shall attach to his response a separate and concise statement of material facts, numbered separately, to which he contends there exists a genuine issue to be tried. Response should be made to each of the movant's numbered material facts. All material facts contained in the moving party's statement which are not specifically controverted by the respondent in his statement shall be deemed to have been admitted. The response that a party has insufficient knowledge to admit or deny is not an acceptable response unless the party has complied with the provisions of F.R.Civ.P. 56(f).

Plaintiff's response to defendant's motion for summary judgment is not in compliance with Local Rule 220-5(b)(2). Accordingly, and based upon the untimely nature of this response, the undersigned Magistrate Judge adopts defendant's statement of material facts not in dispute for purposes of resolving the merits of defendant's motion for summary judgment. These facts are briefly summarized below.

Following plaintiff's honorable discharge from military service, he embarked on a career in professional wrestling.

5

Plaintiff adopted the ring name of "Ranger Ross," and adopted the persona of a decorated war hero.

After some time wrestling in smaller alliances and federations, plaintiff contacted David Crockett, the owner of the National Wrestling Alliance (NWA), regarding the possibility of wrestling within the NWA. At Crockett's urging, plaintiff attended a wrestling school in North Carolina operated by Nelson Royal. Based upon his observations, Royal notified Crockett that plaintiff was qualified to wrestle for the NWA.[1]

In 1988, the NWA was purchased by World Championship Wrestling, Inc. (WCW). In January 1989, plaintiff began to wrestles for WCW. Plaintiff retained the ring name of "Ranger Ross," and continued to use his assumed persona or gimmick. As was true in plaintiff's earlier professional wrestling experiences, plaintiff was required to provide his own equipment and costume at plaintiff's cost.

In this his first tour of duty with WCW, plaintiff received $1,000.00 per week plus an occasional percentage of

---

[1] Plaintiff had previously attended a wrestling school in Atlanta, Georgia, conducted by a popular former professional wrestler, Thunderbolt Paterson.

6

the gate at his matches. Plaintiff wrestled approximately 15 to 20 days per month.

In May 1990, plaintiff was released due to budgetary restraints on the part of WCW. After his first WCW stint ended, plaintiff wrestled briefly in Japan. In January 1991, plaintiff was contacted by WCW President Jim Herd. After discussing the matter with Herd, plaintiff agreed to sign a form entitled "WCW Freelance Wrestler/Independent Contractor Agreement." Plaintiff read and fully understood this document before signing. This document provided that plaintiff would be engaged as an independent contractor rather than an employee, and would not enjoy any of the benefits afforded to WCW employees. Furthermore, the document provided that plaintiff, rather than WCW, would be responsible for the payment of taxes on plaintiff's income pursuant to the agreement. Plaintiff was to be paid $1,500.00 per week according to this agreement.

During the course of his relationship with WCW, plaintiff's primary contact was WCW Consultant Virgil Runnels (a/k/a Dusty Rhodes). In his position as WCW Consultant, Runnels was responsible for booking and scheduling wrestling events, for evaluating and recruiting wrestling talent, for pre-determining the final outcome of each wrestling match, and

7

determining which wrestler or wrestlers to "push" into the position-of-heavyweight champion.

Plaintiff's performance of his work as a professional wrestler can be briefly summarized in the following manner. Plaintiff would receive a booking sheet from Runnels announcing the wrestling match's location and date approximately two weeks to 30 days in advance of the scheduled match. Plaintiff was responsible for travel to the wrestling match site, and was responsible for bearing the cost of such travel. On the date of a match, wrestlers would arrive at the venue, change into their wrestling costumes, and await further instructions. The participants were then informed which wrestler would win each match, and what the finishing move or technique for accomplishing the "victory" would be. The wrestlers were free to choreograph the remainder of the wrestling match on their own. Plaintiff and the other professional wrestlers received little if any other supervision in the performance of their duties.

During the spring and summer of 1991, professional wrestling suffered a decline in popularity. Based upon declining profits, WCW decided not to renew several wrestler's independent contractor agreements. Runnels suggested which wrestlers should be allowed to leave based primarily upon

8

their popularity and drawing power. Rhodes then suggested which wrestlers to include to WCW President Herd. Rhodes specifically found that plaintiff lacked the charisma and ability to generate significant fan interest or profit for WCW. Accordingly, Runnels included plaintiff's name on the list of recommended non-renewals. Runnels suggestions were accepted by Herd, and plaintiff's contract or agreement expired in July 1991.

In all, 14 wrestlers' independent contractor agreements were not renewed during the summer of 1991. Plaintiff was the only African American included within this list. At the time of his discharge, plaintiff received compensation at a higher rate than 10 of the other wrestlers whose contracts were allowed to expire.

During the period of plaintiff's association with WCW, defendant employed approximately 334 male wrestlers. The vast majority (approximately 300) of these male wrestlers were white. Plaintiff's rate of compensation was higher than approximately 278 of these other professional wrestlers.

Plaintiff was not "pushed" into the position of heavyweight champion by Runnels and other WCW agents based upon their determination that he lacked the charisma and

) 72A
ev. 8/82)

ability to generate widespread interest in his matches. It was plaintiff's deficiency in these areas which primarily separated him from three individuals who were allowed to claim the title of heavyweight champion during approximately the same time period. Of these three individuals, two (Rick Flair and Lex Lugar) were white, while the remaining individual (Ron Simmons) was black.

Runnels actually enlisted plaintiff's aid in pushing Simmons into the position of heavyweight champion. Plaintiff was portrayed as conditioning Simmons through military training thereby preparing him for an "assault" on the heavyweight championship.

After exhausting his administrative remedies, plaintiff filed his complaint in the above-styled employment discrimination action on June 1, 1993. (Docket No. 1). Plaintiff's complaint was premised solely upon Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, et seq. (Docket No. 1, ¶ 1) (See also, Plaintiff's Answer to Mandatory Interrogatories, Docket No. 2, ¶ 2, which identifies Title VII, albeit incorrectly, as 28 U.S.C. § 2000, et seq.). Within the framework of Title VII, plaintiff leveled the following charges against defendant:

10

a)   Created a "glass ceiling" for non-white
     employees and independent contractors on
     hiring   and   promotional   policies   to
     positions of World Championship Wrestler;

b)   Created   a   practice   and/or   unwritten
     policy of putting non-white employees and
     independent contractors into the role of
     subsidiary employment or other position,
     and   without   concomitant   salary,
     commission, bonus and title advances;

c)   Promoted white employees and independent
     contractors on a regular basis to higher
     titles, salaries, commissions and bonuses
     over non-white employees and independent
     contractors of longer employment with
     Defendant,   higher   performance
     achievements, better personal skills and
     management abilities;

d)   Denied non-white employees interview (and
     thus   promotion)   opportunities   on   a
     regular basis; and

e)   Replaced non-white employees with equal
     to or less qualified whites when a white
     employee   for   the   position   could   be
     located and installed.

(Docket No. 1, ¶ 6).

72A
'. 8/82)

Under the Federal Rules of Civil Procedure, summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Celotex Corp. v. Catrett, 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986); Everett v. Napper, 833 F.2d 1507, 1510 (11th Cir. 1987). On summary judgment, the parties must satisfy the following burdens of proof:

> The party moving for summary judgment bears the initial burden of "identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." Celotex Corp. v. Catrett, 477 U.S. 317, 323, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986) (quoting Fed. R. Civ. P. 56(c)). An issue of fact is "material" if it is a legal element of the claim, as identified by the substantive law governing the case, such that its presence or absence might affect the outcome of the suit. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). It is "genuine" if the record taken as a whole could lead a rational trier of fact to find for the nonmoving party. Matsushita Elec. Indus. Co. v. Zenith Radio

12

Corp., 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986).

Once the moving party meets this initial burden, summary judgment is then appropriate as a matter of law against the nonmoving party "who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Celotex, 477 U.S. at 322, 106 S.Ct. at 2552. In making a sufficient showing, the nonmoving party must "go beyond the pleadings and by ... affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" Id. at 324, 106 S.Ct. at 2553 (quoting Fed. R. Civ. P. 56(e). In opposing summary judgment, the nonmoving party may avail itself of all facts and justifiable inferences in the record taken as a whole. See United States v. Diebold, Inc., 369 U.S. 654, 655, 82 S.Ct. 993, 994, 8 L.Ed.2d 176 (1962). In reviewing whether the nonmoving party has met its burden, the court must stop short of weighing the evidence and making credibility determinations of the truth of the matter. Anderson, 477 U.S. at 255, 106 S.Ct. at 2513. Instead, "[t]he evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." Id. (citing Adickes v. S.H. Kress & Co., 398 U.S. 144, 158-59, 90 S.Ct. 1598, 1608-09, 26 L.Ed.2d 142 (1970). If, so viewed, a rational trier of fact could find a verdict for the

nonmoving party under the substantive evidential standard, the nonmoving party can defeat summary judgment. Id. 477 U.S. at 252, 106 S.Ct. at 2512.

Tipton v. Bergrohr GMBH-Siegen, 965 F.2d 994, 998-9 (11th Cir. 1992).

In order to fall within the statutory jurisdiction of Title VII, alleged discriminatory conduct must take place within the employer/employee relationship. Specifically, an aggrieved individual may only proceed under Title VII where that individual is an employee rather than an independent contractor. See, e.g., Wilde v. County of Kandiyohi, 15 F.3d 103, 104 (8th Cir. 1994); Cobb v. Sun Papers, Inc., 673 F.2d 337 (11th Cir. 1982), cert. denied, 459 U.S. 874, 103 S.Ct. 163, 74 L.Ed.2d 135 (1982).

In order to determine whether a particular individual is an employee or an independent contractor, courts are to employ common law principles of agency. See, Cobb, 673 F.2d at 341. See also, Nationwide Mutual Insurance Co. v. Darden, 503 U.S. ___, 112 S.Ct. 1344, 117 L.Ed.2d 581, 588-90 (1992). Among the factors to be considered in making this determination are the following: the hiring party's right to control, the level of skill required, the source of equipment and tools, the location of the work, the duration of the relationship between

14

the parties, the right to assign additional work, the method of payment, whether the work in question is an essential part of the hiring party's business in general, the provision of employee benefits, the tax status of the parties, and the intent of the parties. Darden, 117 L.Ed.2d at 589-90 (citing, Community for Creative Non-Violence v. Reid, 490 U.S. 730, 751-52, 109 S.Ct. 2166, 104 L.Ed.2d 811 (1989)). The application of these factors to the undisputed facts in the present case creates a somewhat "mixed" result. See, Cobb, supra. After carefully weighing these factors, as discussed below, however, the undersigned Magistrate Judge finds that plaintiff was an independent contractor, and that his complaints of alleged discrimination therefore fall outside of the statutory jurisdiction of Title VII.

As to the level of defendant's control over the means and manner of plaintiff's performance, the undisputed facts establish that this control was minimal. Plaintiff was allowed to create his own wrestling persona or gimmick. Furthermore, while the nature of the ending of each match was determined by defendant, plaintiff and his opponent were largely free to choreograph the bulk of the action. The balance struck between control and independence of action in this case is thus completely compatible with a finding that plaintiff was an independent contractor rather than an

15

employee. See, e.g., North American Van Lines, Inc. v. NLRB, 869 F.2d 596, 599 (D.C. Cir. 1989).

As to the issue of the skill level required in plaintiff's performance of his duties, plaintiff has testified regarding the fact that he attended two separate professional wrestling schools in order to receive training. Furthermore, plaintiff admitted that an individual lacking in such training would not be qualified to perform as a professional wrestler. Furthermore, plaintiff stated that defendant required him to be evaluated at the second of these wrestling schools in order to determine whether or not he was qualified for the position. Accordingly, this factor also weighs in favor of a finding that plaintiff was an independent contractor.

Plaintiff admits that with the exception of a rope on one occasion and perhaps one pair of boots, he was solely responsible for the provision of his equipment and costumes at his own expense. Therefore, this factor weighs in favor of a finding that plaintiff was an independent contractor.

As to the location of plaintiff's work, it is undisputed that defendant informed plaintiff of the location of his various matches. As defendant controlled the location of

16

plaintiff's work, this factor would tend to weigh against a finding that plaintiff was an independent contractor.

In this case, it is undisputed that plaintiff and defendant's relationship was specifically contracted for a period of six months. This specified period of time for a short duration is consistent with a finding that plaintiff was an independent contractor.

It would not appear that plaintiff had the right or ability to assign his performance to other individuals or assistants. Accordingly, this factor weighs against a finding that plaintiff was an independent contractor rather than an employee. Likewise, the fact that plaintiff was paid a salary, rather than a commission, for the vast majority of his work also tends to weigh against a finding that plaintiff was an independent contractor.

As defendant's sole business is the promotion and performance of professional wrestling matches for profit, the work performed by plaintiff and his fellow grapplers is, of course, essential to defendant's business. The undersigned notes defendant's argument, however, that professional wrestlers often move between federations and alliances and are, in one certain sense, a "fungible good." The undersigned

17

finds ultimately with regard to this factor that it does not weigh heavily toward the conclusion that plaintiff was an independent contractor nor does it suggest that plaintiff was an employee.

The undisputed evidence establishes that plaintiff did not receive any fringe benefits with regard to his relationship with defendant. Furthermore, the agreement entered into between plaintiff and defendant expressly states that plaintiff is not eligible for any benefits provided to defendant's employees. Similarly, plaintiff was responsible for the payment of taxes on money received pursuant to the agreement. Accordingly, the undersigned finds that this factor weighs heavily in favor of a finding that plaintiff was in fact an independent contractor.

Finally, the undersigned considers the question of the party's intent. In the present case, the undisputed evidence inevitably points to the conclusion that both defendant and plaintiff intended to form an independent contractor relationship, and that each party considered the resulting relationship to be, in fact, an independent contractor relationship. Accordingly, the undersigned finds that this factor also weighs heavily in favor of a finding that plaintiff was an independent contractor.

As noted above, the application of this common law test to the facts in the present case generates mixed results. Without giving dispositive weight to any particular factor, the undersigned notes that generally the intent of the parties and the level of control over the performance of the individual's work are considered persuasive factors. Based upon the facts of this case, both of these factors point to a finding that plaintiff was an independent contractor. Additionally, the undersigned finds that the balancing of the remaining elements of this test also indicate that plaintiff was an independent contractor.

Accordingly, the undersigned Magistrate Judge finds that plaintiff's relationship with defendant was that of an independent contractor, and that his claims of discriminatory treatment therefore fall outside of the jurisdictional scope of Title VII. Therefore, defendant is entitled to summary judgment in its favor based solely upon this ground.

The undersigned notes, however, that alternative grounds clearly exist in support of this outcome. Specifically, the undersigned finds that plaintiff has failed to meet his burden of producing some evidence which raises a material question of fact as to discriminatory intent on the part of defendant.

19

The basic standards for evaluating a motion for summary judgment have been set forth above. Other standards specific to claims of discrimination under Title VII are essential to an evaluation of defendant's motion on its merits.

It should be noted that conclusory allegations based on mere subjective beliefs do not create a genuine issue of material fact. Carter v. Miami, 870 F.2d 578, 585 (11th Cir. 1989); Ramsey v. Leath, 706 F.2d 1166, 1170 (11th Cir. 1983). See also, Earley v. Champion International Corp., 907 F.2d 1077, 1081 (11th Cir. 1990) (collecting cases). Specifically, in regards to plaintiff's claim under Title VII of the Civil Rights Act of 1964, it is well established that a Title VII plaintiff opposing a motion for summary judgment must present significantly probative evidence on the issue of discrimination to avoid summary judgment. Young v. General Foods Corp., 840 F.2d 825 (11th Cir. 1988), cert. denied, 488 U.S. 1004, 109 S.Ct. 782, 102 L.Ed.2d 774 (1989); Grigsby v. Reynolds Metals Co., 821 F.2d 590 (11th Cir. 1987). Reliance solely upon speculation and unsubstantiated hearsay constitutes a failure to meet this burden. See, e.g., Palucki v. Sears, Roebuck and Co., 879 F.2d 1568 (7th Cir. 1989) ("a party to a lawsuit cannot ward off summary judgment with an affidavit or deposition based on rumor or conjecture"); Benson v. Vermont American Corp., 723 F.Supp. 1439 (M.D. Ala. 1988)

("inadmissible evidence offered in the form of a deposition, cannot be considered by the court"), aff'd without opinion, 874 F.2d 820 (11th Cir. 1989); Williams v. Housing Authority, 709 F.Supp. 1554 (M.D. Fla. 1988) ("the court cannot base direct-evidence analysis on hearsay testimony by plaintiff"), aff'd without opinion, 872 F.2d 434 (11th Cir. 1989).

A Title VII plaintiff may demonstrate discriminatory intent through either direct or indirect evidence. Direct evidence consists of the actions or remarks of an employer reflecting a discriminatory attitude. Wall v. Trust Company of Georgia, 946 F.2d 805, 809-10 (11th Cir. 1991); Hill v. Metropolitan Atlanta Rapid Transit Authority, 841 F.2d 1533, 1539 (11th Cir. 1988), modified, 848 F.2d 1522 (11th Cir. 1988). See also, Bell v. Birmingham Linen Service, 715 F.2d 1552, 1556 (11th Cir. 1983), cert. denied, 467 U.S. 1204, 104 S.Ct. 2385, 81 L.Ed.2d 344 (1984). Indirect evidence may be demonstrated through the framework established by the United States Supreme Court in McDonnell Douglas Corp. v. Green, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973) and Texas Department of Community Affairs v. Burdine, 450 U.S. 248, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981). For example, an individual may produce indirect evidence of a discriminatory failure to hire by establishing that he is a member of a protected group and that he "applied for an available position for which [he]

21

was qualified, but was rejected under circumstances which give rise to an inference of unlawful discrimination." Burdine, 450 U.S. at 253. This framework, however, is flexible, and can be shaped to fit employment practices other than failure to hire.

If a plaintiff presents direct evidence of discrimination, the burden of proof shifts to defendant to establish that it would have reached the identical employment decision absent unlawful considerations. See, Wall, 946 F.2d at 810 (citing, Price Waterhouse v. Hopkins, 490 U.S. 228, 109 S.Ct. 1775, 104 L.Ed.2d 268 (1989)).

Conversely, where the plaintiff has established a prima facie case of discrimination through indirect evidence a burden of production shifts to the employer "to articulate some legitimate, non-discriminatory reason for the employee's rejection." McDonnell Douglas Corp., 411 U.S. at 802. If the defendant carries this burden, the plaintiff must then prove by a preponderance of the evidence that the legitimate reasons offered by the defendant were merely pretexts for discrimination. Id. at 804; Wall, 946 F.2d at 809; Perryman v. Johnson Products Co., 698 F.2d 1138, 1142 (11th Cir. 1983). If the trier of fact rejects defendant's proffered reason as incredible, this rejection, coupled with the elements of

22

plaintiff's *prima facie* case, may alone support a finding of pretext. St. Mary's Honor Center v. Hicks, ___ U.S. ___, 113 S.Ct. 2742, 125 L.Ed.2d 407, 61 U.S.L.W. 4782, 4784 (1993).

The undersigned first notes that plaintiff has failed to submit any admissible evidence into the record tending to support his claim of discrimination or tending to discredit the affidavit testimony offered by defendant in support of its motion for summary judgment. Instead, plaintiff's deposition testimony is littered with admissions that he has little if any actual knowledge regarding the alleged disparities which existed between him and other supposedly similarly situated white professional wrestlers. (Deposition of Robert Lee Ross, Jr., hereinafter Ross Dep., pp. 118, 120, 124, 125-26). Plaintiff admits that no direct evidence of discrimination exists. (Ross Dep., p. 150). Additionally, the undisputed affidavit testimony offered by defendant is clearly contrary to plaintiff's vague allegations of disparate treatment. Specifically, this testimony indicates that defendant employed approximately 334 male wrestlers during the time that plaintiff wrestled with the WCW. Of this number, approximately 300 were white. Significantly, 278 individuals (the vast majority of them white) earned less compensation

23

than plaintiff. (Affidavit of Eric Holman, hereinafter Holman Aff., ¶¶ 5 and 6).

As noted above, this testimony is not refuted by plaintiff. Instead, plaintiff's untimely response to defendant's motion for summary judgment is entirely devoted to the argument that plaintiff is entitled to proceed to trial on his claims pursuant to 42 U.S.C. § 1981 as well as his pendant state claims. Significantly, none of these claims were raised by plaintiff in his complaint nor referred to in his answer to mandatory interrogatories. Instead, these phantom allegations appear for the first time in plaintiff's untimely response. In sum, the only evidence arguably offered by plaintiff in contradiction to defendant's affidavit testimony are his conclusory allegations during the course of his deposition that defendant engaged in discrimination against black professional wrestlers. The record is devoid, however, of any admissible evidence tending to establish that similarly situated white wrestlers were given favorable treatment.

Assuming arguendo, however, that plaintiff had established sufficient probative evidence of discrimination to raise a material question of fact as to each element of his prima facie case, defendant has clearly discharged its duty to articulate a legitimate, non-discriminatory reason for its

24

actions. In short, the undisputed testimony establishes that Runnels and Herd jointly made the decision not to renew plaintiff's independent contractor agreement based upon his lack of wrestling skill, professional growth, popularity, and gate appeal. (Affidavit of James Herd, hereinafter Herd Aff., ¶ 6; Affidavit of Virgil Runnels, hereinafter Runnels Aff., ¶¶ 6-7).

The undersigned is aware of the recent precedent of this circuit that summary judgment is generally inappropriate in Title VII cases where a plaintiff has established sufficient evidence of each element of his prima facie case. Hairston v. Gainesville Sun Publishing Co., 9 F.3d 913, 919 (11th Cir. 1993). The entry of summary judgment in favor of defendant is still appropriate, however, "when evidence of discriminatory intent is totally lacking." Hairston, 9 F.3d at 921. In the present case, plaintiff has failed to present one shred of admissible evidence which would tend to establish that defendant's proffered legitimate, non-discriminatory reason was pretextual, or to otherwise establish discriminatory intent on the part of defendant. In view of this fact, defendant is entitled to summary judgment in its favor even in light of the demanding standards set forth in Hairston, supra.

AO 72A
(Rev. 8/82)

Based upon the above facts, the undersigned Magistrate Judge hereby RECOMMENDS that defendant's motion for summary judgment be GRANTED.

IT IS SO ORDERED, REPORTED AND RECOMMENDED, this 17th day of May, 1994.

WILLIAM L. HARPER

UNITED STATES MAGISTRATE JUDGE

ENTE

MAY 19 1954

L.D.T., CLERK

BY DEPUTY CLERK

AO 72A
(Rev. 8/82)

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

BOUNTHAN SAENGSIPHAN,                    )
                                         )
                    Plaintiff,           )
                                         )        CIVIL ACTION FILE
v.                                       )
                                         )        NO. 1:00-CV-1719-CC
WORLD CHAMPIONSHIP WRESTLING, INC.,)
TURNER SPORTS, INC. and TURNER           )
BROADCASTING SYSTEM, INC.,               )
                                         )
                    Defendants.          )

## CERTIFICATE OF SERVICE

This is to certify that I have this day served a copy of

this ***MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS' MOTION FOR***

***SUMMARY JUDGMENT*** upon the interested parties by hand delivery

to:

> Cary Ichter
> Kelly Jean Beard
> Charles Gernazian
> Michelle M. Rothenberg-Williams
> MEADOWS, ICHTER AND BOWERS, P.C.
> Fourteen Piedmont Center, Suite 1100
> 3535 Piedmont Road
> Atlanta, GA  30305

This 30th day of January, 2003.

Evan H. Pontz
TROUTMAN SANDERS LLP
Suite 5200, Bank of America Plaza
600 Peachtree Street, N.E.
Atlanta, GA  30308-2216
(404) 885-3000

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA JAN 30 2003
ATLANTA DIVISION

LUTHER D. THOMAS, CLERK
BY:
Deputy Clerk

BOUNTHAN SAENGSIPHAN,                    )
                                         )
                    Plaintiff,           )
                                         )     CIVIL ACTION FILE
v.                                       )
                                         )     NO. 1:00-CV-1719-CC
WORLD CHAMPIONSHIP WRESTLING, INC.,)
TURNER SPORTS, INC. and TURNER           )
BROADCASTING SYSTEM, INC.,               )
                                         )
                    Defendants.          )

## DEFENDANTS' STATEMENT OF UNDISPUTED MATERIAL FACTS
## IN SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT

Defendants Universal Wrestling Corporation (f/k/a World
Championship Wrestling, Inc.) ("WCW"), Turner Sports, Inc.
("TSI") and Turner Broadcasting System, Inc. ("TBS") submit this
Statement of Undisputed Material facts in support of their
Motion for Summary Judgment as to all claims brought by
Plaintiff Bounthan Saengsiphan("Saengsiphan").

### STATEMENT OF UNDISPUTED MATERIAL FACTS

1.

WCW created, produced, and marketed professional
wrestling events during the 1990s and through March 2001.
(Affidavit of Diana Myers ("Myers Aff.") ¶ 3).

2.

WCW's wrestling events were seen by live audiences and/or aired on various television networks and pay-per-view cable and satellite systems. (Myers Aff. at ¶ 3).

3.

The wrestlers and other on-screen talent who appeared in WCW's wrestling events provided their services to WCW as independent contractors, either through formal written contracts or without written agreements. (Myers Aff. at ¶ 4).

4.

A creative team of writers and producers at WCW created WCW's wrestling events, both live and taped, with the goal of entertaining wrestling fans and general audiences nationwide. (Myers Aff. at ¶ 3).

5.

After having much commercial and financial success in the mid-to-late 1990s, WCW's business suffered a sharp downturn in late 1998 into 1999. (Myers Aff. at ¶ 6).

6.

As a result of this business downturn, WCW began to significantly restructure many of its operations, including its training facility, known as the "Power Plant." (Id.; Affidavit of Joseph Hamilton ("Hamilton Aff."), ¶ 6).

7.

Despite WCW's restructuring efforts, WCW's business downturn continued, and in March 2001, WCW sold certain of its assets and completely ceased its operations. (Myers Aff. at ¶ 8).

8.

After the sale of its assets was completed, WCW changed its name to Universal Wrestling Corporation. (Myers Aff. at ¶ 8).

9.

Saengsiphan first became involved with professional wrestling and WCW in 1997, after he saw a television commercial about the Power Plant. (Deposition of Bounthan Saengsiphan ("Saengsiphan Dep."), at 21-22).

10.

Despite having no experience of any kind in wrestling, Saengsiphan decided that he wanted to wrestle for WCW and contacted the Power Plant to inquire about a tryout. (Saengsiphan Dep. at 22).

11.

Saengsiphan was invited to a three day tryout, for which he paid a $250 fee. (Saengsiphan Dep. at 21).

12.

Based upon Saengsiphan's tryout, WCW trainers believed that Saengsiphan had some potential, and WCW invited Saengsiphan to train in WCW's full time professional wrestling training program. (Saengsiphan Dep. at 23-26).

13.

The purpose behind this training program was to help Saengsiphan develop not only the physical and wrestling skills necessary to wrestle professionally with WCW, but also the charisma, acting ability, and uniqueness necessary both to appeal to the masses and to compete in wrestling matches with minimal instruction. (Hamilton Aff. at ¶ 5).

14.

Saengsiphan began to train at the Power Plant in January 1998. (Saengsiphan Dep. at 26).

15.

During his tryout and training at the Power Plant, however, WCW was concerned about Saengsiphan's size. (Hamilton Aff. at ¶ 5).

16.

Saengsiphan is very small by WCW standards at 5 foot 8 inches, and only one hundred and eighty pounds. (Hamilton Aff. at ¶ 5; Deposition of Paul Orndorff ("Orndorff Dep."), at 55;

Deposition of Dewayne E. Bruce ("Bruce Dep."), at 62;
Saengsiphan Dep. at 38-39).

17.

Saengsiphan admits that he was only "slightly" above the
WCW weight minimum. (Saengsiphan Dep. at 39).

18.

Because Saengsiphan was so small, for him to be successful
as a WCW wrestler, it was necessary for him to be acrobatic and
to have additional skills not required of larger wrestlers.
(Hamilton Aff. at ¶ 5; Orndorff Dep. at 55).

19.

In June 1998, Saengsiphan suffered an injury to his back.
(Saengsiphan Dep. at 82-83, Exh. 6).

20.

As a result of this back injury, Saengsiphan received
treatment for over a month at two different rehabilitation
facilities. (Saengsiphan Dep. at 82-83, Exh. 6).

21.

As Saengsiphan rehabilitated, he returned to training and
wrestling slowly and progressively. (Saengsiphan Dep. at 82-83,
Exh. 6).

22.

Consequently, Saengsiphan was severely limited in his ability to wrestle in June and July of 1998. (Saengsiphan Dep. at 82-83, Exh. 6).

23.

Saengsiphan admits that under those circumstances it took some time to return to a normal training regimen. (Saengsiphan Dep. at 83).

24.

In May 1999, Saengsiphan tore his anterior cruciate ligament in his right knee while training at the Power Plant. (Saengsiphan Dep. at 84-89).

25.

Saengsiphan had previously suffered the same injury prior to training at WCW, and underwent surgery to repair his knee at that time. (Saengsiphan Dep. at 84-89).

26.

After the injury in May 1999, Saengsiphan's doctors instructed him not to lift more than twenty pounds and not to wrestle. (Saengsiphan Dep. at Exh. 7).

27.

On June 3, 1999, Saengsiphan again underwent surgery on his injured knee. (Saengsiphan Dep. at Exh. 7).

28.

Following Saengsiphan's surgery, he continued to receive
rehabilitation treatment from June until August 1999, during
which time he was instructed not to wrestle. (Saengsiphan Dep.
at 84-89, Exh. 7).

29.

After August 1999, Saengsiphan was allowed to resume
training with restrictions, including that he not lift more than
seventy pounds, and that he avoid twisting his knee.
(Saengsiphan Dep. at 84-89, Exh. 7).

30.

Saengsiphan admits that these restrictions precluded him
from performing wrestling moves. (Saengsiphan Dep. at 87-88).

31.

Even with these restrictions, Saengsiphan continued to have
problems with his knee and required additional surgery in
February 2000. (Saengsiphan Dep. at 88, Exh. 7).

32.

As part of the restructuring at WCW at the end of 1998 and
into 1999, WCW transferred its Power Plant facility from its
previous location to a new location on Log Cabin Drive, in
Smyrna, Georgia. (Hamilton Aff. at ¶ 6).

33.

WCW established this new facility to serve as WCW's training facility for a smaller group of wrestler trainees than the group who had previously been training at the former Power Plant location. (Hamilton Aff. at ¶ 6).

34.

WCW planned to and did enter into written independent contractor agreements with the wrestlers selected to train at this new facility. (Hamilton Aff. at ¶ 6).

35.

To select the individuals who would be signed to independent contractor agreements, WCW training officials spent roughly six to eight weeks evaluating the skills and talents of the approximately forty individuals who were then training at the Power Plant. (Hamilton Aff. at ¶ 7).

36.

At the end of this period, WCW conducted "tryout" sessions and matches among all of the trainees. (Hamilton Aff. at ¶ 7).

37.

Saengsiphan participated in the tryout matches. (Saengsiphan Dep. at 64).

38.

However, during this period, as WCW made its decisions
regarding which Power Plant trainees would be offered written
agreements, Saengsiphan was still suffering from his knee injury
and was limited in his ability to wrestle and train at the Power
Plant. (Hamilton Aff. at ¶ 8; Hamilton Dep. at 58-59).

39.

Although WCW believed that Saengsiphan may have had
potential, WCW ultimately concluded that Saengsiphan was too
inexperienced and unskilled, particularly given his small size,
to deserve a contract over other trainees at the Power Plant.
(Hamilton Aff. at ¶¶ 8-9; Orndorff Dep. at 55-56; Bruce Dep. at
62).

40.

Moreover, Saengsiphan was injured and was unable to fully
wrestle or train at the Power Plant when WCW made contract
decisions regarding trainees. (Hamilton Aff. at ¶ 8; Hamilton
Dep. at 58-59; Orndorff at 55-56).

41.

In fact, Saengsiphan failed a physical given to him by WCW
at about the time WCW made the trainee contract decisions.
(Hamilton Dep. at 58-59).

42.

Accordingly, WCW decided not to offer Saengsiphan a contract to train at the new facility. (Hamilton Aff. at ¶ 9; Hamilton Dep. at 58-59; Orndorff Dep. at 55-56).

This 30th day of January, 2003.

TROUTMAN SANDERS LLP

*Evan H. Pontz*
_____
JOHN J. DALTON
Georgia Bar No. 203700
JAMES A. LAMBERTH
Georgia Bar No. 431851
ERIC A. RICHARDSON
Georgia Bar No. 233873
EVAN H. PONTZ
Georgia Bar No. 583577

Suite 5200, Bank of America Plaza
600 Peachtree Street, N.E.
Atlanta, GA 30308-2216
(404) 885-3000

Attorneys for Defendants

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

BOUNTHAN SAENGSIPHAN, )
                                        )
                    Plaintiff,          )
                                        )   CIVIL ACTION FILE
v.                                      )
                                        )   NO. 1:00-CV-1719-CC
WORLD CHAMPIONSHIP WRESTLING, INC.,)
TURNER SPORTS, INC. and TURNER          )
BROADCASTING SYSTEM, INC.,              )
                                        )
                    Defendants.         )

## CERTIFICATE OF SERVICE

I hereby certify that I have this day served a copy of

*DEFENDANTS' STATEMENT OF UNDISPUTED MATERIAL FACTS IN SUPPORT OF*

*THEIR MOTION FOR SUMMARY JUDGMENT* upon the interested parties by

hand delivery to:

Cary Ichter
Kelly Jean Beard
Charles Gernazian
Michelle M. Rothenberg-Williams
MEADOWS, ICHTER AND BOWERS, P.C.
Fourteen Piedmont Center, Suite 1100
3535 Piedmont Road
Atlanta, GA  30305

This 30th day of January, 2003.

EVAN H. PONTZ
Georgia Bar No. 583577

TROUTMAN SANDERS LLP
Bank of America Plaza
600 Peachtree Street, N.E.
Suite 5200
Atlanta, GA  30308-2216
(404) 885-3000 (voice)
(404) 885-3995 (facsimile)