ORIGINAL

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

BOUNTHAN SAENGSIPHAN,              )
                                   )
              Plaintiff,           )
                                   )    CIVIL ACTION FILE
v.                                 )
                                   )    NO. 1:00-CV-1719-CC
WORLD CHAMPIONSHIP WRESTLING, INC.,)
TURNER SPORTS, INC. and TURNER     )
BROADCASTING SYSTEM, INC.,         )
                                   )
              Defendants.          )

**APPENDIX OF DEPOSITION EXCERPTS**

INDEX

1.    Deposition of Dewayne E. Bruce

2.    Deposition of Joseph N. Hamiliton

3.    Deposition of Paul Orndorff

4.    Deposition of Bountnan Saengsiphanh



# EXHIBIT / ATTACHMENT

## I

**(To be scanned in place of tab)**

Page 1

1             IN THE UNITED STATES DISTRICT COURT
         FOR THE NORTHERN DISTRICT OF GEORGIA
2                      ATLANTA DIVISION
3   Davis v. World Championship Wrestling, Inc. and Turner
         Sports, Inc., Civ. File No. 1-00-CV-1716-CC;
4   Saengsiphan v. World Championship Wrestling, Inc. and
         Turner Sports, Inc., Civ. File No. 1-00-CV-1719-CC;
5   Speight v. World Championship Wrestling, Inc. and
    Turner
6         Sports, Inc., Civ. File No. 1-00-CV-1718-CC;
    Worthen v. World Championship Wrestling, Inc. and
7   Turner
         Sports, Inc., Civ. File No. 1-00-CV-1717-CC;
8   Reeves v. World Championship Wrestling, Inc. and Turner
         Sports, Inc., Civ. File No. 1-00-CV-1720-CC;
9   Easterling v. World Championship Wrestling, Inc. and
    Turner Sports, Inc., Civ. File No. 1-00-CV-1715-CC;
10  Onoo v. World Championship Wrestling, Inc., and Turner
         Sports, Inc., Civ. File No. 1:00-CV-0368-CC;
11  Norris v. World Championship Wrestling, Inc., and
    Turner
12        Sports, Inc., Civ. File No. 1:00-CV-0369-CC;
    Walker v. World Championship Wrestling, Inc., and
13  Turner
         Sports, Inc., Civ. File No. 1:00-CV-0367-CC;
14  Patterson v. World Championship Wrestling, Inc., Turner
         Sports, Inc. and Turner Entertainment Group, Inc.,
15       Civ. File No. 1:01-CV-1152-CC
16
17             DEPOSITION OF DEWAYNE E. BRUCE
                    NOVEMBER 21, 2002
18
19
20
21
22
23
24
25           CERTIFIED COURT REPORTERS

The Pinnacle, Suite 500 • 3455 Peachtree Road, N.E. • Atlanta, Georgia  30326 • www.premierrptg.com
404-237-1990
800-317-5773

1   sounds like what you are saying is experience whether it

2   was WCW or other wrestling organizations, by being able

3   to practice your microphone skills and your wrestling

4   moves, it helps you become a better wrestler?

5           A       Oh, yeah.  Yes, sir.

6           Q       And Lester Speight, I believe you said --

7           A       Lester.  Yeah, he was a big guy.  He

8   moved okay.  You know, he wasn't there terribly long

9   that I recall but I mean he had good size and good

10  movement.

11          Q       And Rick Reeves, do you remember him ever?

12  And I'm not suggesting you would.

13          A       Rick Reeves.  I don't know.

14          Q       Okay.

15          A       I'm sorry.

16          Q       No, that's fine.  How about Bounthan

17  Saengsiphanh, do you remember him?

18          A       Yes.

19          Q       How would you evaluate him as a wrestler?

20          A       Bounthan was okay.  He was sporadic about

21  the school and here and there.  It just comes down to

22  experience and he didn't have the size nearly that the

23  other guys have but, you know, some people didn't, you

24  know, so.

25          Q       But they had a lightweight division, right?



# EXHIBIT / ATTACHMENT

## _____2_____

(To be scanned in place of tab)

Page 1

1         IN THE UNITED STATES DISTRICT COURT
        FOR THE NORTHERN DISTRICT OF GEORGIA
2                 ATLANTA DIVISION

3  Walker v. World Championship Wrestling, Inc., Turner
   Sports, Inc., Civ. File No.  100-CV-0367-CC
4  Onoo v. World Championship Wrestling, Inc., Turner
   Sports, Inc., Civ. File No. 1:00-CV-0368-CC
5  Norris v. World Championship Wrestling, Inc., Turner
   Sports, Inc., Civ. File No. 1:00-CV-0369-CC
6  Easterling v. World Championship Wrestling, Inc., Turner
   Sports, Inc., Civ. File No. 1:00-CV-1715-CC
7  Davis v. World Championship Wrestling, Inc. and Turner
   Sports, Inc., Civ. File No. 1:00-CV-1716-CC
8  Worthen v. World Championship Wrestling, Inc. and Turner
   Sports, Inc., Civ. File No. 1:00-CV-1717-C
9  Speight v. World Championship Wrestling, Inc. and Turner
   Sports, Inc., Civ. File No. 1:00-CV-1718-CC
10 Saengsiphan v. World Championship Wrestling, Inc. and
   Turner Sports, Inc., Civ. File No. 1:00-CV-1719-CC
11 Reeves v. World Championship Wrestling, Inc. and Turner
   Sports, Inc., Civ. File No. 1:00-CV-1720-CC
12 Patterson v. World Championship Wrestling, Inc., Turner
   Sports, Inc. and Turner Entertainment Group, Inc.,
13 Civ. File No. 1:01-CV-1152-CC

14 _____

         DEPOSITION OF JOSEPH N. HAMILTON
15                 MARCH 22, 2002
                    1:30 P.M.
16 _____

17

18                                    COPY

19

20

21          Premier

22

23

24

25           CERTIFIED COURT REPORTERS

The Pinnacle, Suite 500 • 3455 Peachtree Road, N.E. • Atlanta, Georgia  30326 • www.premierrptg.com
404-237-1990
800-317-5773

Page 46

1    know.  I don't recall now, but he -- he goes way back.

2         Q    Can you remember who you talked about

3    Harold Hogue with?

4         A    Probably Dusty I think.  I don't know.

5    I'm not sure.

6         Q    Okay.  I'm going to ask you the same

7    question about any Asian wrestlers.  Did you have any

8    Asian wrestlers from --

9         A    Bounthan Saengsiphan from Laos.

10        Q    Okay.  Did you push him?

11        A    You bet.

12        Q    Okay.  How did you push him?

13        A    Well, I talked to Annette Yother about

14   him.

15        Q    Do you remember what you said --

16        A    What I said?

17        Q    -- to Ms. Yother?  Yes.

18        A    Well, I told her that WCW is always

19   looking for human interest stories and so on.  So

20   instead of having to make up one, you've got one

21   ready-made.  And I wrote out a -- the scenario as it

22   was given to me, the true scenario of his escape --

23   he -- he and his family's escape from -- from Laos.

24             MR. GERNAZIAN:  We're going to go ahead

25   and mark this.

Page 58

1    that was there, and if he was there, that he was

2    introduced to whoever the evaluator was.

3        Q    Are you aware that Bounthan didn't get a

4    contract?

5        A    Am I aware of that?

6        Q    Yes, sir.

7        A    Yeah.

8        Q    Do you remember Bounthan asking you why he

9    didn't get a contract?

10       A    He never asked me.

11       Q    Okay.  Do you remember even talking to him

12   about that?

13       A    I don't recall seeing him after that move

14   was made.

15       Q    Do you recall telling him at any time that

16   it was because he was too small?

17       A    No.  From what I understand now that I

18   recall a little bit about this, he was invited to come

19   over to The Power Plant at Log Cabin.  But he had a

20   bad knee and -- that never got any better, and that's

21   why he -- I understand that was why he didn't get a

22   contract.

23       Q    Okay.  How did you understand that?  Who

24   told you that?

25       A    Basically they -- they said -- well, I

Page 59

1    asked what -- what happened to him when I didn't see

2    him anymore, and somebody said, well, he had a bad

3    knee and they didn't want -- didn't want to give him a

4    contract because of the physical.  He couldn't pass

5    the physical.

6           Q      Who told you that?

7           A      It's in a meeting with Orndorff.

8           Q      Do you know when Orndorff told you that?

9           A      It wasn't long after the move was made.

10          Q      Do you remember when Bounthan had a knee

11   injury that you're talking about?

12          A      Yeah.  His knee was hurt over at Carole

13   Drive.

14          Q      So you remember him hurting his knee

15   before the move to Log Cabin, right?

16          A      Yeah.

17          Q      Okay.  And would you agree with me that

18   you weren't involved -- well, let me ask you this:  Do

19   you remember contracts being given out that year?

20   That was in '99, right?

21          A      Yeah.

22          Q      Do you remember when those contracts were

23   given out?

24          A      No.

25          Q      They were after the move to Log Cabin,

1    right?

2         A    I don't know.

3         Q    When you say Bounthan hurt his knee, are

4    you talking about re-injuring a knee or what are you

5    referring to?

6         A    I'm referring to he had a bad knee, hurt

7    his knee somehow.  Whether it was a re-injury or not,

8    I -- I don't -- I don't recall him having a bad knee

9    before so.

10        Q    And it's your recollection that happened

11   at Carole Drive.

12        A    No, it did not happen at Carole Drive.  It

13   happened while he was training at Carole Drive.  It

14   happened off the premises --

15        Q    Okay.  Where --

16        A    -- he hurt his knee.

17        Q    Where did it happen?

18        A    I don't know.  He just showed up one day

19   and his knee was bad.

20        Q    You don't remember it happening during

21   a -- a training event?

22        A    No, no.  I said it didn't happen at -- at

23   Carole Drive.

24        Q    I hear you.  I'm not trying to argue with

25   you.  I'm just -- with your --



# EXHIBIT / ATTACHMENT

## 3

(To be scanned in place of tab)

1        IN THE UNITED STATES DISTRICT COURT
          FOR THE NORTHERN DISTRICT OF GEORGIA
2              ATLANTA DIVISION

3  Davis v. World Championship Wrestling, Inc. and Turner
        Sports, Inc., Civ. File No. 1-00-CV-1716-CC;
4  Saengsiphan v. World Championship Wrestling, Inc. and
        Turner Sports, Inc., Civ. File No. 1-00-CV-1719-CC;
5  Speight v. World Championship Wrestling, Inc. and Turner
        Sports, Inc., Civ. File No. 1-00-CV-1718-CC;
6  Worthen v. World Championship Wrestling, Inc. and Turner
        Sports, Inc., Civ. File No. 1-00-CV-1717-CC;
7  Reeves v. World Championship Wrestling, Inc. and Turner
        Sports, Inc., Civ. File No. 1-00-CV-1720-CC;
8  Easterling v. World Championship Wrestling, Inc. and
        Turner Sports, Inc., Civ. File No. 1-00-CV-1715-CC;
9  Onoo v. World Championship Wrestling, Inc., and Turner
        Sports, Inc., Civ. File No. 1:00-CV-0368-CC;
10  Norris v. World Championship Wrestling, Inc., and Turner
        Sports, Inc., Civ. File No. 1:00-CV-0369-CC;
11  Walker v. World Championship Wrestling, Inc., and Turner
        Sports, Inc., Civ. File No. 1:00-CV-0367-CC;
12  Patterson v. World Championship Wrestling, Inc., Turner
        Sports, Inc. and Turner Entertainment Group, Inc.,
13     Civ. File No. 1:01-CV-1152-CC

14

15

16    _____

17           DEPOSITION OF PAUL ORNDORFF
                MAY 7, 2002
18              10:00 A.M.

19    _____

20

21

22

23

24

25        CERTIFIED COURT REPORTERS

The Pinnacle, Suite 500 • 3455 Peachtree Road, N.E. • Atlanta, Georgia 30326 • www.premierrptg.com
404-237-1990
800-317-5773

Page 55

```
 1                    So what do you want to know?

 2         Q    Okay.  Do you recall getting this document?

 3         A    I'm sure I did, yes.

 4         Q    Okay.  Who is Georgia Davidson?

 5         A    She was -- Georgia was Diana Myers'

 6   assistant.

 7         Q    Was she an attorney?

 8         A    No, she was an assistant.

 9         Q    Okay.  Do you remember a wrestler by the

10   name of Bouthan Saengsiphan?

11         A    Yes, yes.

12         Q    Do you know whether or not he got a

13   contract?

14         A    No, he did not.

15         Q    Did you recommend that he get a contract?

16         A    No.

17         Q    Okay.  Why was that?

18         A    He was really small.  I mean, I don't

19   know.  He just -- didn't see anything special.  You

20   know, a lot of these other kids in here, quite

21   frankly, to me, had more talent.

22         Q    Anything else about Bouthan that you can

23   recall as to why he didn't get a contract?

24         A    He got hurt too and -- well, that's it.

25   He just -- he wasn't one of the guys, you know, that
```

1   simple.

2          Q      To what extent was size a part of your

3   analysis?

4          A      You see, a lot of these kids they had

5   down there at the old Power Plant, they paid money to

6   train.

7          Q      Follow my question.  To what extent --

8          A      I am telling you now.  And anybody that

9   pays money, he could be 2 inches tall, he could be

10  6 feet tall, he could be anything.  All it was about

11  is whoever paid the money, which I know nothing about,

12  but I am pretty sure these guys had to pay a certain

13  amount of money, and that's usually the way it is.

14  You have to pay.

15             Well, a lot of those kids, wannabees, you

16  get thousands of them.  I got phone calls, hundreds a

17  week, send tapes in.  Just every Tom, Dick or Harry

18  wants to be a wrestler.  Well, this guy would pay and

19  could be trained and everything, and that's why he was

20  even a part of that.

21         Q      But my question is this:  To what extent

22  was his size a part of the reason why he didn't get a

23  contract?

24         A      Size.  Maybe, maybe a little bit but not

25  -- you know, he just didn't have it.



# EXHIBIT / ATTACHMENT

## 4

(To be scanned in place of tab)

1           IN THE UNITED STATES DISTRICT COURT
             NORTHERN DISTRICT OF GEORGIA
2                   ATLANTA DIVISION

3

4    Davis v. World Championship Wrestling, Inc. and Turner
          Sports, Inc., Civ. File No. 1:00-CV-1716-CC;
5    Saengsiphan v. World Championship Wrestling, Inc. and
          Turner Sports, Inc., Civ. File No. 1:00-CV-1719-CC;
6    Speight v. World Championship Wrestling, Inc. and Turner
          Sports, Inc., Civ. File No. 1:00-CV-1718-CC;
7    Worthen v. World Championship Wrestling, Inc., and Turner
          Sports, Inc., Civ. File No. 1:00-CV-1717-CC;
8    Reeves v. World Championship Wrestling, Inc., and Turner
          Sports, Inc., Civ. File No. 1:00-CV-1720-CC;
9    Easterling v. World Championship Wrestling, Inc., and Turner
          Sports, Inc., Civ. File No. 1:00-CV-1715-CC;
10   Onoo v. World Championship Wrestling, Inc., and Turner
          Sports, Inc., Civ. File No. 1:00-CV-0368-CC;
11   Norris v. World Championship Wrestling, Inc., and Turner
          Sports, Inc., Civ. File No. 1:00-CV-0369-CC;
12   Walker v. World Championship Wrestling, Inc., and Turner
          Sports, Inc., Civ. File No. 1:00-CV-0367-CC;
13   Patterson v. World Championship Wrestling, Inc., Turner
          Sports, Inc., and Turner Entertainment Group, Inc.,
14        Civ. File No. 1:00-CV-1152-CC

15          DEPOSITION OF BOUNTHAN SAENGSIPHANH
                    MARCH 21, 2002
16                   10:05 a.m.

17

18

19

20

21

22

23

24

25              CERTIFIED COURT REPORTERS

The Pinnacle, Suite 500 • 3455 Peachtree Road, N.E. • Atlanta, Georgia  30326 • www.premierrptg.com
                    404-237-1990
                    800-317-5773

1      A.   No, sir.

2      Q.   Have you ever filed any other charges of

3   discrimination with any employer or other organization other

4   than the EEOC?

5      A.   No, sir.

6      Q.   You've never raised a complaint of discrimination

7   with any employer or any other employer you've been involved

8   with other than the one involving this case?

9      A.   No, sir.

10     Q.   Let me talk to you a bit about your background and

11  how you got to WCW and take you through some of your time

12  with WCW, okay?

13     A.   Yes, sir.

14     Q.   Am I correct that you first came to WCW in October

15  of 1997 for a tryout?

16     A.   That time frame, yes, sir.

17     Q.   You're not sure when the tryout was?

18     A.   It was around October or September of '97.

19     Q.   Do you recall paying an amount for the tryout?

20     A.   Yes, sir.

21     Q.   Do you recall how much it was?  Do you believe it

22  was $250 for the tryout?

23     A.   Approximately.

24     Q.   Okay.  And was this your first experience of any

25  kind with professional wrestling?

1      A.   Yes, sir.

2      Q.   Okay.  How did you find out about the tryout?

3      A.   I saw a commercial on TV.

4      Q.   During a show?  Was it a wrestling show that you

5  saw the commercial?

6      A.   Wrestling show, local show, there was a commercial

7  about WCW Power Plant.

8      Q.   Do you remember what the commercial said?

9      A.   That they will train me to be professional

10  wrestler.

11      Q.   Okay.  Did they tell you who to contact?

12      A.   Yes, sir.

13      Q.   Like a phone number or something?

14      A.   Yes, sir.

15      Q.   Okay.  Why did you choose to go try out to be a

16  professional wrestler with WCW?

17      A.   Wrestling, to become a professional wrestler, it

18  was one of my dreams.  WCW have a commercial at that time

19  frame and that's what I want to do.

20      Q.   Okay.  Had you ever sought out any other wrestling

21  opportunity before the tryout?

22      A.   No, sir.

23      Q.   How long had you had the dream that you described

24  to be a professional wrestler?

25      A.   Go way, way back.  I mean, as far as I can

Page 23

```
 1    remember.

 2         Q.   Okay.  But in 1997 this was the first time you

 3    decided to do anything about it?

 4         A.   That was when I was old enough.

 5         Q.   How old were you in 1997?  About 24?  Does that

 6    sound about right?

 7         A.   Twenty-three, I believe.

 8         Q.   Okay.  But in your twenties?

 9         A.   Yes, sir.

10         Q.   So between the time that you were 18 and that time

11    you hadn't done anything to try to become a professional

12    wrestler?

13         A.   Can you rephrase that?

14         Q.   Between the time you were 18 and the time you were

15    23 or 24, you hadn't done anything to try to become a

16    professional wrestler yet, had you?

17         A.   I work out.

18         Q.   Lift weights?

19         A.   Keep myself in shape, yes, sir.

20         Q.   Okay.  Had you ever sought out any wrestling

21    training anywhere?

22         A.   No, I didn't.

23         Q.   When you went to the tryout, you understood that

24    you might not make it, right?

25         A.   Yes, sir.
```

Page 24

1       Q.    Okay.  But you made it through and WCW invited you

2   to come back and train with them at the Power Plant, right?

3       A.    Yes, sir.

4       Q.    Is it your understanding that not everyone who

5   came to the tryouts made it through and was invited to train

6   at the Power Plant?

7       A.    Can you rephrase that?

8       Q.    Sure.  Would you agree with me that there were

9   lots of people who came for tryouts at WCW who didn't make

10  it?

11      A.    Yes, I agree.

12      Q.    And a lot of them never got the opportunity to

13  train at all at the Power Plant, right?  They would just go

14  to the tryout and not make it, right?

15      A.    Right.

16      Q.    Did you see some of the people who came in for

17  tryouts and didn't make it?

18      A.    Yes.

19      Q.    A lot of those individuals were white individuals,

20  Caucasian individuals, right?

21      A.    Yes.

22      Q.    But you made it and they asked you to come train

23  at the Power Plant, right?

24      A.    Yes.

25      Q.    Do you know who made the decision to have you

1    come -- to let you come and train at the Power Plant?

2         A.    Their staff that was there.

3         Q.    Who was it who you believe made the decision?

4         A.    Mr. Hamilton, Mr. Wenner.  I do not -- I don't

5    know the rest of the name.

6         Q.    Okay.  Did either of those gentlemen -- is it Jody

7    Hamilton?

8         A.    Yes, sir.

9         Q.    And Mike Wenner?

10        A.    Yes, sir.

11        Q.    Did either of those gentlemen tell you who made

12   the decision to say to you, you can come train with us?

13        A.    Can you repeat that?

14        Q.    Did Mr. Hamilton or Mr. Wenner tell you who

15   actually made the decision to have you come and train at the

16   Power Plant?

17        A.    Yes.

18        Q.    What did they say?

19        A.    They're the ones who make the decision.

20        Q.    Who told you that?

21        A.    They asked me to come back.

22        Q.    Well, did one of them ask you or did both of them

23   ask you?

24        A.    Well, what happened was after the third day, the

25   last day of tryout, they asked me to go into Mr. Hamilton's

Page 26

1   office.

2       Q.   Okay.

3       A.   Mr. Wenner was in there, Mr. Hamilton.  I believe

4   there's one other person.  I don't remember who it was.

5       Q.   Okay.  And they asked you to come back to train?

6       A.   They told me that I got the potential, they like

7   the way I look.  They say that -- they asked me to come back

8   to train full time at the Power Plant.

9       Q.   Okay.  And they told you that there would be an

10  expense involved in training at the Power Plant; is that

11  right?

12      A.   Yes, sir.

13      Q.   About $3,000 for a six-month training course; is

14  that right?

15      A.   Yes, sir.

16      Q.   And you decided to come back and train at the

17  Power Plant?

18      A.   Yes, sir.

19      Q.   Okay.  You started training in the beginning of

20  1998; is that right?  About January or so?

21      A.   Yes, sir.

22      Q.   Okay.  And what happened during the period?  Tell

23  me about what the training at the Power Plant over this

24  first few months was like.  What do you recall about that

25  training time?

1    Joe Hamilton?

2        A.    Yes.

3        Q.    Were these receipts for when you paid in some of

4    the $3,000 for training, he would give you receipts

5    reflecting that you had paid some of that money?

6        A.    Yes, sir.

7        Q.    Okay.  Now, these receipts indicate that your

8    first payment was a thousand dollars -- this is the first

9    page of this document -- on March 30th of 1998.  Does that

10   fit with your recollection of when you first paid for your

11   training at WCW?

12       A.    Yes, sir.

13       Q.    Okay.  So you trained in January and February and

14   pretty much all of March before you made the first payment?

15       A.    I do not recall the date, but I do recall that I

16   paid a thousand dollars.

17       Q.    Okay.  Do you recall that you had been training

18   for a little while at WCW before you were able to make that

19   payment?

20       A.    That I don't remember.

21       Q.    Do you recall having to pay before you could start

22   training?

23       A.    That I don't remember.

24       Q.    Okay.  It appears from these documents that you

25   paid a few more times some varying amounts according to the

Page 38

1      A.   Can you repeat that?

2      Q.   They never guaranteed you that you'd wrestle in a

3  certain number of matches, did they?

4      A.   No.

5      Q.   And they never guaranteed you that you'd wrestle

6  against certain kinds of other wrestlers, did they?

7      A.   Yes.

8      Q.   What did they say?

9      A.   They say that with my weight and my height, I

10 would fit right in with the light weight group.

11     Q.   It's a group sometimes known as the cruiserweight?

12     A.   Cruiserweight, yes, sir.

13     Q.   How tall were you at the time?

14     A.   I'm about five-eight or five-nine.  I'm the same

15 height as I am now.

16     Q.   You haven't grown in height since then?

17     A.   No, sir.

18     Q.   So you were about five-eight or five-nine in WCW?

19     A.   Yes, sir.

20     Q.   And how much did you weigh in 1998 when you were

21 training at WCW?

22     A.   Between 185 and 190.

23     Q.   Do you understand there's a minimum weight at WCW

24 of about 180 pounds to be a trainee?

25     A.   Yes, sir.

Page 39

1      Q.   So you were just slightly above that?  You were a

2  little bit more than 180 pounds?

3      A.   Yes, sir.

4      Q.   Okay.  So after the six months passed and you were

5  a wrestler, did you continue to train at the Power Plant?

6      A.   Yes, sir.

7      Q.   And were your days similar to what they were

8  before or were you just there kind of on your own practicing

9  and learning more wrestling?

10     A.   After the first six month, after I learn the moves

11  and I pretty much just make it better.

12     Q.   So you'd come each day to try to kind of improve

13  on the skills and abilities that you had learned?

14     A.   Yes, sir.

15     Q.   Did you practice wrestling with various other

16  people out at the Power Plant?

17     A.   Yes, sir.

18     Q.   And pretty much anybody who was there on a given

19  day or --

20     A.   Mainly African-American wrestler.

21     Q.   Okay.  How come mainly African-American wrestlers?

22     A.   Well, the white wrestler, they did not make me

23  feel -- I did not feel welcome.  I did not feel that --

24  basically they didn't want me in the ring with them.

25     Q.   Why do you say that?

Page 45

1        A.   No, I don't.

2        Q.   So it's your testimony that you never wrestled in

3    a WCW event?

4        A.   No, sir.

5        Q.   Did you ever get paid anything by WCW?

6        A.   Yes, sir.

7        Q.   What did you get paid by WCW?  Do you remember

8    roughly the amount?

9        A.   Maybe $200.

10       Q.   For a particular event or something?

11       A.   I don't remember what it's for, but I remember

12   getting the check from them for approximately $200.

13       Q.   And you don't remember why they paid you $200?

14       A.   I did something for them, but I don't remember

15   what it was.

16       Q.   Let me see if I can help you remember.  Maybe this

17   is it.

18            (Marked Defendants' Exhibit No. 2.)

19   BY MR. PONTZ:

20       Q.   Bounthan, take a look, if you will, at what's been

21   marked as Defendants' Exhibit 2.  Have you ever seen this

22   before?  I'm not sure that you have, but let me know if you

23   have.

24       A.   I never see it before.

25       Q.   Okay.  Do you remember participating in some kind

1    your appearance in some kind of wrestling event?

2          A.    Appear to be, yes.

3          Q.    Okay.  And do you see paragraph number two?

4          A.    Yes, sir.

5          Q.    And it says independent contractor?

6          A.    Yes.

7          Q.    And you can read with me that it says in there

8    that contractor, in the performance of the services agreed

9    to herein, shall be and is an independent contractor.   Do

10   you understand those words?

11         A.    Yes, sir.

12         Q.    Okay.  And when you were with WCW, did you pay for

13   your own gym clothes and workout clothes?

14         A.    Yes, sir.

15         Q.    Did you have any other expenses or items that you

16   used when you were with WCW for wrestling?

17         A.    I used my car.

18         Q.    Okay.  You were responsible for taking care of

19   your car?

20         A.    Yes, sir.

21         Q.    And paying for it?

22         A.    Yes, sir.

23         Q.    Were you ever reimbursed any of those expenses?

24         A.    No, sir.

25         Q.    Any other money that you paid out in your effort

Page 52

1    to pursue your wrestling career other than the money you

2    paid to WCW to train?

3         A.   My wrestling outfit.

4         Q.   What kind of wrestling outfit did you wear?

5         A.   I wear tight, long tight, boots, shin pad, and gas

6    to get back and forth.

7         Q.   Okay.  Did you pick out the tights and the boots

8    and the shin pads yourself?

9         A.   Yes, sir.

10        Q.   And you paid for them yourself?

11        A.   Yes.

12        Q.   Did you know when you were out at the Power Plant

13   whether some of the other people out at the Power Plant had

14   a contract or didn't have a contract with WCW?

15        A.   Can you be more specific?  What time frame?

16        Q.   Sure.  How about in 1998, is it your understanding

17   that some of the people out there didn't have contracts with

18   WCW?

19        A.   That did not have contracts?

20        Q.   Yes.

21        A.   Yes, I did.

22        Q.   And that included both white and minority

23   wrestlers who didn't have contracts out at WCW?

24        A.   Yes, sir.

25        Q.   Okay.  And that was true in 1999, as well?

1    A.   Most if not all of the white wrestler got contract

2    during towards the summer of '99.

3    Q.   Okay.  We'll get back to that in a few minutes

4    because things changed around the spring and summer of 1999

5    around the Power Plant, right?

6    A.   Yes.

7    Q.   Okay.  We'll talk about that in a little bit.

8    When you were at the Power Plant, if you had other things

9    that you had to attend to during the day, like a doctor's

10   appointment or a personal matter like that, you could just

11   go ahead and take care of that, right?

12   A.   I would let the trainer know that I have to go to

13   the doctor.

14   Q.   So you'd tell him you were going, you had

15   something you had to do and you'd tell him that?

16   A.   I would let them know and they would say go ahead

17   and go.

18   Q.   Did they ever say don't go?

19   A.   No.

20   Q.   And if you were sick or injured or hurt, couldn't

21   wrestle that day, you didn't come to the Power Plant, right?

22   A.   I was never sick at the time I was there.

23   Q.   But you understood had you been sick, had you

24   woken up with the flu one day, you just would not have gone

25   to the Power Plant, right?

Page 55

1   the unique skills that you brought, right?  You took the

2   moves that they taught you and you added your own

3   athleticism and your own abilities, right?

4        A.   Yes, sir.

5        Q.   And so you learned from other people and then

6   added your own ideas, right?

7        A.   Yes, sir.

8        Q.   And you never had any responsibility for filing

9   any written reports or doing any documentation about

10  anything you were doing, did you?

11       A.   Can you repeat that?

12       Q.   Did you ever file any written reports on your

13  progress at the Power Plant or the training that you were

14  doing or anything like that?

15       A.   My personal written report?  No, I didn't.

16       Q.   You never prepared any documents for the company

17  or anything like that?

18       A.   Well, my life story, if that's what you're talking

19  about.

20       Q.   There's a document -- well, let me -- well,

21  there's a document you prepared that was your life story?

22       A.   Yes, sir.

23       Q.   And you prepared that for the company?

24       A.   Yes, sir.

25       Q.   Okay.  And you mentioned earlier you came up with

Page 56

1    the name Lee Chanz?

2          A.    Yes, sir.

3          Q.    What was -- did your wrestling character, this Lee

4    Chanz, did it have a particular kind of personality or

5    gimmick or theme to it?

6          A.    Asian gimmick.

7          Q.    Okay.  Describe what kind of character this -- the

8    wrestling personality you had was.

9          A.    High flying, do some spin kick, sort of like Asian

10   style.

11         Q.    Were there any martial arts involved in your

12   wrestling skills or was that not something you did?

13         A.    Moi Tai.

14         Q.    How do you spell "Moi Tai"?  Do you know?

15         A.    No, I don't.

16         Q.    It's Moi Tai?

17         A.    Yes, sir.

18         Q.    Okay.  And this is a type of martial arts?

19         A.    Yes, sir.

20         Q.    Is this something you trained in?

21         A.    Yes, sir.

22         Q.    Where does it come from?  Do you know?

23         A.    Thailand.

24         Q.    And so this was part of your character, as well?

25         A.    Yes, in the ring.

Page 61

1    guys just didn't help.

2         Q.   And you were always willing to help?

3         A.   Yes, sir.

4         Q.   Did you ever say I don't want to help?

5         A.   No.

6         Q.   Did anybody ever say what would happen to you if

7    you had said I don't want to help?

8         A.   Did -- I'm not sure I understand you on that one.

9         Q.   Okay.  That's fine.  Don't worry about it.

10             And was breaking down or setting up rings or

11   unloading trucks the same kind of thing that if people were

12   around and they were willing to help, they would help?

13        A.   Yes, sir.

14        Q.   Were there white wrestlers who helped clean up

15   sometimes?

16        A.   Sometimes.

17        Q.   And white wrestlers who helped unload trucks or

18   break down rings sometimes?

19        A.   Sometimes.

20        Q.   Now, at some point did you learn that -- let me go

21   back for a second.  The training facility that you started

22   training in, the Power Plant at WCW, that was located on

23   Carol Drive?  Do you remember that?

24        A.   I believe so.

25        Q.   And did you learn at some point that that training

Page 64

1    the Power Plant where they were going to be making decisions

2    about who might get a contract and who won't be getting a

3    contract?

4        A.   Yes, sir.

5        Q.   Okay.  Do you remember when those tryouts were

6    conducted?

7        A.   No, I don't.

8        Q.   Okay.  Was it pretty much everybody out at the

9    Power Plant was going through one of those tryouts?

10       A.   Yes, sir.

11       Q.   Okay.  And is it your understanding that out of

12   that some individuals were signed to contracts with WCW?  Is

13   that your understanding of things?

14       A.   Can you repeat that?

15       Q.   Is it your understanding, do you think that out of

16   that event, out of those tryouts that some people, some of

17   those wrestlers received contracts with WCW?

18       A.   Yes, sir.

19       Q.   Okay.  Do you know any wrestlers who received

20   contracts with WCW at that time?

21       A.   Mainly they are white wrestler.

22       Q.   Do you know if Harrison Norris received a contract

23   at that time?

24       A.   Yes, sir.

25       Q.   He did?

1   under those contracts, do you?

2       A.   No, I don't.

3       Q.   And other than what you've told me about Mr.

4   Hamilton and Mr. Wenner, you don't know why decisions were

5   made, the basis for decisions of who would get a contract

6   and who wouldn't, do you?

7       A.   I know the reason why.

8       Q.   What do you think the reason is?

9       A.   Because I'm Asian.

10      Q.   Why do you believe that?

11      A.   I did not get contract because I am an Asian

12  wrestler.  There's a white wrestler that came after me, I

13  even teach them how to wrestle.  They got a contract.  I

14  didn't.

15      Q.   Who was that?

16      A.   Shannon Moore, Shane Helms, Allen, David Flair.

17  There was a whole bunch of them that came after me and I

18  remember I showed them some wrestling move and technique in

19  the ring.

20      Q.   Okay.  Other than the fact that there were some

21  other wrestlers who came after you who got contracts and you

22  didn't, is there anything else that you believe supports

23  what you state, which is that you didn't get your contract

24  because of your race?

25      A.   Can you make that short, sir?

1    had been wrestling before they got to WCW?

2         A.   Can you repeat that?

3         Q.   Do you know if Mr. Helms or Mr. Moore had been

4    wrestling before they got to WCW?

5         A.   I don't know as far as prior experience, but while

6    they were there, the way that I work with them, no, they

7    don't.  Because I teach them some basic move that common

8    wrestle would know.  I teach them how to do a lot of stuff

9    at the Power Plant.

10        Q.   Okay.  So you wrestled with them and worked with

11   them in the ring at the Power Plant?

12        A.   Yes, sir.

13        Q.   Do you know how they came to WCW in the first

14   place?  Do you know who was responsible for that?

15        A.   No, I don't.

16        Q.   Okay.  But you came on your own, right?  You

17   sought out WCW?

18        A.   Yes, sir.

19        Q.   And you don't know if maybe someone else brought

20   Mr. Helms or Mr. Moore to WCW's attention, do you?

21        A.   No, I don't.

22        Q.   And as far as the other wrestlers that you

23   mentioned who you believe got a contract instead of you, you

24   don't know what those individuals' wrestling backgrounds

25   were, do you?

Page 77

1      A.   No, I don't.

2      Q.   And you mentioned David Flair.  Is that someone

3  who you think shouldn't have gotten a contract over you?

4      A.   Can you repeat that?

5      Q.   Do you think you should have gotten a contract

6  over Mr. David Flair?

7      A.   Yes, sir.

8      Q.   And is it your understanding that David Flair is

9  the son of Rick Flair?

10     A.   Yes, sir.

11     Q.   Would you think that perhaps, if you had been the

12 son of a famous wrestler, that would have been a good

13 selling point for using in wrestling matches?

14     A.   Can you repeat that?

15          MR. GERNAZIAN:  Objection.  Calls for speculation.

16 BY MR. PONTZ:

17     Q.   Well, let me ask you this.  Can you understand how

18 being the son of a famous professional wrestler would be

19 beneficial in using a character, making a persona out at

20 WCW?  Is that something you understand?

21     A.   I don't --

22     Q.   Here's -- let me ask you your opinion on this.  I

23 understand this is just your opinion, but do you think if

24 your father had been a famous professional wrestler, it

25 would have been easier for you to break into professional

Page 79

1   BY MR. PONTZ:

2       Q.   So you don't know whether there were white

3   wrestlers who got contracts or not in that time frame or

4   not, do you?

5       A.   I don't recall, sir.

6       Q.   That's fine.  Do you remember hurting your back in

7   the beginning of June of 1998?

8            MR. GERNAZIAN:  Are you talking about '99?

9            MR. PONTZ:  No, 1998.

10           THE WITNESS:  I don't recall hurting my back.  I

11  recall hurting my eye.

12  BY MR. PONTZ:

13      Q.   Do you recall having a cut over your eye at some

14  point in 1998?

15      A.   Yes, sir, that I do.

16           (Marked Defendants' Exhibit No. 6.)

17  BY MR. PONTZ:

18      Q.   Let me hand you a group of documents that are

19  clipped together that we'll mark as Defendants' Exhibit 6.

20  These are some documents that seem to indicate that you had

21  some kind of back pain, lower back pain in January of -- or

22  June, excuse me, June of 1998.  Do you recall that?

23      A.   No, I don't, sir.

24      Q.   Do you remember going to the Atlanta Spine and

25  Rehab Center on Howell Mill Road in June for some physical

Page 80

1   therapy?

2         A.    Howell Mill Road.  No, I don't, sir.

3         Q.    Okay.  Would you turn to the next page in that

4   group of documents.  This is a health insurance claim form

5   that indicates that you were treated in some way at Atlanta

6   and Rehab Center on June 4th, and you don't recall that?

7         A.    No, sir.

8         Q.    How about the next page which indicates similar

9   form dated June 9th, 1998.  You don't recall being treated

10  for anything there?

11        A.    No, I don't, sir.

12        Q.    Do you remember a physical therapist named Brent

13  Scott?

14        A.    No, I don't.

15        Q.    Is it possible that you went to Atlanta Spine and

16  Rehab Center in June of 1998 and just don't remember doing

17  that?

18        A.    Is it possible?  Yes.

19        Q.    If you'll turn to the last page of that group of

20  documents.  Do you remember going to Southeastern

21  Orthopaedic Institute?  You're not on the same page with me.

22  The last page of that document.

23              MR. GERNAZIAN:  The last one.

24

25  BY MR. PONTZ:

1    Q.    The very last one.  Do you remember going to

2    Southeast Orthopaedic Institute?

3    A.    I do not recall.

4    Q.    Okay.  Do you remember seeing a Dr. Ciepella or

5    Ciepella?

6    A.    Dr. Ciepella familiar name.

7    Q.    Okay.  This document seems to indicate that you

8    saw that doctor near the end of June 1998.  You don't

9    remember whether that happened or not?

10   A.    No, I don't.

11   Q.    Okay.  And this document seems to indicate that

12   you were to return to work with a slow progressive return

13   for one month.  Do you remember being limited in your

14   ability to wrestle in June or July of 1998 due to some back

15   pain or any other physical problem?

16   A.    I don't remember.

17   Q.    Okay.  Let me ask you to take a look at one of the

18   documents we looked at just a second ago, a document that's

19   Defendants' 5.

20         That document indicates in there that at some

21   point you left WCW to go back to Ohio because of an illness

22   in the family.  Do you recall leaving the Power Plant for a

23   little while to attend to a family illness back in Ohio

24   sometime back in 1998?

25   A.    Yes, sir.

1  Q. Who was ill?

2  A. My mother.

3  Q. And this was before she passed away?

4  A. Yes, sir.

5  Q. How long did you go back to be with your mother?

6  A. Maybe about a week.  Week and a half.

7  Q. So you were gone from the Power Plant for a week

8 or a week and a half?

9  A. Yes, sir.

10  Q. And do you remember what time of year that was?

11  A. No, I don't.

12  Q. Was it in the wintertime?  Do you remember what

13 the weather was in Ohio when you got back?

14  A. No, I don't, sir.

15  Q. Nothing sticks out in your mind of having left

16 warm Atlanta and the Ohio weather being any different?

17  A. I was not -- no, I don't.

18  Q. Okay.  That's fine.  So you don't remember whether

19 you might have been unable to wrestle for much of June and

20 July of 1998 due to a back injury?

21  A. I don't recall that back injury.

22  Q. Okay.  Now, assuming that you missed some time in

23 June and July, and I understand you don't recall that, but

24 assuming that you missed some time in June and July, would

25 that have slowed your learning and progress in becoming a

Page 83

1   wrestler?  If you weren't wrestling in June and July of

2   1998, would that have slowed you down a little bit?

3       A.   Can you repeat that?

4       Q.   Sure.  Would you agree with me that if during the

5   six months that you were learning the training program

6   there, if you had to miss some of that time because you were

7   physically unable to wrestle or something like that, you'd

8   miss out on some training and practice and so it would take

9   longer for you to be ready; is that right?

10      A.   It would take some time to come back, but it won't

11  be that long.

12      Q.   Okay.  Well, if you were training for six months,

13  would you agree with me that the idea was it would take six

14  months of training for someone to be ready, right?

15      A.   It doesn't take six months for someone to be

16  ready.

17      Q.   You don't think it takes six months?

18      A.   It doesn't take me six months.

19      Q.   You think you were ready before that?

20      A.   They teach you basic move.  You can probably learn

21  all that within two months and it's up to you to make it

22  better.  It's up to you to --

23      Q.   Perfect it?

24      A.   -- perfect, practice over and over again.

25      Q.   And it obviously takes some time to where you can

Page 84

1    get to where you do all the moves as well as you want to,

2    right?

3         A.   Yes, sir.

4         Q.   Now, I understand in about May of 1999, okay, May

5    of 1999, you hurt your right knee?

6         A.   Yes, sir.

7         Q.   Okay.  And in fact, you tore what they call the

8    ACL in your right knee; is that right?

9         A.   No, sir.

10        Q.   You didn't tear the ACL in your right knee?

11        A.   No, sir.

12        Q.   What did you do to your right knee?

13        A.   My ACL was torn prior myself coming to WCW Power

14   Plant.

15        Q.   Okay.  So --

16        A.   I had a surgery on my knee.  It was fixed prior to

17   me get to the Power Plant.

18        Q.   Okay.  So before you came to the WCW, you had torn

19   your ACL on your right knee?

20        A.   Way, way before that.

21        Q.   How long ago was it?  Was it back in high school?

22        A.   I believe right after high school.

23        Q.   Okay.  How did you tear your right knee out?

24        A.   Football.

25        Q.   But do you recall in May of 1999 while you were at

1    WCW having more problems with that same knee?

2        A.    I had a problem, yes.

3        Q.    Okay.  Let me hand you -- let's mark this as

4    Defendants' Exhibit 7.

5            (Marked Defendants' Exhibit No. 7.)

6    BY MR. PONTZ:

7        Q.    Let me hand you another group of documents that

8    have been marked together as Defendants' Exhibit 7.  This

9    document indicates, the first page, that you have been

10   restricted from wrestling in about mid May of 1999 due to

11   some concerns about your knee.  Do you recall that

12   happening?

13       A.    Yes, sir.

14       Q.    Okay.  And do you recall if you were ever

15   diagnosed with additional problems with your ACL in your

16   right knee after May of 1999?  Is that what the diagnosis

17   was that the doctors came up with?

18       A.    I'm not sure.

19       Q.    Okay.  Did you have some surgery in June of 1999

20   on your right knee?

21       A.    I had surgery, but I'm not sure exact date.

22       Q.    Okay.  If these documents from the doctors that

23   I've handed to you indicate that the surgery was on June 3rd

24   of 1998, do you have any reason to believe that's not an

25   accurate time of when you had the surgery?

Page 86

1          MR. GERNAZIAN:  Objection.  Misstates the year.

2          THE WITNESS:  No.

3    BY MR. PONTZ:

4          Q.   '99.  Sorry.  If these documents indicate that you

5    had knee surgery on June 3rd of 1999, do you have any reason

6    to believe that's not when you had that surgery?

7          A.   No.

8          Q.   And if you'll turn a few pages in for me to the

9    document that on the bottom right corner has the number

10   19881.  Keep turning a couple more.  Do you see the document

11   that has on the bottom right corner 19881?

12         A.   Yes, sir.

13         Q.   Okay.  That document is dated in June of 1999, and

14   it indicates that you're not to work until you come back for

15   your next visit in July of 1999; is that right?

16         A.   Yes, sir.

17         Q.   Okay.  Do you remember missing -- not being able

18   to wrestle in June and July and August of 1999?

19         A.   Yes, sir.

20         Q.   Okay.  And do you remember those restrictions

21   continuing through the summer and the end of the year and

22   into the next year, the restrictions on you doing any heavy

23   activity with your knee?

24         A.   Can you repeat that?

25         Q.   Okay.  Do you remember the restrictions on you

1    doing heavy activity with your knee continuing through the

2    rest of 1999 and into early 2000?

3        A.    No, I don't.

4        Q.    Well, let's take a look.  Will you turn two more

5    pages for me.  You see a document on the bottom right-hand

6    corner has the number 18964?

7        A.    Yes, sir.

8        Q.    And it appears this document indicates that

9    you're -- again, your work status is no work until your next

10   visit, and the next visit is scheduled for August of 1999;

11   is that correct?

12       A.    Yes, sir.

13       Q.    Then if you'll turn for two more pages, you'll see

14   a document that on the right corner says it's dated

15   August 13th, 1999, right?

16       A.    Yes, sir.

17       Q.    And at that point the work restrictions that are

18   listed are medium to heavy work.  Right?

19       A.    Yes, sir.

20       Q.    Now, could you wrestle if the maximum you could

21   lift would be 70 pounds?

22       A.    I'm not sure.

23       Q.    You don't -- you couldn't carry out a body slam,

24   could you, if the most you could lift was 70 pounds, right?

25       A.    No, sir.

Page 88

1      Q.   Okay.  And it appears that down here it says

2   additional restrictions.  Down near the bottom it says,

3   avoid twisting right knee.  Does that look like what that

4   says?

5      A.   Yes, sir.

6      Q.   You agree with me it would be pretty hard to

7   wrestle without twisting your arms and legs and things like

8   that?

9      A.   Yes, sir.

10      Q.   Okay.  Now, if you'll turn to the next page --

11   well, turn two more pages for me, you'll see a document

12   marked 19898.

13      A.   Yes, sir.

14      Q.   Do you remember having a procedure done on your

15   knee in February of 2000, an arthroscopic knee surgery?

16      A.   Yes, sir.

17      Q.   So you were still having knee problems through the

18   beginning of 2000, right?

19      A.   That was the follow-up, the same injury.

20      Q.   Okay.  Had you done any wrestling between when you

21   went into surgery on your knee and the beginning of 2000?

22   You hadn't done any wrestling, had you?

23      A.   No, sir.

24      Q.   Okay.  So the last time you trained with WCW at

25   the Power Plant was in May of 1999; was that right?

Page 89

1    A.    Approximately that time frame.

2    Q.    The last time you trained was right before you

3  started to have those knee problems?

4    A.    With WCW?

5    Q.    Uh-huh.

6    A.    Yes, sir.

7    Q.    From the time that you first came to WCW for a

8  tryout until you stopped training at WCW, that whole time

9  frame, did you ever make any efforts to find opportunities

10  to wrestle with any other company?

11    A.    No, sir.

12    Q.    Okay.  After -- well, let me back up.  Did you

13  ever contact -- forget it.

14        How come you never contacted any other wrestling

15  organization?

16    A.    I was with WCW.

17    Q.    You never promised that you wouldn't work with

18  anybody else, did you?

19    A.    Can you repeat that?

20    Q.    You never promised that you wouldn't work with any

21  other company, did you?

22    A.    Can you rephrase that?  I ever promise or WCW?

23    Q.    You never signed anything with WCW that said you

24  couldn't work with any other company, did you?

25    A.    No, sir.

Page 92

1   around -- after first couple months that I was there.

2        Q.   Okay.  Am I correct that the reason you stopped

3   coming to the Power Plant was because of the knee surgery

4   and the problems you were having with your knee, right?

5        A.   No, sir.

6        Q.   Why did you stop coming to the Power Plant then?

7        A.   I have to support my family.  There was no income

8   coming in.  I have to get a job to support my family,

9   basically.

10       Q.   So no one ever told you that you couldn't come to

11  the Power Plant anymore; you made the decision that you had

12  to find a different opportunity to make money?

13       A.   I was at the Power Plant a year and a half,

14  roughly a year and a half.  WCW, the management people at

15  the Power Plant did not give me an opportunity to wrestle.

16            If I do not get the opportunity, there is no way

17  that I can support my family.  There is no way that --

18  basically, I just need money.  I have to get a job somewhere

19  quick just so I can support my family.

20       Q.   Okay.  Where did you get a job?

21       A.   I work for MARTA.

22       Q.   When did you start working with MARTA?  This is

23  the transit company here in Atlanta, right?

24       A.   Yes, sir.

25       Q.   When did you start working with MARTA?

Page 98

1    Hamilton, Mr. Wenner at WCW Power Plant, and I tried to be a

2    professional wrestler and that was my goal, so I just didn't

3    complain.

4         Q.   All right.  Let me ask you about some of the

5    allegations that are in your complaint.  Are you claiming --

6    I believe you are, but are you claiming in this case that

7    you didn't receive a contract to be an independent

8    contractor wrestler with WCW because of your race?

9         A.   Yes, sir.

10        Q.   And are you saying you believe it was Jody

11   Hamilton who denied you a contract on the basis of your

12   race?

13        A.   And Mr. Wenner.

14        Q.   Mike Wenner and Jody Hamilton?

15        A.   Yes, sir.

16        Q.   Anybody else who you believe denied you a contract

17   on the basis of your race?

18        A.   I asked Mr. Orndorff about getting a contract and

19   he did not give me one.

20        Q.   Okay.  Do you believe that was because of your

21   race?

22        A.   Yes, sir.

23        Q.   What reason do you believe that was because of

24   your race?

25        A.   I'm a good wrestler.  I know some of those guy,

Page 99

```
1    the white guy that got contract.  They're not as talented as

2    I am, plus they came to WCW Power Plant after myself.  They

3    got a job.  I did not get a job.  I don't -- I just can't

4    see why I can't get a job, if not my race.

5         Q.   Okay.  Other than what you've already talked

6    about, I don't want to make you repeat anything again, but

7    other than what you've talked about, is there anything else,

8    any other events or facts that you believe support your

9    claim that you didn't get a contract because of your race?

10        A.   Yes, sir.

11        Q.   What else is there?

12        A.   I remember there was a time Mr. Bischoff was at

13   the Power Plant making a commercial.  He was inside the ring

14   working out with one of the wrestler.  Everybody was outside

15   the ring looking on.

16             After he finish with that particular wrestler, he

17   walked to the rope right before me.  He said, Jap, come up

18   here.  I went up inside the ring.  Mr. Bischoff asked me, do

19   I know any karate.  I told him no, sir, but I know Moi Tai.

20   Mr. Bischoff told me that if I ever hurt him with that Asian

21   bullshit, I will not get a job at WCW, with WCW.

22        Q.   When did this happen?

23        A.   I don't remember exact date, but he was only there

24   that one time for that commercial.  That's the only time

25   that he was there.
```

1       Q.   Okay.  So because you were there longer, you feel

2  like you should have gotten a contract instead of him?

3       A.   I wasn't given opportunity like I should be given.

4       Q.   What opportunity was that that you wanted that you

5  don't believe you were given?

6       A.   To wrestle.  TV time, TV taping, house show.

7       Q.   So you think Mr. Skipper, for example, was given

8  that opportunity instead of you?

9       A.   Can you repeat that?

10      Q.   Do you think Mr. Skipper, for example, was given

11  that opportunity instead of you?

12          MR. GERNAZIAN:  Objection.  Calls for speculation.

13  BY MR. PONTZ:

14      Q.   Do you know whether Mr. Skipper was given that

15  opportunity instead of you?

16      A.   No, I don't know.

17      Q.   You didn't complain to anyone at WCW about not

18  receiving a contract, did you?

19      A.   I asked Mr. Orndorff about getting a contract.

20      Q.   And he referred you to someone else?

21      A.   To Mr. Hamilton.

22      Q.   Okay.  But you never complained to anyone and said

23  I'm not getting a contract because of my race?

24      A.   Can you repeat that?

25      Q.   You never complained to anyone and said, I'm not

Page 113

1   getting -- I believe I'm not getting a contract because of

2   my race?

3        A.   No, sir.

4        Q.   Is there any other fact or any other information

5   that you believe supports your claim that you didn't get a

6   contract because of your race other than all the things

7   we've already talked about?

8        A.   Those are the only thing that I can remember.

9        Q.   Your complaint also talks about your complaint

10  that you didn't get wrestling opportunities that you wanted.

11  Is that part of your claim, as well?

12       A.   Yes, sir.

13       Q.   Okay.  Who is it that you believe denied you

14  wrestling opportunities because of your race?

15       A.   Mr. Hamilton, Mr. Wenner.

16       Q.   Okay.  Anybody besides Mr. Hamilton and

17  Mr. Wenner?

18       A.   The booking committee.

19       Q.   But you don't know who those people are?

20       A.   Some of them I do.

21       Q.   Who are they?

22       A.   Going back to Mr. Orndorff.  I don't know the rest

23  of the booking committee.

24       Q.   Okay.  Do you know whether Mr. Wenner or Mr.

25  Hamilton had any control over who got to wrestle in

Page 119

1    Q.   Now, your complaint talks about discrimination in

2    pay, okay.  Is that any different than your claim that you

3    didn't get a contract with WCW?

4    A.   Can you repeat that, sir?

5    Q.   Okay.  Your complaint claims that you were paid

6    less than white wrestlers, but isn't it your testimony that

7    you weren't paid at all by WCW?  Let me back up.  Are you

8    claiming that you were paid less than white wrestlers at

9    WCW?

10   A.   No, sir.

11   Q.   There's a claim in your lawsuit for what they call

12   a hostile work environment.  You've told me about the names

13   that you claim you were called at the Power Plant and the

14   fact that you didn't get a contract opportunity or

15   opportunities that you wanted to wrestle.

16        Is there anything else that you believe made your

17   work environment at WCW hostile, in your opinion?

18   A.   Yes, sir.

19   Q.   What else is there?

20   A.   Every day at the Power Plant I have to go through

21   name calling.  For example, that I mentioned before, they

22   would call me Jap instead of Bounthan.  They would say Jap,

23   you're next.  Everybody heard it at the Power Plant.

24        While I was in the ring doing a match or practice,

25   Mr. Wenner or Mr. Hamilton, they would push back like so,

1   (indicating), on the outer edge of the eye.  They would tell

2   me, Slanted Eye, get mad.  Get mad, Slanted Eye.  This is

3   every match they would do the same thing.

4           I would go up to the top row to do a flip.  They

5   would yell out, fly, Chink, or, Chink can fly.  Everybody's

6   laughing because of the comment that they made.

7           That type of comment, that type of racial slur,

8   I'm hurt.  I mean, there is not a day go by, every morning I

9   wake up, I just think about going to that Power Plant for

10  eight hours, whatever the case may be.  Every day I wake up,

11  I have to say, okay, I'm going to suck it up because I

12  wanted to be a wrestler.  I want them to give me the

13  opportunity to wrestle.

14      Q.   But you never said to any of them, hey, stop that,

15  I don't like those words, I find them offensive, did you?

16      A.   Who are you referring to when you say that?

17      Q.   At any time at the Power Plant when someone called

18  you one of the names you allege they called you, did you say

19  to them, please don't do that or stop doing that, I don't

20  like that name?

21      A.   No, I didn't.  The people follow the trainers, the

22  people follow Mr. Hamilton.  Whatever they say, that's what

23  people going to follow.

24      Q.   But you never said to Mr. Hamilton or Mr. Wenner,

25  would you please stop calling me those names, I don't like

1   them, I find them offensive, did you?

2       A.   I didn't say it because I was afraid to stand up

3   and say, don't do this or don't say that.  I tried to get an

4   opportunity.  I tried to become a professional wrestler at

5   the Power Plant.

6       Q.   I understand that, but do you know -- you don't

7   know what would have happened if you had walked into

8   Mr. Hamilton's office and said, please don't use those words

9   to describe me, do you?

10          MR. GERNAZIAN:  Objection.  Calls for speculation.

11  BY MR. PONTZ:

12      Q.   You don't know what would have happened, do you?

13      A.   I was afraid to say that.

14      Q.   But you don't know what would have happened?

15          MR. GERNAZIAN:  Same objection.

16  BY MR. PONTZ:

17      Q.   Mr. Saengsiphanh, you don't know what would have

18  happened?

19      A.   To the best of my knowledge, I don't think it

20  would make any difference.

21      Q.   Why do you say that?

22      A.   That name calling, the racial slur, that's

23  everyday thing at the Power Plant.  That's everyday comment,

24  everyday slur, racial slur for the management people there.

25      Q.   But you don't know whether they knew that it was

1    offensive to you, according to your testimony, do you,

2    because you never said, that offends me?

3        A.    Oh, they know.

4        Q.    How do you know they know?

5        A.    Now, I would not go out and call somebody the

6    negative racial name or negative comment about people.

7    Common sense.  I mean, I would not do that.  That would hurt

8    their feeling.  They would not like that, and --

9        Q.    Did you ever hear any of the wrestlers refer

10   amongst themselves to each other in a joking manner by a bad

11   word?

12       A.    What do you mean?

13       Q.    Did you ever hear -- I'll give you an example.

14   Did you ever hear any of the African-American wrestlers call

15   each other "nigger"?

16       A.    That I don't recall.

17       Q.    If you had heard one African-American wrestler

18   call another African-American wrestler "nigger" in a joking

19   manner, would you assume that that was done to hurt them or

20   that it was done because they were friends and felt okay

21   doing that?  Do you know?

22       A.    That I don't know.

23       Q.    Okay.  So isn't it possible that Mr. Hamilton,

24   Mr. Wenner didn't know that you found these words offensive,

25   since you never told them you found them offensive?

1            MR. GERNAZIAN:  Objection.  Calls for speculation.

2    BY MR. PONTZ:

3        Q.    Isn't that possible?

4        A.    I don't know, sir.

5        Q.    Okay.  Other than the name calling that you've

6    described, treatment at the Power Plant, is there anything

7    else that you believe made your work environment hostile

8    because of your race, or is that what that claim is about?

9        A.    When I come to Power Plant first thing in the

10   morning, I have to sweep or set up the ring, unload the

11   ring.  If I don't do that, they -- I know in the back of my

12   head that if I don't do that, okay, they're going to tell me

13   to do it, so I just go ahead and do it.

14            That's in a way that's -- in a way, that is

15   hostile, hostile work environment.

16       Q.    Anything else besides that?

17       A.    That's all I can think of, sir.

18       Q.    Okay.  And I think you told me earlier, but you

19   were able to continue training during the six months, the

20   first six months, right?  You trained and you learned how to

21   become a professional wrestler, right?

22            During the first six months you were at the Power

23   Plant, you did in fact train and learn how to become a

24   professional wrestler, right?

25       A.    Yes.

Page 127

1     Q.   All right.  Other than the things we've already

2   talked about, the name calling that you've described, not

3   giving you a contract, not giving you wrestling

4   opportunities, is there anything else that you think someone

5   at WCW did that was an intentional effort to harm you?

6     A.   Yes.

7     Q.   Okay.  What is that?

8     A.   When Mr. Bischoff told me that -- when we was in

9   the ring and Mr. Bischoff told me that if I hurt him in any

10   way with my Asian bullshit, I would not get a job with WCW.

11     Q.   Okay.

12     A.   Also day in and day out, again, when the

13   management people at the WCW Power Plant leading the

14   wrestler, making fun of the way my eye -- slanted eyes, the

15   way they call me those negative name, Jap, Chink, all this

16   other stuff, those -- sometime I go home, I don't even want

17   to talk to my wife or kid.  I just go home, just want to be

18   alone.  Sometime I would go to a temple just to sit.

19     Q.   Just -- I'm sorry.  If you're not finished, please

20   continue.

21     A.   I mean, those are the day in and day out.  It's

22   just, you know --

23     Q.   No one ever threatened you physically, to harm you

24   physically, right?

25     A.   No, sir.

1   booking committee that you're aware of, did you, other than

2   maybe what you've talked about with Paul Orndorff?

3       A.   I cannot -- I do not recall.

4       Q.   And other than what you've told me about Mike

5   Wenner and Jody Hamilton and wrestlers at the Power Plant

6   and Eric Bischoff, you never heard anyone else at WCW use

7   any language that you felt was a racial slur, did you?

8       A.   No, sir.

9       Q.   You don't know what the booking committee used to

10  make decisions about who was going to wrestle whom, did you?

11      A.   No, sir.

12      Q.   You never asked anyone to complain to WCW about

13  discrimination on your behalf, did you?

14      A.   Can you repeat that?

15      Q.   Sure.  You told me earlier that you never

16  complained about discrimination or complained about anything

17  when you were at WCW.  You never asked any other person to

18  kind of, would you go complain for me or raise a complaint

19  with the company?

20      A.   No, sir.

21      Q.   And you're not aware of anybody who did in fact

22  raise a complaint on your behalf, are you?

23      A.   No, sir.

24      Q.   You've got some claims in your lawsuit under the

25  statute called the Fair Labor Standards Act.  Do you know

1    what the Fair Labor Standards Act is?

2         A.    Yes, sir.

3         Q.    What is that?

4         A.    The minimum wage that you have to pay if you work

5    over 40 hours, you have to pay overtime.

6         Q.    Okay.  You're exactly right.  You understood

7    minimum wage and overtime concepts before you came to WCW?

8         A.    Can you repeat that?

9         Q.    Okay.  Before you came to WCW you worked in some

10   other jobs?

11        A.    Yes, sir.

12        Q.    Were you aware at those jobs that those employers

13   were required to pay you a minimum wage and to pay you

14   overtime if you worked over 40 hours per week?

15        A.    Yes, sir.

16        Q.    Well, when you were training at the Power Plant,

17   did you ever say to anyone that you feel like you should be

18   paid minimum wage?

19        A.    No, sir.

20        Q.    Did you ever say to anyone you feel like you

21   should be paid overtime?

22        A.    No, sir.

23        Q.    Did you ever work more than 40 hours in a week at

24   the Power Plant or do anything for more than 40 hours a week

25   at the Power Plant?

Page 136

1   happened?

2        A.   At least a couple times, yes, sir.

3        Q.   Now, is it correct to say that a professional

4   wrestler kind of is a combination of an athlete and an

5   actor; is that right?

6        A.   I'm not sure.

7        Q.   Well, you understand that the wrestling matches

8   are planned out, right?

9        A.   Yes, sir.

10        Q.   The outcome is set.  It's not an actual

11   competition to see who's going to win, right?

12        A.   Right.

13        Q.   So wouldn't you agree with me that the two things

14   or two of the things that you need to be a wrestler is you

15   have to have the athleticism to carry out the moves, right?

16        A.   Yes, sir.

17        Q.   And you have to have some acting ability to make

18   the audience believe that this is a competition instead of

19   just a planned out event, right?

20        A.   Yes, sir.

21        Q.   So as a professional wrestler, you're kind of like

22   an athlete and an actor combined, right?

23        A.   Yes, sir.

24        Q.   Okay.  And how good you do at your job as a

25   professional wrestler has to do with your unique abilities

Page 138

1 and this is basically what we want to happen, but it's up to

2 you to put the match together, right?

3     A.    Yes.

4     Q.    That's one of the things you learned how to do is

5 put the match together?

6     A.    Yes, sir.

7     Q.    And I think we talked about this earlier, but no

8 one ever prevented you from coming to the Power Plant or

9 said you couldn't come anymore, right?

10     A.    What time frame are we talking about?

11     Q.    At any time at WCW, no one ever told you you

12 couldn't continue training at the Power Plant, did they?

13     A.    No.

14     Q.    And you never agreed or promised anyone to work

15 only at WCW, to train only at WCW, right?

16     A.    No, sir.

17     Q.    Now, some of the documents in this lawsuit

18 regarding you refer to providing security services at a

19 convention in Los Angeles in 1999.

20     A.    Yes, sir.

21     Q.    Did that have something to do with WCW?

22     A.    Yes, sir.

23     Q.    What was that?  Tell me about that.

24     A.    Summer of '99 we were out in Los Angeles for

25 Mayhem convention out there.  We were out there.  I was out

Page 139

1    there to do the security for the convention.

2          Q.    Did someone ask you to do that?

3          A.    Yes, somebody did.

4          Q.    Who was that?

5          A.    I don't remember who, but somebody did.

6          Q.    How did you get to Los Angeles?

7          A.    We flew out there.

8          Q.    Who paid for the plane ticket?

9          A.    WCW.

10         Q.    Okay.   And what did you do while you were out at

11   the convention?

12         A.    We did the security.

13         Q.    How many days did you do it?

14         A.    Three days.

15         Q.    How long each day?

16         A.    It was an all day thing.

17         Q.    What time did you start?   Do you recall?

18         A.    We left our hotel 7:00 in the morning or

19   something.

20         Q.    Okay.   What time did you get to the convention and

21   start doing security?

22         A.    Around 8:00 o'clock.

23         Q.    And what time did you finish?

24         A.    It was late.   5:00 or 6:00.   It was late.

25         Q.    Did you take a lunch break?

Page 157

1      Q.   You don't have any idea?

2      A.   I don't know.

3      Q.   Did you ever see a psychiatrist or a psychologist

4   about this emotional pain and suffering?

5      A.   No, I didn't.

6      Q.   Did you ever go to a counselor, talk to anyone

7   about the emotional pain and suffering that you claim you

8   went through?

9      A.   I went to the temple and sit and thought about

10  things.

11     Q.   Did you meet with anybody to talk about it?

12     A.   No, sir.

13     Q.   So you didn't have any medical expenses other than

14  related to your knee injury at WCW?

15     A.   No, sir.

16     Q.   And all the medical expenses at WCW, were those

17  taken care of through workers' compensation?

18     A.   Yes, sir.

19     Q.   You're not seeking to recover your medical

20  expenses in this lawsuit, are you?

21     A.   No, sir.

22     Q.   And you'd agree with me that when WCW shut down in

23  March of 2001, that after that, even if you had had a

24  contract with WCW, you wouldn't have had any opportunity to

25  continue wrestling with WCW, would you?



# EXHIBIT / ATTACHMENT

## 4

**(To be scanned in place of tab)**

# WCW

## *WORLD CHAMPIONSHIP WRESTLING, INC.*

## RELEASE

For good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the person signing below ("Contractor") provides the following release and waiver of liability in connection with any and all services he may provide for World Championship Wrestling, Inc.

1.  **RELEASE OF LIABILITY.** CONTRACTOR HEREBY ASSUMES ALL RISKS ASSOCIATED WITH HIS PERFORMANCE OF THE SERVICES AND HEREBY RELEASES AND HOLDS HARMLESS WCW AND ITS PARENT, DIRECTORS, OFFICERS, EMPLOYEES, AGENTS, SUCCESSORS AND ASSIGNS, FROM AND AGAINST ANY AND ALL CLAIMS, DAMAGES, LIABILITIES, COSTS AND EXPENSES, INCLUDING REASONABLE ATTORNEY'S FEES, ARISING OUT OF HIS PERFORMANCE OF SUCH SERVICES, INCLUDING, WITHOUT LIMITATION, ANY PERSONAL INJURIES OR PROPERTY DAMAGE WHICH MAY BE INCURRED OR WHICH MAY ARISE OR RESULT FROM CONTRACTOR'S VOLUNTARY PERFORMANCE OF SUCH SERVICES.

2.  **INDEPENDENT CONTRACTOR.** Contractor, in the performance of the services agreed to herein, shall be and is an independent contractor. Both WCW and Contractor shall be acting in their own separate capacities and not as agents, employees, partners, joint venturers or associates of one another. Contractor is responsible for all of his expenses, including without limitation, medical expenses, workers' compensation insurance, health and welfare insurance, training expenses, props, wardrobe, make-up and other expenses necessary to perform services under this Release. Without limiting the generality of the foregoing, Contractor acknowledges that, as between WCW and Contractor, Contractor shall be solely responsible and liable for the payment of any and all withholding, social security, unemployment or other taxes levied, assessed or due as a result of the services which are performed by Contractor for WCW.

3.  **NAME RELEASE AND WORK PRODUCT.** Contractor agrees that all recordings of all wrestling matches and events in which Contractor appears for or on behalf of WCW (hereinafter referred to as "Works") shall belong exclusively to WCW. WCW shall have the perpetual and exclusive right to use, exhibit, distribute or license throughout the universe, any Work or part thereof in any form of radio or television which is now known or may hereafter exist including, without limitation, free over-the-air broadcast, cablecast, DBS, MDS, pay television, subscription television and superstation telecasts, or otherwise exploit such Works in such forums and for uses throughout the universe as it deems appropriate. All revenues derived by WCW from the use, exhibition, distribution, licensing or other exploitation of such Works shall be the sole and exclusive property of WCW. To the extent that the Works are considered: (i) contributions to collective works and/or (ii) as parts or components of audio-visual works, the parties hereby expressly agree that the Works shall be considered "works made for hire" under the United States Copyright Act of 1976, as amended (17 U.S.C. § 101 et seq.). In accordance therewith, the sole right of copyright in and to the Works shall belong exclusively to WCW in perpetuity. To the extent that the Works are deemed works other than contributions to collective works and/or parts or components of audio-visual works, Contractor hereby assigns to WCW all rights, title and interest in and to the copyrights of such Works and all renewals and extensions of the copyrights that may be secured under the laws now or hereafter in force and effect in the United States of America or any other country or countries. Contractor shall execute, verify, acknowledge, deliver and file any and all formal assignments, recordations and any and all other documents which WCW may prepare and reasonably call for to give effect to the provisions of this Release. Contractor further agrees and acknowledges that his name and likeness may be used in any advertising and promotional materials distributed by or on behalf of WCW which relate to the Works or the business of WCW, but not as an endorsement of any product or service without the express, separate consent of Contractor. Nothing contained herein shall be deemed to obligate WCW to record, reproduce, broadcast or exploit the Works in any way. It is understood that the rights granted to WCW shall continue in effect after Contractor ceases to provide services to WCW to the extent necessary for WCW's full enjoyment of such rights.

_Bounthan Saengsiphan_
PRINTED NAME

_Bounthan Saengphybe_
SIGNATURE

_10/6/98_
DATE

_1278 Stoneham Ct_
(Street Address)

_College park Ga 30349_
(City, State)

_(70) 997-1730_
(Phone)

DEFENDANT'S
EXHIBIT
4
Saengsiphanh

WCW 019561
CONFIDENTIAL



# EXHIBIT / ATTACHMENT

## 5

(To be scanned in place of tab)

TALENT EVALUATIONS FOR THE POWER PLANT, JANUARY, 1999:

"CRUISERWEIGHT DIVISION"

BOUTHAN SAENGSIPHAN:........$250.00

VERY GOOD ATTITUDE, HE CAN DO SOME MARTIAL ARTS MOVES ALONG WITH OUR STYLE OF WRESTLING, HE IS REY MYSTERIO SIZE, IN EXCELLENT SHAPE, CAN DO SOME HIGH FLYING MOVES ALSO, BECAUSE OF ILLNESS IN THE FAMILY HE HAD TO GO BACK TO OHIO FOR A WHILE , BUT HE IS BACK HERE NOW AND AT THE POWER PLANT EVERYDAY.

"LOOKS FOR TV."

WITH HIS TRUE REAL LIKE STORY, AND HIS CUTE LITTLE BABYFACE, IF YOU CAN'T CREATE A REAL LIFE AND DEATH HUMAN INTREST STORY THAT IS TRUE, I'LL KISS YOUR, well-a-how about your foot?. THAT PAGE I GAVE YOU ON HIS REAL LIFE STORY IS TRUE, HE WAS JUST A BABY WHEN MOST OF IT HAPPENED, BUT IT DID HAPPEN. I THINK IT WOULD MAKE GREAT TV, AND IT'S NOT A BUNCH OF B. S. IT'S ALL TRUE.



CONFIDENTIAL

DEFENDANT'S
EXHIBIT
5
Saengsiphanh

WCW 002752



# EXHIBIT / ATTACHMENT

6

(To be scanned in place of tab)

## GEORGIA STATE BOARD OF WORKERS' COMPENSATION

**EMPLOYER'S FIRST REPORT OF INJURY OR OCCUPATIONAL DISEASE**

| | |
|---|---|
| OSHA File No. | |
| Insurer File No. | |

**A.**

WORLD CHAMPIONSHIP WRESTLING   Employer Phone No.   Insurer/Self Insurer Name

TPA Claims Office

Address   One CNN Center   Box 105366   Employer FEIN

TPA FEIN

City   Atlanta, GA 30348   State/Zip   Nature of Business (Mfg., Trade, Transp., etc.)   Sports Entertainment

Address

Employer Location Address (If Different)   City   State/Zip

City   State/Zip

Place of Accident or Exposure (Address or Location)   WCW Power Plant

TPA Claims Office Phone No.

Employee Name (Last) (First) (Middle)   Saengsiphan Bounthan   ✓   Date of Birth   9-15-73   ✓   County

Address   1278 Stoneham Ct   Male ✓   Female   Employee Social Security Number

City   College Park, Ga   State/Zip   Employee's Home Ph. #   (770) 997-1730   Number of Dependents Including Spouse   1

**DO NOT WRITE IN THIS COLUMN**

| | |
|---|---|
| Insurer No. | |

Date of Injury   6/1/98   Time of Injury   11:8AM   am ☐ / noon ☐ pm ☐   Date Employer Notified

SK

Date Hired   5/98   TRAINEE   Did Employee Work the Next Day?   ☐ Yes   ☐ No   First Date Employee Failed to Work a Full Day   6-1-98   Did Employer Receive Full Pay for Date of Injury?   ☐ Yes   ☒ No ✓

Date of Birth

Hours Worked   Per Day ( 8 )   Per Week ( )   Number of Days Worked Per   5   List Normally Scheduled Off Days   SAT + Sun   Wage Rate at Time of Injury or Disease   NO —   Hour ( )   Day ( )   Week ( )   Mo ( )

Sex

COMPLETE WAGE STATEMENT ON REVERSE: If employee is paid hourly, on commission or piecework basis, enter average weekly amount   $ WCW TRAINEE - No Salary   If board, lodging, or other advantages were furnished, enter average weekly amount   Medical Only

County of Injury

Did Injury/Illness Exposure Occur on Employer's Premises?   Yes ✓   No ☐   Type of Injury/Illness   Right lower back pain   Part of Body Affected   Right lower back

Employer Aware

How Injury or Illness/Abnormal Health Condition Occurred   Front bum and land on my back

Nature

If Returned to Work, Give Date   Returned at What Wage _____ per Week   If Fatal: Give Date of Death

Body Part

Treating Physician (Name and Address)   Micheal Cipielo.   3280 Howell Mill Rd.   Atl. GA. 30327

| Initial Treatment | Hospital (Name & Address) |
|---|---|
| ☐ No Treatment | |
| ☐ Minor: By Employer | |
| ☐ Minor: (Clinic/Hospital) | |
| ☐ Emergency Care | |
| ☐ Hospitalized > 24 hrs. | |
| MCO   Yes ☐   No ☐ | |

Cause

M.O.

Controvert

D. First

Report Prepared By (Print or Type)   Position   Telephone Number   Date of Report

**EMPLOYER'S FAILURE TO SUBMIT THIS REPORT TO INSURER IMMEDIATELY MAY RESULT IN PENALTY**

**B.**   **FOR USE BY INSURER/SELF-INSURER**

Average weekly wage: $_____   Weekly benefit: $_____   Date of disability: _____   Date of first payment _____

Compensation paid: $_____   Penalty paid: $_____   Previously Medical Only   Yes ☐   No ☐

BENEFITS ARE PAYABLE FROM _____ , 19__ FOR:

☐ Total temporary total disability   ☐ Temporary partial disability   ☐ Permanent partial disability of ____ % to _____ for ____ weeks   Part of Body

UNTIL _____ , 19__   WHEN THE EMPLOYEE ACTUALLY RETURNED TO WORK. ALL OTHER SUSPENSIONS REQUIRE THE FILING OF FORM WC2 WITH THE STATE BOARD OF WORKERS' COMPENSATION AND THE EMPLOYEE.

By _____   (Insurer/Self Insurer: Type or Print Name of Person Filing Form and Sign)   (Date)   (Phone)   (Extension)

**C.**   **NOTICE TO CONTROVERT PAYMENT OF COMPENSATION (over for additional information)**

Benefits will not be paid because:

By _____   (Insurer/Self Insurer: Type or Print Name of Person Filing Form and Sign)   (Date)   (Phone)   (Extension)

Willfully making a false statement for the purpose of obtaining or denying benefits is a crime subject to penalties of up to $10,000.00 per violation (O.C.G.A. §34-9-18 and §34-9-19).

WC-1 (7/97)

**DEFENDANT'S EXHIBIT**
6
Saengs.phanh

WCW 019807
CONFIDENTIAL

CRAWFORD AND COMPANY
WCW
PO BOX  52067
ATLANTA GA 30355 0067

WCW / CARRIER

**HEALTH INSURANCE CLAIM FORM**

| PICA | | | | | | | PICA |
|---|---|---|---|---|---|---|---|

| 1. MEDICARE (Medicare #) | MEDICAID (Medicaid #) | CHAMPUS (Sponsor's SSN) | CHAMPVA (VA File #) | GROUP HEALTH PLAN (SSN or ID) | FECA BLK LUNG (SSN) | OTHER (ID) | 1a. INSURED'S I.D. NUMBER (FOR PROGRAM IN ITEM 1) |
|---|---|---|---|---|---|---|---|
| | | | | X | | | 268868617 |

| 2. PATIENT'S NAME (Last Name, First Name, Middle Initial) | 3. PATIENT'S BIRTH DATE | SEX | 4. INSURED'S NAME (Last Name, First Name, Middle Initial) |
|---|---|---|---|
| SAENGSIPJAAN BOUNTHAN | 09 15 73 M X F | SAME |

| 5. PATIENT'S ADDRESS (No., Street) | 6. PATIENT RELATIONSHIP TO INSURED | 7. INSURED'S ADDRESS (No., Street) |
|---|---|---|
| 1278 STONEHAM CT | Self X Spouse Child Other | SAME |

| CITY | STATE | 8. PATIENT STATUS | CITY | STATE |
|---|---|---|---|---|
| COLLEGE PARK | GA | Single Married Other | | |

| ZIP CODE | TELEPHONE (Include Area Code) | Employed Full-Time Student Part-Time Student | ZIP CODE | TELEPHONE (INCLUDE AREA CODE) |
|---|---|---|---|---|
| 30067 | (770) 997 1730 | | | ( ) |

| 9. OTHER INSURED'S NAME (Last Name, First Name, Middle Initial) | 10. IS PATIENT'S CONDITION RELATED TO: | 11. INSURED'S POLICY GROUP OR FECA NUMBER |
|---|---|---|
| NA | | WCW |

CLM# A08 086772

a. OTHER INSURED'S POLICY OR GROUP NUMBER
NC 537 001 6-1-98

a. EMPLOYMENT? (CURRENT OR PREVIOUS)
YES X NO

a. INSURED'S DATE OF BIRTH / SEX

b. OTHER INSURED'S DATE OF BIRTH
JURIS STATE  BA*

b. AUTO ACCIDENT? PLACE (State)
YES X NO

b. EMPLOYER'S NAME OR SCHOOL NAME

c. EMPLOYER'S NAME OR SCHOOL NAME
DT/PC MT 1 21 TR

c. OTHER ACCIDENT?
YES X NO

c. INSURANCE PLAN NAME OR PROGRAM NAME
CRAWFORD AND COMPANY

d. INSURANCE PLAN NAME OR PROGRAM NAME
Initials / date VS 8-6-98

10d. RESERVED FOR LOCAL USE

d. IS THERE ANOTHER HEALTH BENEFIT PLAN?
YES X NO    If yes, return to and complete item 9 a-d.

READ BACK OF FORM BEFORE COMPLETING & SIGNING THIS FORM.

12. PATIENT'S OR AUTHORIZED PERSON'S SIGNATURE  I authorize the release of any medical or other information necessary to process this claim. I also request payment of government benefits either to myself or to the party who accepts assignment below.

SIGNED SIGNATURE ON FILE    DATE 6 04 98

13. INSURED'S OR AUTHORIZED PERSON'S SIGNATURE  I authorize payment of medical benefits to the undersigned physician or supplier for services described below.

SIGNED SIGNATURE ON FILE    6 04 98

| 14. DATE OF CURRENT: ILLNESS (First symptom) OR INJURY (Accident) OR PREGNANCY (LMP) | 15. IF PATIENT HAS HAD SAME OR SIMILAR ILLNESS. GIVE FIRST DATE | 16. DATES PATIENT UNABLE TO WORK IN CURRENT OCCUPATION FROM TO |
|---|---|---|

| 17. NAME OF REFERRING PHYSICIAN OR OTHER SOURCE | 17a. I.D. NUMBER OF REFERRING PHYSICIAN | 18. HOSPITALIZATION DATES RELATED TO CURRENT SERVICES FROM TO |
|---|---|---|
| MIKE CIEPELLA GA | E75539 | |

19. 

20. OUTSIDE LAB?  YES X NO

RECEIVED BY
AUG 05 1998
K & K CLAIMS

| 21. DIAGNOSIS OR NATURE OF ILLNESS OR INJURY. (RELATE ITEMS 1,2,3 OR 4 TO ITEM 24E BY LINE) | 22. MEDICAID RESUBMISSION CODE / ORIGINAL REF. NO. |
|---|---|
| 1. 840.9     3. | |
| 2.     4. | 23. PRIOR AUTHORIZATION NUMBER |

| 24. A DATE(S) OF SERVICE From   To | | B Place of Service | C Type of Service | D PROCEDURES, SERVICES, OR SUPPLIES (Explain Unusual Circumstances) CPT/HCPCS   MODIFIER | E DIAGNOSIS CODE | F $ CHARGES | G DAYS OR UNITS | H EPSDT Family Plan | I EMG | J COB | K RESERVED FOR LOCAL USE |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 06 04 98 | 06 04 98 | 11 | 1 | 99204 | 840.9 | 125 00 | 1 | | | | |
| 06 04 98 | 06 04 98 | 11 | 1 | 97110 | 840.9 | 40 00 | 1 | | | | |
| 06 04 98 | 06 04 98 | 11 | 1 | 97265 | 840.9 | 70 00 | 1 | | | | |
| 06 04 98 | 06 04 98 | 11 | 1 | 97010 | 840.9 | 26 00 | 1 | | | | |
| 06 04 98 | 06 04 98 | 11 | 1 | 97014 | 840.9 | 30 00 | 1 | WCW 019799 CONFIDENTIAL | | | |

| 25. FEDERAL TAX I.D. NUMBER    SSN EIN | 26. PATIENT'S ACCOUNT NO. | 27. ACCEPT ASSIGNMENT? (For govt. claims, see back) | 28. TOTAL CHARGE | 29. AMOUNT PAID | 30. BALANCE DUE |
|---|---|---|---|---|---|
| 58 2157687    X | | YES X NO | $ 291 00 | $ 0 00 | $ 291 00 |

| 31. SIGNATURE OF PHYSICIAN OR SUPPLIER INCLUDING DEGREES OR CREDENTIALS (I certify that the statements on the reverse apply to this bill and are made a part thereof.) | 32. NAME AND ADDRESS OF FACILITY WHERE SERVICES WERE RENDERED (If other than home or office) | 33. PHYSICIAN'S, SUPPLIER'S BILLING NAME, ADDRESS, ZIP CODE & PHONE # |
|---|---|---|
| S BRENT SCOTT MS PT   04853   06  98 | | ATLANTA SPINE AND REHAB CTR 3280 HOWELL MILL RD  SUITE 1 ATLANTA GA 30327 |
| | | PIN#    GRP# |

(APPROVED BY AMA COUNCIL ON MEDICAL SERVICE 8/88)    **PLEASE PRINT OR TYPE**

FORM HCFA-1500 (12-90)
FORM OWCP-1500
FORM RRB-1500

APPROVED OMB-0938-0008

CRAWFORD AND COMPANY
WCW
PO BOX 52067
ATLANTA GA 30355 0067

## HEALTH INSURANCE CLAIM FORM

PLEASE DO NOT STAPLE IN THIS AREA

| PICA | | | | | | | | | | PICA |

1. MEDICARE ☐ (Medicare #)  MEDICAID ☐ (Medicaid #)  CHAMPUS ☐ (Sponsor's SSN)  CHAMPVA ☐ (VA File #)  GROUP HEALTH PLAN ☐ (SSN or ID)  FECA BLK LUNG ☐ (SSN)  OTHER ☐ (ID)

1a. INSURED'S I.D. NUMBER (FOR PROGRAM IN ITEM 1)
268868617

2. PATIENT'S NAME (Last Name, First Name, Middle Initial)
SAENGSIPJAAN BOUNTHAN

3. PATIENT'S BIRTH DATE MM 09 DD 15 YY 73   SEX M ☒ F ☐

4. INSURED'S NAME (Last Name, First Name, Middle Initial)
SAME

5. PATIENT'S ADDRESS (No., Street)
1278 STONEHAM CT

6. PATIENT RELATIONSHIP TO INSURED
Self ☒   Spouse ☐   Child ☐   Other ☐

7. INSURED'S ADDRESS (No., Street)
SAME

CITY
COLLEGE PARK   STATE GA

8. PATIENT STATUS
Single ☐   Married ☐   Other ☐
Employed ☐   Full-Time Student ☐   Part-Time Student ☐

CITY   STATE

ZIP CODE
30067

TELEPHONE (Include Area Code)
(770) 997 1730

ZIP CODE   TELEPHONE (INCLUDE AREA CODE) ( )

9. OTHER INSURED'S NAME (Last Name, First Name, Middle Initial)
NA

10. IS PATIENT'S CONDITION RELATED TO:

11. INSURED'S POLICY GROUP OR FECA NUMBER
WCW

a. OTHER INSURED'S POLICY OR GROUP NUMBER

a. EMPLOYMENT? (CURRENT OR PREVIOUS)
☒ YES   ☐ NO

a. INSURED'S DATE OF BIRTH MM DD YY   SEX M ☐ F ☐

b. OTHER INSURED'S DATE OF BIRTH MM DD YY   SEX M ☐ F ☐

b. AUTO ACCIDENT?
☐ YES   ☒ NO   PLACE (State)

b. EMPLOYER'S NAME OR SCHOOL NAME

c. EMPLOYER'S NAME OR SCHOOL NAME

c. OTHER ACCIDENT?
☐ YES   ☒ NO

c. INSURANCE PLAN NAME OR PROGRAM NAME
CRAWFORD AND COMPANY

d. INSURANCE PLAN NAME OR PROGRAM NAME

10d. RESERVED FOR LOCAL USE

d. IS THERE ANOTHER HEALTH BENEFIT PLAN?
☐ YES   ☒ NO   If yes, return to and complete item 9 a-d.

READ BACK OF FORM BEFORE COMPLETING & SIGNING THIS FORM.

12. PATIENT'S OR AUTHORIZED PERSON'S SIGNATURE I authorize the release of any medical or other information necessary to process this claim. I also request payment of government benefits either to myself or to the party who accepts assignment below.

SIGNED   SIGNATURE ON FILE   DATE   6 09 98

13. INSURED'S OR AUTHORIZED PERSON'S SIGNATURE I authorize payment of medical benefits to the undersigned physician or supplier for services described below.

SIGNED   SIGNATURE ON FILE   6 09 98

14. DATE OF CURRENT: MM DD YY   ◄ ILLNESS (First symptom) OR INJURY (Accident) OR PREGNANCY(LMP)

15. IF PATIENT HAS HAD SAME OR SIMILAR ILLNESS. GIVE FIRST DATE MM DD YY

16. DATES PATIENT UNABLE TO WORK IN CURRENT OCCUPATION
FROM   TO

17. NAME OF REFERRING PHYSICIAN OR OTHER SOURCE
MIKE CIEPELLA GA

17a. I.D. NUMBER OF REFERRING PHYSICIAN
E75539

18. HOSPITALIZATION DATES RELATED TO CURRENT SERVICES
FROM   TO

RECEIVED BY

19. RESERVED FOR LOCAL USE

20. OUTSIDE LAB?
☐ YES   ☒ NO   $ CHARGES

AUG 05 1998

21. DIAGNOSIS OR NATURE OF ILLNESS OR INJURY. (RELATE ITEMS 1,2,3 OR 4 TO ITEM 24E BY LINE)
1. 840.9
3.
2.
4.

22. MEDICAID RESUBMISSION CODE   ORIGINAL REF. NO.

23. PRIOR AUTHORIZATION NUMBER

K & K CLAIMS

| 24. A. DATE(S) OF SERVICE From MM DD YY | To MM DD YY | B. Place of Service | C. Type of Service | D. PROCEDURES, SERVICES, OR SUPPLIES (Explain Unusual Circumstances) CPT/HCPCS | MODIFIER | E. DIAGNOSIS CODE | F. $ CHARGES | G. DAYS OR UNITS | H. EPSDT Family Plan | I. EMG | J. COB | K. RESERVED FOR LOCAL USE |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 06 09 98 | 06 09 98 | 11 | 1 | 97750 | | 840.9 | 65 00 | 1 | | | | |
| 06 09 98 | 06 09 98 | 11 | 1 | 97750 | | 840.9 | 65 00 | 1 | | | | |
| 06 09 98 | 06 09 98 | 11 | 1 | 97535 | | 840.9 | 50 00 | 1 | | | | |
| | | | | | | | | | | | | |
| | | | | | | | | | | | | |

WCW 019800
CONFIDENTIAL

25. FEDERAL TAX I.D. NUMBER   SSN ☐ EIN ☒
58 2157687

26. PATIENT'S ACCOUNT NO.

27. ACCEPT ASSIGNMENT? (For govt. claims, see back)
☒ YES   ☐ NO

28. TOTAL CHARGE
$ 180 00

29. AMOUNT PAID
$ 0 00

30. BALANCE DUE
$ 180 00

31. SIGNATURE OF PHYSICIAN OR SUPPLIER INCLUDING DEGREES OR CREDENTIALS (I certify that the statements on the reverse apply to this bill and are made a part thereof.)
S BRENT SCOTT MS PT
00853   06 16 98

32. NAME AND ADDRESS OF FACILITY WHERE SERVICES WERE RENDERED (if other than home or office)

33. PHYSICIAN'S, SUPPLIER'S BILLING NAME, ADDRESS, ZIP CODE & PHONE #
ATLANTA SPINE AND REHAB CTR
3280 HOWELL MILL RD   SUITE 1
ATLANTA GA 30327
PIN#   GRP#

(APPROVED BY AMA COUNCIL ON MEDICAL SERVICE 8/88)   PLEASE PRINT OR TYPE   FORM HCFA-1500 (12-90)
FORM OWCP-1500
FORM RRB-1500

Mfd. by Medical Arts Press

APPROVED OMB-0938-0008

CRAWFORD AND COMPANY
WCW
PO BOX  52067
ATLANTA GA 30355 0067

NF
6-24-98

**HEALTH INSURANCE CLAIM FORM**

| PICA | | | | | | | | | PICA |
|---|---|---|---|---|---|---|---|---|---|

| 1. MEDICARE | MEDICAID | CHAMPUS | CHAMPVA | GROUP HEALTH PLAN | FECA BLK LUNG | OTHER | 1a. INSURED'S I.D. NUMBER | (FOR PROGRAM IN ITEM 1) |
|---|---|---|---|---|---|---|---|---|
| (Medicare #) | (Medicaid #) | (Sponsor's SSN) | (VA File #) | (SSN or ID) | (SSN) | (ID) | 268868617 | |

2. PATIENT'S NAME (Last Name, First Name, Middle Initial)
SAENGSIPJAAN BOUNTHAN

3. PATIENT'S BIRTH DATE
MM 09 DD 15 YY 73   SEX M [X] F [ ]

4. INSURED'S NAME (Last Name, First Name, Middle Initial)
SAME

5. PATIENT'S ADDRESS (No., Street)
1278 STONEHAM CT

6. PATIENT RELATIONSHIP TO INSURED
Self [ ] Spouse [ ] Child [ ] Other [ ]

7. INSURED'S ADDRESS (No., Street)
SAME

CITY
COLLEGE PARK
STATE GA

8. PATIENT STATUS
Single [ ] Married [ ] Other [ ]

CITY                                        STATE

ZIP CODE
30067
TELEPHONE (Include Area Code)
(770) 997 1730

Employed [ ] Full-Time Student [ ] Part-Time Student [ ]

ZIP CODE
TELEPHONE (INCLUDE AREA CODE)
( )

9. OTHER INSURED'S NAME (Last Name, First Name, Middle Initial)
NA

10. IS PATIENT'S CONDITION RELATED TO:

11. INSURED'S POLICY GROUP OR FECA NUMBER
WCW

a. OTHER INSURED'S POLICY OR GROUP NUMBER

a. EMPLOYMENT? (CURRENT OR PREVIOUS)
YES [X] NO [ ]

a. INSURED'S DATE OF BIRTH
MM DD YY   SEX M [ ] F [ ]

b. OTHER INSURED'S DATE OF BIRTH
MM DD YY   SEX

b. AUTO ACCIDENT?   PLACE (State)
YES [ ] NO [X]

b. EMPLOYER'S NAME OR SCHOOL NAME

c. EMPLOYER'S NAME OR SCHOOL NAME

c. OTHER ACCIDENT?
YES [ ] NO [X]

c. INSURANCE PLAN NAME OR PROGRAM NAME
CRAWFORD AND COMPANY

d. INSURANCE PLAN NAME OR PROGRAM NAME

10d. RESERVED FOR LOCAL USE

d. IS THERE ANOTHER HEALTH BENEFIT PLAN?
YES [ ] NO [X]   If yes, return to and complete item 9 a-d.

READ BACK OF FORM BEFORE COMPLETING & SIGNING THIS FORM.
12. PATIENT'S OR AUTHORIZED PERSON'S SIGNATURE I authorize the release of any medical or other information necessary to process this claim. I also request payment of government benefits either to myself or to the party who accepts assignment below.
SIGNED   SIGNATURE ON FILE   DATE   6 11 98

13. INSURED'S OR AUTHORIZED PERSON'S SIGNATURE I authorize payment of medical benefits to the undersigned physician or supplier for services described below.
SIGNED   SIGNATURE ON FILE   6 11 98

14. DATE OF CURRENT:   ILLNESS (First symptom) OR INJURY (Accident) OR PREGNANCY (LMP)
MM DD YY

15. IF PATIENT HAS HAD SAME OR SIMILAR ILLNESS. GIVE FIRST DATE MM DD YY

16. DATES PATIENT UNABLE TO WORK IN CURRENT OCCUPATION
FROM MM DD YY   TO MM DD YY

17. NAME OF REFERRING PHYSICIAN OR OTHER SOURCE
MIKE CIEPELLA GA

17a. I.D. NUMBER OF REFERRING PHYSICIAN
E75539

18. HOSPITALIZATION DATES RELATED TO CURRENT SERVICES
FROM MM DD YY   TO MM DD YY

19. RESERVED FOR LOCAL USE

20. OUTSIDE LAB?
YES [ ] NO [X]

**RECEIVED BY**

21. DIAGNOSIS OR NATURE OF ILLNESS OR INJURY. (RELATE ITEMS 1,2,3 OR 4 TO ITEM 24E BY LINE)
1. 840.9
3.

22. MEDICAID RESUBMISSION CODE   ORIGINAL REF. NO.

**AUG 05 1998**

2.
4.

23. PRIOR AUTHORIZATION NUMBER

**K & K CLAIMS**

| 24. A DATE(S) OF SERVICE From MM DD YY | To MM DD YY | B Place of Service | C Type of Service | D PROCEDURES, SERVICES, OR SUPPLIES (Explain Unusual Circumstances) CPT/HCPCS MODIFIER | E DIAGNOSIS CODE | F $ CHARGES | G DAYS OR UNITS | H EPSDT Family Plan | I EMG | J COB | K RESERVED FOR LOCAL USE |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 06 11 98 | 06 11 98 | 11 | 1 | 97750 | 840.9 | 65 00 | 1 | | | | |
| 06 11 98 | 06 11 98 | 11 | 1 | 97110 | 840.9 | 40 00 | 1 | | | | |
| 06 11 98 | 06 11 98 | 11 | 1 | 97530 | 840.9 | 48 00 | 1 | | | | |

**RECEIVE**
**JUN 24 1998**
**By**

WCW 019801
CONFIDENTIAL

25. FEDERAL TAX I.D. NUMBER   SSN [ ] EIN [X]
58 2157687

26. PATIENT'S ACCOUNT NO.

27. ACCEPT ASSIGNMENT? (For govt. claims, see back)
YES [X] NO [ ]

28. TOTAL CHARGE
$ 153 00

29. AMOUNT PAID
$ 0 00

30. BALANCE DUE
$ 153 00

31. SIGNATURE OF PHYSICIAN OR SUPPLIER INCLUDING DEGREES OR CREDENTIALS (I certify that the statements on the reverse apply to this bill and are made a part thereof.)
S BRENT SCOTT MS PT
#0853   06 16 98

32. NAME AND ADDRESS OF FACILITY WHERE SERVICES WERE RENDERED (If other than home or office)

33. PHYSICIAN'S, SUPPLIER'S BILLING NAME, ADDRESS, ZIP CODE & PHONE #
ATLANTA SPINE AND REHAB CTR
3280 HOWELL MILL RD  SUITE 1
ATLANTA GA 30327
PIN#   GRP#

(APPROVED BY AMA COUNCIL ON MEDICAL SERVICE 8/88)   **PLEASE PRINT OR TYPE**

FORM HCFA-1500 (12-90)
FORM OWCP-1500
FORM RRB-1500

PLEASE
DO NOT
STAPLE
IN THIS
AREA

CARRIER

CRAWFORD AND COMPANY
WCW
PO BOX  52067
ATLANTA GA 30355 0067

## HEALTH INSURANCE CLAIM FORM

| | | | | | |
|---|---|---|---|---|---|
| PICA | | | | | PICA |

| 1. | MEDICARE | MEDICAID | CHAMPUS | CHAMPVA | GROUP HEALTH PLAN | FECA BLK LUNG | OTHER | 1a. INSURED'S I.D. NUMBER | (FOR PROGRAM IN ITEM 1) |
|---|---|---|---|---|---|---|---|---|---|
| | (Medicare #) | (Medicaid #) | (Sponsor's SSN) | (VA File #) | (SSN or ID) | (SSN) | (ID) | 268868617 | |

**2. PATIENT'S NAME** (Last Name, First Name, Middle Initial)
SAENGSIPJAAN BOUNTHAN

**3. PATIENT'S BIRTH DATE** 09 15 73  SEX M ☒ F ☐

**4. INSURED'S NAME** (Last Name, First Name, Middle Initial)
SAME

**5. PATIENT'S ADDRESS** (No., Street)
1278 STONEHAM CT

**6. PATIENT RELATIONSHIP TO INSURED**
Self ☐ Spouse ☐ Child ☐ Other ☐

**7. INSURED'S ADDRESS** (No., Street)
SAME

**CITY** COLLEGE PARK  **STATE** GA

**8. PATIENT STATUS**
Single ☐ Married ☐ Other ☐
Employed ☐ Full-Time Student ☐ Part-Time Student ☐

**CITY** | **STATE**

**ZIP CODE** 30067  **TELEPHONE** (Include Area Code) (770) 997 1730

**ZIP CODE** | **TELEPHONE** (INCLUDE AREA CODE) ( )

**9. OTHER INSURED'S NAME** (Last Name, First Name, Middle Initial)
NA

**10. IS PATIENT'S CONDITION RELATED TO:**
WCW

**11. INSURED'S POLICY GROUP OR FECA NUMBER**
WCW

**a. OTHER INSURED'S POLICY OR GROUP NUMBER**

**a. EMPLOYMENT?** (CURRENT OR PREVIOUS)
☒ YES ☐ NO

**a. INSURED'S DATE OF BIRTH** MM DD YY  SEX M ☐ F ☐

**b. OTHER INSURED'S DATE OF BIRTH** MM DD YY  SEX M ☐ F ☐

**b. AUTO ACCIDENT?** PLACE (State)
☐ YES ☒ NO

**b. EMPLOYER'S NAME OR SCHOOL NAME**

**c. EMPLOYER'S NAME OR SCHOOL NAME**

**c. OTHER ACCIDENT?**
☐ YES ☒ NO

**c. INSURANCE PLAN NAME OR PROGRAM NAME**
CRAWFORD AND COMPANY

**d. INSURANCE PLAN NAME OR PROGRAM NAME**

**10d. RESERVED FOR LOCAL USE**

**d. IS THERE ANOTHER HEALTH BENEFIT PLAN?**
☐ YES ☒ NO  If yes, return to and complete item 9 a-d.

READ BACK OF FORM BEFORE COMPLETING & SIGNING THIS FORM.
**12. PATIENT'S OR AUTHORIZED PERSON'S SIGNATURE** I authorize the release of any medical or other information necessary to process this claim. I also request payment of government benefits either to myself or to the party who accepts assignment below.
SIGNATURE ON FILE        6 18 98
SIGNED                    DATE

**13. INSURED'S OR AUTHORIZED PERSON'S SIGNATURE** I authorize payment of medical benefits to the undersigned physician or supplier for services described below.
SIGNATURE ON FILE   6 18 98
SIGNED

**14. DATE OF CURRENT:** MM DD YY  ILLNESS (First symptom) OR INJURY (Accident) OR PREGNANCY(LMP)

**15. IF PATIENT HAS HAD SAME OR SIMILAR ILLNESS.** GIVE FIRST DATE MM DD YY

**16. DATES PATIENT UNABLE TO WORK IN CURRENT OCCUPATION**
FROM         TO

**17. NAME OF REFERRING PHYSICIAN OR OTHER SOURCE**
MIKE CIEPELLA GA

**17a. I.D. NUMBER OF REFERRING PHYSICIAN**
E75539

**18. HOSPITALIZATION DATES RELATED** MM DD YY
FROM         TO

RECEIVED BY
AUG 05 1998
K & K CLAIMS

**19. RESERVED FOR LOCAL USE**

**20. OUTSIDE LAB?**
☐ YES ☒ NO  $ CHARGES

**21. DIAGNOSIS OR NATURE OF ILLNESS OR INJURY.** (RELATE ITEMS 1,2,3 OR 4 TO ITEM 24E BY LINE)
1. 840 9
2.
3.
4.

**22. MEDICAID RESUBMISSION** CODE | ORIGINAL REF. NO.

**23. PRIOR AUTHORIZATION NUMBER**

| 24. A DATE(S) OF SERVICE From MM DD YY | To MM DD YY | B Place of Service | C Type of Service | D PROCEDURES, SERVICES, OR SUPPLIES (Explain Unusual Circumstances) CPT/HCPCS | MODIFIER | E DIAGNOSIS CODE | F $ CHARGES | G DAYS OR UNITS | H EPSDT Family Plan | I EMG | J COB | RESERVED FOR LOCAL USE |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 06 18 98 | 06 18 98 | 11 | 1 | 97750 | | 840.9 | 65 00 | 1 | | | | |
| 06 18 98 | 06 18 98 | 11 | 1 | 97110 | | 840.9 | 40 00 | 1 | | | | |
| | | | | | | | | | | | | |
| | | | | | | | | | | | | |
| | | | | | | | | | | | | |
| | | | | | | | | | | | | |

WCW 019802
CONFIDENTIAL

**25. FEDERAL TAX I.D. NUMBER** SSN ☐ EIN ☒
58 2157687

**26. PATIENT'S ACCOUNT NO.**

**27. ACCEPT ASSIGNMENT?** (For govt. claims, see back)
☐ YES ☐ NO

**28. TOTAL CHARGE** $ 105 00

**29. AMOUNT PAID** $ 0 00

**30. BALANCE DUE** $ 105 00

**31. SIGNATURE OF PHYSICIAN OR SUPPLIER INCLUDING DEGREES OR CREDENTIALS** (I certify that the statements on the reverse apply to this bill and are made a part thereof.)
S BRENT SCOTT  MS PT
004853        07 06 98
SIGNED            DATE

**32. NAME AND ADDRESS OF FACILITY WHERE SERVICES WERE RENDERED** (If other than home or office)

**33. PHYSICIAN'S, SUPPLIER'S BILLING NAME, ADDRESS, ZIP CODE & PHONE #**
ATLANTA SPINE AND REHAB CTR
3280 HOWELL MILL RD  SUITE 1
ATLANTA GA 30327
PIN#              GRP#

(APPROVED BY AMA COUNCIL ON MEDICAL SERVICE 8/88)
PLEASE PRINT OR TYPE
FORM HCFA-1500 (12-90)

CRAWFORD AND COMPANY
WCW
PO BOX 52067
ATLANTA GA 30355 0067

## HEALTH INSURANCE CLAIM FORM

| 1. MEDICARE | MEDICAID | CHAMPUS | CHAMPVA | GROUP HEALTH PLAN | FECA BLK LUNG | OTHER | 1a. INSURED'S I.D. NUMBER | (FOR PROGRAM IN ITEM 1) |
|---|---|---|---|---|---|---|---|---|
| (Medicare #) | (Medicaid #) | (Sponsor's SSN) | (VA File #) | (SSN or ID) | (SSN) | (ID) | 268868617 | |

| 2. PATIENT'S NAME (Last Name, First Name, Middle Initial) | 3. PATIENT'S BIRTH DATE | SEX | 4. INSURED'S NAME (Last Name, First Name, Middle Initial) |
|---|---|---|---|
| SAENGSIPJAAN BOUNTHAN | 09 15 73 | M [X] F | SAME |

| 5. PATIENT'S ADDRESS (No., Street) | 6. PATIENT RELATIONSHIP TO INSURED | 7. INSURED'S ADDRESS (No., Street) |
|---|---|---|
| 1278 STONEHAM CT | Self [X] Spouse Child Other | SAME |

| CITY | STATE | 8. PATIENT STATUS | CITY | STATE |
|---|---|---|---|---|
| COLLEGE PARK | GA | Single Married Other | | |

| ZIP CODE | TELEPHONE (Include Area Code) | | ZIP CODE | TELEPHONE (INCLUDE AREA CODE) |
|---|---|---|---|---|
| 30067 | (770) 997 1730 | Employed Full-Time Student Part-Time Student | | |

RECEIVED BY
WCW
AUG 05 1998
K & K CLAIMS

| 9. OTHER INSURED'S NAME (Last Name, First Name, Middle Initial) | 10. IS PATIENT'S CONDITION RELATED TO: | 11. INSURED'S POLICY GROUP OR FECA NUMBER |
|---|---|---|
| NA | | |

| a. OTHER INSURED'S POLICY OR GROUP NUMBER | a. EMPLOYMENT? (CURRENT OR PREVIOUS) | a. INSURED'S DATE OF BIRTH | SEX |
|---|---|---|---|
| | [X] YES NO | | M F |

| b. OTHER INSURED'S DATE OF BIRTH | SEX | b. AUTO ACCIDENT? | PLACE (State) | b. EMPLOYER'S NAME OR SCHOOL NAME |
|---|---|---|---|---|
| | M F | YES [X] NO | | |

| c. EMPLOYER'S NAME OR SCHOOL NAME | c. OTHER ACCIDENT? | c. INSURANCE PLAN NAME OR PROGRAM NAME |
|---|---|---|
| | YES [X] NO | CRAWFORD AND COMPANY |

| d. INSURANCE PLAN NAME OR PROGRAM NAME | 10d. RESERVED FOR LOCAL USE | d. IS THERE ANOTHER HEALTH BENEFIT PLAN? |
|---|---|---|
| | | YES [X] NO If yes, return to and complete item 9 a-d. |

READ BACK OF FORM BEFORE COMPLETING & SIGNING THIS FORM.
12. PATIENT'S OR AUTHORIZED PERSON'S SIGNATURE I authorize the release of any medical or other information necessary to process this claim. I also request payment of government benefits either to myself or to the party who accepts assignment below.
SIGNED SIGNATURE ON FILE     DATE 6 16 98

13. INSURED'S OR AUTHORIZED PERSON'S SIGNATURE I authorize payment of medical benefits to the undersigned physician or supplier for services described below.
SIGNED SIGNATURE ON FILE  6 16 98

| 14. DATE OF CURRENT: ILLNESS (First symptom) OR INJURY (Accident) OR PREGNANCY(LMP) | 15. IF PATIENT HAS HAD SAME OR SIMILAR ILLNESS. GIVE FIRST DATE | 16. DATES PATIENT UNABLE TO WORK IN CURRENT OCCUPATION |
|---|---|---|
| | | FROM TO |

| 17. NAME OF REFERRING PHYSICIAN OR OTHER SOURCE | 17a. I.D. NUMBER OF REFERRING PHYSICIAN | 18. HOSPITALIZATION DATES RELATED TO CURRENT SERVICES |
|---|---|---|
| MIKE CIEPELLA GA | E75539 | FROM TO |

| 19. RESERVED FOR LOCAL USE | 20. OUTSIDE LAB? | $ CHARGES |
|---|---|---|
| | YES [X] NO | |

| 21. DIAGNOSIS OR NATURE OF ILLNESS OR INJURY. (RELATE ITEMS 1,2,3 OR 4 TO ITEM 24E BY LINE) | 22. MEDICAID RESUBMISSION CODE / ORIGINAL REF. NO. |
|---|---|
| 1. 840 9     3. | |
| 2.     4. | 23. PRIOR AUTHORIZATION NUMBER |

| 24. A DATE(S) OF SERVICE From MM DD YY | To MM DD YY | B Place of Service | C Type of Service | D PROCEDURES, SERVICES, OR SUPPLIES CPT/HCPCS / MODIFIER | E DIAGNOSIS CODE | F $ CHARGES | G DAYS OR UNITS | H EPSDT Family Plan | I EMG | J COB | K RESERVED FOR LOCAL USE |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 06 16 98 | 06 16 98 | 11 | 1 | 977501 | 840.9 | 65 00 | 1 | | | | |
| 06 16 98 | 06 16 98 | 11 | 1 | 97265 | 840.9 | 70 00 | 1 | | | | |
| | | | | | | | | | | | WCW 019803 CONFIDENTIAL |
| | | | | | | | | | | | JUL 09 1998 |
| | | | | | | | | | | | |

| 25. FEDERAL TAX I.D. NUMBER | SSN EIN | 26. PATIENT'S ACCOUNT NO. | 27. ACCEPT ASSIGNMENT? (For govt. claims, see back) | 28. TOTAL CHARGE | 29. AMOUNT PAID | 30. BALANCE DUE |
|---|---|---|---|---|---|---|
| 58 2157687 | [X] | | [X] YES NO | $ 135 00 | $ 0 00 | $ 135 00 |

| 31. SIGNATURE OF PHYSICIAN OR SUPPLIER INCLUDING DEGREES OR CREDENTIALS (I certify that the statements on the reverse apply to this bill and are made a part thereof.) | 32. NAME AND ADDRESS OF FACILITY WHERE SERVICES WERE RENDERED (if other than home or office) | 33. PHYSICIAN'S, SUPPLIER'S BILLING NAME, ADDRESS, ZIP CODE & PHONE # |
|---|---|---|
| S BRENT SCOTT MS PT | | ATLANTA SPINE AND REHAB CTR 3280 HOWELL MILL RD   SUITE 1 ATLANTA GA 30327 |
| 004853     07 06 98 | | PIN# GRP# |

(APPROVED BY AMA COUNCIL ON MEDICAL SERVICE 8/88)     PLEASE PRINT OR TYPE     FORM HCFA-1500 (12-90)

PLEASE
DO NOT
STAPLE
IN THIS
AREA

CRAWFORD AND COMPANY
WCW
PO BOX   52067
ATLANTA GA 30355 0067

**HEALTH INSURANCE CLAIM FORM**

PICA

| 1. MEDICARE | MEDICAID | CHAMPUS | CHAMPVA | GROUP HEALTH PLAN | FECA BLK LUNG | OTHER | 1a. INSURED'S I.D. NUMBER | (FOR PROGRAM IN ITEM 1) |
|---|---|---|---|---|---|---|---|---|
| (Medicare #) | (Medicaid #) | (Sponsor's SSN) | (VA File #) | (SSN or ID) | (SSN) | (ID) | 268868617 | |

2. PATIENT'S NAME (Last Name, First Name, Middle Initial)
SAENGSIPJAAN BOUNTHAN

3. PATIENT'S BIRTH DATE   MM 09 DD 15 YY 73   SEX M [X] F

4. INSURED'S NAME (Last Name, First Name, Middle Initial)
SAME

5. PATIENT'S ADDRESS (No., Street)
1278 STONEHAM CT

6. PATIENT RELATIONSHIP TO INSURED
Self [X] Spouse [ ] Child [ ] Other [ ]

7. INSURED'S ADDRESS (No., Street)
SAME

CITY
COLLEGE PARK   STATE GA

8. PATIENT STATUS
Single [ ] Married [ ] Other [ ]
Employed [ ] Full-Time Student [ ] Part-Time Student [ ]

CITY   STATE

ZIP CODE 30067   TELEPHONE (Include Area Code) (770) 997 1730

ZIP CODE   TELEPHONE (INCLUDE AREA CODE) ( )

9. OTHER INSURED'S NAME (Last Name, First Name, Middle Initial)
NA

10. IS PATIENT'S CONDITION RELATED TO:

11. INSURED'S POLICY GROUP OR FECA NUMBER
WCW

a. OTHER INSURED'S POLICY OR GROUP NUMBER

a. EMPLOYMENT? (CURRENT OR PREVIOUS)
[X] YES [ ] NO

a. INSURED'S DATE OF BIRTH   MM DD YY   SEX M [ ] F [ ]

b. OTHER INSURED'S DATE OF BIRTH   MM DD YY   SEX M [ ] F [ ]

b. AUTO ACCIDENT?
[ ] YES [X] NO   PLACE (State)

b. EMPLOYER'S NAME OR SCHOOL NAME

c. EMPLOYER'S NAME OR SCHOOL NAME

c. OTHER ACCIDENT?
[ ] YES [X] NO

c. INSURANCE PLAN NAME OR PROGRAM NAME
CRAWFORD AND COMPANY

d. INSURANCE PLAN NAME OR PROGRAM NAME

10d. RESERVED FOR LOCAL USE

d. IS THERE ANOTHER HEALTH BENEFIT PLAN?
[ ] YES [X] NO   If yes, return to and complete item 9 a-d.

READ BACK OF FORM BEFORE COMPLETING & SIGNING THIS FORM.
12. PATIENT'S OR AUTHORIZED PERSON'S SIGNATURE I authorize the release of any medical or other information necessary to process this claim. I also request payment of government benefits either to myself or to the party who accepts assignment below.
SIGNED   SIGNATURE ON FILE   DATE 6 25 98

13. INSURED'S OR AUTHORIZED PERSON'S SIGNATURE I authorize payment of medical benefits to the undersigned physician or supplier for services described below.
SIGNED   SIGNATURE ON FILE   6 25 98

14. DATE OF CURRENT:   ILLNESS (First symptom) OR INJURY (Accident) OR PREGNANCY(LMP)

15. IF PATIENT HAS HAD SAME OR SIMILAR ILLNESS. GIVE FIRST DATE   MM DD YY

16. DATES PATIENT UNABLE TO WORK IN CURRENT OCCUPATION
FROM   TO

17. NAME OF REFERRING PHYSICIAN OR OTHER SOURCE
MIKE CIEPELLA GA

17a. I.D. NUMBER OF REFERRING PHYSICIAN
E75539

18. HOSPITALIZATION DATES RELATED TO CURRENT SERVICES
FROM   TO

19. RESERVED FOR LOCAL USE

20. OUTSIDE LAB?
[ ] YES [X] NO   $ CHARGES

**RECEIVED BY**

21. DIAGNOSIS OR NATURE OF ILLNESS OR INJURY. (RELATE ITEMS 1,2,3 OR 4 TO ITEM 24E BY LINE)
1. 840.9
2. 
3. 
4. 

22. MEDICAID RESUBMISSION CODE   ORIGINAL REF. NO.

**AUG 05 1998**

23. PRIOR AUTHORIZATION NUMBER

**K & K CLAIMS**

| 24. DATE(S) OF SERVICE From MM DD YY | To MM DD YY | B Place of Service | C Type of Service | D PROCEDURES, SERVICES, OR SUPPLIES (Explain Unusual Circumstances) CPT/HCPCS MODIFIER | E DIAGNOSIS CODE | F $ CHARGES | G DAYS OR UNITS | H Family Plan | I EMG | J COB | K RESERVED FOR LOCAL USE |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 06 25 98 | 06 25 98 | 11 | 1 | 97750 | 840.9 | 65 00 | 1 | | | | |
| 06 25 98 | 06 25 98 | 11 | 1 | 97110 | 840.9 | 40 00 | 1 | | | | |
| | | | | | | | | | | | |
| | | | | | | | | | | | |
| | | | | | | | | | | | |

WCW 019804
CONFIDENTIAL

25. FEDERAL TAX I.D. NUMBER   SSN EIN
58 2157687   [X]

26. PATIENT'S ACCOUNT NO.

27. ACCEPT ASSIGNMENT? (For govt. claims, see back)
[X] YES [ ] NO

28. TOTAL CHARGE   $ 105 00

29. AMOUNT PAID   $ 0.00

30. BALANCE DUE   $ 105 00

31. SIGNATURE OF PHYSICIAN OR SUPPLIER INCLUDING DEGREES OR CREDENTIALS (I certify that the statements on the reverse apply to this bill and are made a part thereof.)
S BRENT SCOTT MS PT
004853   DATE 07 06 98

32. NAME AND ADDRESS OF FACILITY WHERE SERVICES WERE RENDERED (If other than home or office)

33. PHYSICIAN'S, SUPPLIER'S BILLING NAME, ADDRESS, ZIP CODE
ATLANTA SPINE AND REHAB CTR
3280 HOWELL MILL RD   SUITE 1
ATLANTA GA 30327
PIN#   GRP#

(APPROVED BY AMA COUNCIL ON MEDICAL SERVICE 8/88)

**PLEASE PRINT OR TYPE**

FORM HCFA-1500 (12-90)
FORM OWCP-1500   FORM RRB-1500

3280 Howell Mill Road   Atlanta, Georgia   30347   (404) 355-0655   FAX (404) 355-5258



## Southeastern Orthopaedic Institute™

## _WORK STATUS REPORT_

Employee __SAENGSIPHAN, BONTHAN__   Date __6·25·98__

Employer __WCW__   Date of injury _____

Diagnosis _____

☐  No Work Until _____

☑  Return to:   ☐ Limited   work on: _____

☐  Continue:   ☑ Regular

☐  Recheck   Date: _____

☐  Dismissed   Date: _____

Remarks: __Slow progressive return.__
__F/u 1 mo__

## _Work Limitations_

☐ No lifting over _____ lbs.

☐ No repetitive bending and/or rotation waist level.

☐ No work performed above shoulder level.

☐ Sit down work _____ of time.

☐ Standing work _____ of time.

☐ No work where use of _____ required.

☐ No climbing, squatting, crawling.

☐ Typing/Keyboard Activities More than _____ Hr./Day

☐ Other _____

Physician: _____   M.D.

Arrival Time _____   Departure Time _____

☐ No repetitive hand motions.

☐ No Driving.

☐ Keep wound dry and clean.

_Permanent Partial Disability (PPD)_

☐ PPD is _____ % whole person or _____ % of extremity.

Erroll J. Bailey, MD        Michael D. Ciepiela, MD        Jon E. Minter, DO

WCW 019798
CONFIDENTIAL

Attn B. Smith



# EXHIBIT / ATTACHMENT

## _____ 7 _____

(To be scanned in place of tab)

ATTN: ~~Paul~~
Jodi
Mike

## RESURGENS ORTHOPAEDICS

**EMPLOYEE WORK STATUS REPORT**
**PHYSICIAN'S EVALUATION**

EMPLOYEE'S NAME: *Bounthan Saengaphan* ~~Saengsi~~   DATE: 5-17-99

EMPLOYER: *WCW*   CONTACT:

TELEPHONE #:   FAX #:   DOI:

DIAGNOSIS: *Poss. ACL Tear.*

TREATMENT PLAN: *MRI*

NEXT VISIT ON:

### WORK STATUS

RETURN TO REGULAR DUTY ON: _____ NO WORK UNTIL: _____

RETURN TO WORK WITH MODIFICATIONS (SEE LIST OF MODIFICATIONS BELOW)

FROM: *5-17-99*   TO: *Next Visit*

### MODIFIED WORK DESCRIPTIONS

☐ **NO LIFTING**
☐ **SEDENTARY WORK**
   Lifting 10 lbs. Maximum and occasionally lifting and/or carrying of such articles as dockets, ledgers, and small tools. A certain amount of standing and walking is often necessary in carrying out job duties.
☒ **MODERATE WORK**
   Lifting 20 lbs. Maximum with frequent lifting and/or carrying of objects weighing up to 10 lbs. May involve sitting with a degree of pushing and pulling of arm or leg controls.
☐ **MEDIUM WORK**
   Lifting 50 lbs. Maximum with frequent lifting and/or carrying of objects weighing up to 25 lbs.
☐ **MEDIUM HEAVY WORK**
   Lifting 65 - 70 lbs. Maximum with frequent lifting and/or carrying of objects weighing up to 40 lbs.
☐ **HEAVY WORK**
   Lifting 100 lbs. Maximum with frequent lifting and/or carrying of objects weighing up to 50 lbs.
☐ **VERY HEAVY WORK**
   Lifting of objects in excess of 100 lbs. With frequent lifting and/or carrying of objects weighing up to 50 lbs.

In an eight hour workday employee can stand/walk:
   ☐ None   ☐ 1-4 hours   ☐ 4-6 hours   ☐ 6-8 hours
In an eight hour workday employee can sit:
   ☐ 1-3 hours   ☐ 3-5 hours   ☐ 5-8 hours
Employee can use hands for:
   ☐ Simple grasping   ☐ Pushing & Pulling   ☐ Fine manipulation
Employee can use feet for repetitive movement as in operating foot controls:
   ☐ Yes   ☐ No

Employee is able to:

|  | Not at all | Occasionally | Frequently | Constantly |
|---|---|---|---|---|
| Bend | ☐ | ☐ | ☐ | ☐ |
| Squat | ☐ | ☐ | ☐ | ☐ |
| Climb | ☐ | ☐ | ☐ | ☐ |
| Work at shoulder level | ☐ | ☐ | ☐ | ☐ |
| Perform overhead work | ☐ | ☐ | ☐ | ☐ |

Additional Restrictions: *Do Wrestling*

Physician's Signature:

Physician's Name Printed:

**DEFENDANT'S EXHIBIT**
7
Saengsiphanh

WCW 019886
CONFIDENTIAL



# RESURGENS
# ORTHOPAEDICS
*An affiliate of OrthoLink*

John C. Garrett, M.D.
Keith D. Osborn, M.D.
Blane A. Woodfin, M.D.
Drew V. Miller, M.D.
Kenneth J. Kress, M.D.
George Cierny III, M.D.
Roy M. Rubin, M.D.
Christopher R. Edwards, M.D.
Steven B. Wertheim, M.D.
William S. Armstrong, M.D.
Robert A. Kelly, M.D.
Jonathan S. Swift, M.D.
M. Shay Womack, M.D.
Thomas W. Marks, M.D.
Paul L. Flicker, M.D.
William H. Greenwood, M.D.
C. Michael Morris, M.D.
Joseph B. Chandler, M.D.
Scott M. Morrell, M.D.
Mark C. Cullen, M.D.

*All correspondence/inquiries to:*
440 Barrett Parkway
Suite 55
Kennesaw, Georgia 30144
(770) 421-8005

5671 Peachtree Dunwoody Road NE
Suite 900
Atlanta, Georgia 30342

203 Woodpark Place
Building A100
Woodstock, Georgia 30188

*West Paces Office*
3200 Downwood Circle
4th Floor
Atlanta, Georgia 30327

1380 Milstead Avenue
Suite D
Conyers, Georgia 30207

320 Hospital Road
Canton, Georgia 30114

575 Professional Drive
Suite 420
Lawrenceville, Georgia 30045

June 7, 1999

Brenda Smith
C/o WCW
P.O. Box 105366
Atlanta, GA 30348-5366

### RE: Bounthan Saengsiphan

Dear Ms Smith:

Patient underwent surgery on 6/3/99. At the time of surgery he had a displaced Bucket Handle tear of the medial meniscus and an arthroscopic partial medial meniscectomy. The ACL was torn. After removing the previous screw in the tibia the new tibia drill hole was good. However, upon removing the old femoral screw created a situation that prohibited proceeding with the ACL reconstruction. Bone grafts were taken from the tibia and placed in the drill hole sights in the femur. Once this bone is consolidated we will be able to go back at a later date and perform the ACL reconstruction as if this was a virgin knee.

Exam today shows moderate swelling. We were able to remove the staples.

X-rays shows the sights from the bone graft filled with the artificial bone. The metallic fragments in the femur are visualized as expected from the time of surgery. The bone graft in the femur appears to be in good position.

He will initiate physical therapy to maintain the leg in the best shape possible and we will see him back again in 3-weeks.

Thank you for the referral of this patient and allowing me to participate in his care.

Sincerely yours,

William S. Armstrong, M.D.
WSA:klp
(DICTATED BUT NOT PROOFREAD TO AVOID DELAY IN CORRESPONDENCE)

WCW 019880
CONFIDENTIAL



**RESURGENS**
**ORTHOPAEDICS**

**EMPLOYEE WORK STATUS REPORT**
**PHYSICIAN'S EVALUATION**

EMPLOYEE'S NAME: _Bounthan Saengsiphan_                    DATE: _6-28-99_

EMPLOYER: _WCW_                                CONTACT: _____

TELEPHONE #: _____ FAX #: _____ DOI: _____

DIAGNOSIS: _R Knee Surgery. 6-3-99_

TREATMENT PLAN: _Continue with Physical Therapy. ACL Recon._

NEXT VISIT ON: _7-21-99  2:00 pm_

## WORK STATUS

RETURN TO REGULAR DUTY ON: _____ NO WORK UNTIL: _next visit_

_7-21-99_

RETURN TO WORK WITH MODIFICATIONS (SEE LIST OF MODIFICATIONS BELOW)

FROM: _____ TO: _____

## MODIFIED WORK DESCRIPTIONS

☐ **NO LIFTING**
☐ **SEDENTARY WORK**
   Lifting 10 lbs. Maximum and occasionally lifting and/or carrying of such articles as dockets, ledgers, and small tools.
   A certain amount of standing and walking is often necessary in carrying out job duties.
☐ **MODERATE WORK**
   Lifting 20 lbs. Maximum with frequent lifting and/or carrying of objects weighing up to 10 lbs. May involve sitting
   with a degree of pushing and pulling of arm or leg controls.
☐ **MEDIUM WORK**
   Lifting 50 lbs. Maximum with frequent lifting and/or carrying of objects weighing up to 25 lbs.
☐ **MEDIUM HEAVY WORK**
   Lifting 65 - 70 lbs. Maximum with frequent lifting and/or carrying of objects weighing up to 40 lbs.
☐ **HEAVY WORK**
   Lifting 100 lbs. Maximum with frequent lifting and/or carrying of objects weighing up to 50 lbs.
☐ **VERY HEAVY WORK**
   Lifting of objects in excess of 100 lbs. With frequent lifting and/or carrying of objects weighing up to 50 lbs.

In an eight hour workday employee can stand/walk:
   ☐ None      ☐ 1-4 hours      ☐ 4-6 hours      ☐ 6-8 hours
In an eight hour workday employee can sit:
   ☐ 1-3 hours      ☐ 3-5 hours      ☐ 5-8 hours
Employee can use hands for:
   ☐ Simple grasping   ☐ Pushing & Pulling   ☐ Fine manipulation
Employee can use feet for repetitive movement as in operating foot controls:
   ☐ Yes      ☐ No

Employee is able to:

|  | Not at all | Occasionally | Frequently | Constantly |
|---|---|---|---|---|
| Bend | ☐ | ☐ | ☐ | ☐ |
| Squat | ☐ | ☐ | ☐ | ☐ |
| Climb | ☐ | ☐ | ☐ | ☐ |
| Work at shoulder level | ☐ | ☐ | ☐ | ☐ |
| Perform overhead work | ☐ | ☐ | ☐ | ☐ |

Additional Restrictions: _____

Physician's Signature: _____

Physician's Name Printed: _____

WCW 019881
CONFIDENTIAL



**RESURGENS
ORTHOPAEDICS**
*An affiliate of OrthoLink*

John C. Garrett, M.D.
Keith D. Osborn, M.D.
Blane A. Woodfin, M.D.
Drew V. Miller, M.D.
Kenneth J. Kress, M.D.
George Cierny III, M.D.
Roy M. Rubin, M.D.
Christopher R. Edwards, M.D.
Steven B. Wertheim, M.D.
William S. Armstrong, M.D.
Robert A. Kelly, M.D.
Jonathan S. Swift, M.D.
M. Shay Womack, M.D.
Thomas W. Marks, M.D.
Paul L. Flicker, M.D.
William H. Greenwood, M.D.
C. Michael Morris, M.D.
Joseph B. Chandler, M.D.
Scott M. Morrell, M.D.
Mark C. Cullen, M.D.

*All correspondence/inquiries to:*
440 Barrett Parkway
Suite 55
Kennesaw, Georgia 30144
(770) 421-8005

5671 Peachtree Dunwoody Road NE
Suite 900
Atlanta, Georgia 30342

203 Woodpark Place
Building A100
Woodstock, Georgia 30188

West Paces Office
3200 Downwood Circle
4th Floor
Atlanta, Georgia 30327

1380 Milstead Avenue
Suite D
Conyers, Georgia 30207

320 Hospital Road
Canton, Georgia 30114

575 Professional Drive
Suite 420
Lawrenceville, Georgia 30045

May 24, 1999

Brenda Smith
C/o WCW
P.O. Box 105366
Atlanta, GA  30348-5366

### RE:  Bounthan Saengsiphan

Dear Ms. Smith:

Follow-up MRI scan.  MRI report shows a bucket handle tear of the medial meniscus.  There is also a joint effusion and large Baker's cyst and a bone bruise involving the lateral femoral condyle and lateral tibial plateau.  They saw evidence of a previous ACL reconstruction and did not feel a definite impingement or recurrent tear (although in my opinion from our examination we no he has an ACL deficiency).

ASSESSMENT:      1.)     ACL deficiency right knee (status post-previous ACL reconstruction with retained screws)
                 2.)     Tear medial meniscus.

PLAN:      At this point in time I have recommended ACL reconstruction and surgery to either repair or remove the torn medial meniscus.  However, with the retained screws it may be difficult to pursue ACL resonstruction due to the bone defect that the screw will cause.  The plan will be to perform arthroscopic surgery with either meniscal repair or meniscectomy.  In the process performing the drill holes for ACL reconstruction I would assess the position of the screws.  It may be necessary to bone graft the area of the bone screws then come back three months later after the bone graft had healed to pursue ACL reconstruction.  I discussed this with the patient and we will proceed with that in the near future.

WCW 019882
CONFIDENTIAL

Bounthan Saengsiphan
5/24/99
Page2-

Thank you for the referral of this patient and allowing me to participate in his care.

Sincerely yours,

William S. Armstrong, M.D.
WSA:klp
(DICTATED BUT NOT PROOFREAD TO AVOID DELAY IN CORRESPONDENCE)

WCW 019883
CONFIDENTIAL

*Use VS 8/9/99*



**RESURGENS
ORTHOPAEDICS**

*An affiliate of OrthoLink*

John C. Garrett, M.D.
Keith D. Osborn, M.D.
Blane A. Woodfin, M.D.
Drew V. Miller, M.D.
Kenneth J. Kress, M.D.
George Cierny III, M.D.
Roy M. Rubin, M.D.
Christopher R. Edwards, M.D.
Steven B. Wertheim, M.D.
William S. Armstrong, M.D.
Robert A. Kelly, M.D.
Jonathan S. Swift, M.D.
M. Shay Womack, M.D.
Thomas W. Marks, M.D.
Paul L. Flicker, M.D.
William H. Greenwood, M.D.
C. Michael Morris, M.D.
Joseph B. Chandler, M.D.
Scott M. Morrell, M.D.
Mark C. Cullen, M.D.

*All correspondence/inquiries to:*
440 Barrett Parkway
Suite 55
Kennesaw, Georgia 30144
(770) 421-8005

5671 Peachtree Dunwoody Road NE
Suite 900
Atlanta, Georgia 30342

203 Woodpark Place
Building A100
Woodstock, Georgia 30188

West Paces Office
3200 Downwood Circle
4th Floor
Atlanta, Georgia 30327

1380 Milstead Avenue
Suite D
Conyers, Georgia 30207

320 Hospital Road
Canton, Georgia 30114

575 Professional Drive
Suite 420
Lawrenceville, Georgia 30045

July 21, 1999

Brenda Smith
WCW
P.O. Box 105366
Atlanta, GA 30348-5366

## RE: BOUNTHAN SAENGSIPHAN

Dear Ms. Smith:

The patient returns today. He underwent bone grafting to his femoral defect (status post ACL graft failure). He has been fitted for an ACL brace and initiated physical therapy.

PHYSICAL EXAMINATION:     Range of motion is good. Strength is improving.

X-RAYS:     X-ray today shows further consolidation of the bone graft in the femoral drill holes.

RECOMMENDATIONS:     The patient is on course to proceed with ACL reconstruction to his right knee around 8/3/99 or later. In reviewing the sources of the tendons initially we felt that a hamstring tendon may be functional for him. However, with the type of defect in the femur I feel that consideration of a secondary type of bone graft is a consideration. The patellar tendon on the contralateral leg I feel is too thick to utilize as an ACL graft. I have recommended this an allograft patellar tendon or allograft quad tendon. The allograft patellar tendon has a waiting list at this time and we will put his name in for that now so that when he is ready for his ACL reconstruction hopefully an allograft patellar tendon will be available.

In the meantime he is to continue on his rehab program. We will see him back again in three weeks. We will keep him out of work until we see him back.

Thank you for the referral of this patient and allowing me to participate in his care.

Sincerely,

William S. Armstrong, M.D.
WSA/cb (DICTATED BUT NOT PROOFREAD TO AVOID DELAY IN CORRESPONDENCE)

WCW 019878
CONFIDENTIAL

**RESURGENS ORTHOPAEDICS**

**EMPLOYEE WORK STATUS REPORT**
**PHYSICIAN'S EVALUATION**

EMPLOYEE'S NAME: Bounthan Saengsiphan          DATE: 7-21-99

EMPLOYER: WCW                                   CONTACT:

TELEPHONE #:                    FAX #:                    DOI:

DIAGNOSIS: S/r knee sx

TREATMENT PLAN:

NEXT VISIT ON: 8-13-99    4:15 pm

## WORK STATUS

RETURN TO REGULAR DUTY ON: _____ NO WORK UNTIL _____ next visit

RETURN TO WORK WITH MODIFICATIONS (SEE LIST OF MODIFICATIONS BELOW)

FROM: _____ TO: _____

## MODIFIED WORK DESCRIPTIONS

☐ **NO LIFTING**
☐ **SEDENTARY WORK**
  Lifting 10 lbs. Maximum and occasionally lifting and/or carrying of such articles as dockets, ledgers, and small tools. A certain amount of standing and walking is often necessary in carrying out job duties.
☐ **MODERATE WORK**
  Lifting 20 lbs. Maximum with frequent lifting and/or carrying of objects weighing up to 10 lbs. May involve sitting with a degree of pushing and pulling of arm or leg controls.
☐ **MEDIUM WORK**
  Lifting 50 lbs. Maximum with frequent lifting and/or carrying of objects weighing up to 25 lbs.
☐ **MEDIUM HEAVY WORK**
  Lifting 65 - 70 lbs. Maximum with frequent lifting and/or carrying of objects weighing up to 40 lbs.
☐ **HEAVY WORK**
  Lifting 100 lbs. Maximum with frequent lifting and/or carrying of objects weighing up to 50 lbs.
☐ **VERY HEAVY WORK**
  Lifting of objects in excess of 100 lbs. With frequent lifting and/or carrying of objects weighing up to 50 lbs.

In an eight hour workday employee can stand/walk:
☐ None    ☐ 1-4 hours    ☐ 4-6 hours    ☐ 6-8 hours
In an eight hour workday employee can sit:
☐ 1-3 hours    ☐ 3-5 hours    ☐ 5-8 hours
Employee can use hands for:
☐ Simple grasping    ☐ Pushing & Pulling    ☐ Fine manipulation
Employee can use feet for repetitive movement as in operating foot controls:
☐ Yes    ☐ No

Employee is able to:

|  | Not at all | Occasionally | Frequently | Constantly |
|---|---|---|---|---|
| Bend | ☐ | ☐ | ☐ | ☐ |
| Squat | ☐ | ☐ | ☐ | ☐ |
| Climb | ☐ | ☐ | ☐ | ☐ |
| Work at shoulder level | ☐ | ☐ | ☐ | ☐ |
| Perform overhead work | ☐ | ☐ | ☐ | ☐ |

Additional Restrictions:

Physician's Signature:

Physician's Name Printed:

REORDER # 18-08A1-80

WCW 018964
CONFIDENTIAL



**RESURGENS**™
**ORTHOPAEDICS**
*An affiliate of OrthoLink*

John C. Garrett, M.D.
Keith D. Osborn, M.D.
Blane A. Woodfin, M.D.
Drew V. Miller, M.D.
Kenneth J. Kress, M.D.
George Cierny III, M.D.
Roy M. Rubin, M.D.
Christopher R. Edwards, M.D.
Steven B. Wertheim, M.D.
William S. Armstrong, M.D.
Robert A. Kelly, M.D.
Jonathan S. Swift, M.D.
M. Shay Womack, M.D.
Thomas W. Marks, M.D.
Paul L. Flicker, M.D.
William H. Greenwood, M.D.
C. Michael Morris, M.D.
Joseph B. Chandler, M.D.
Scott M. Morrell, M.D.
Mark C. Cullen, M.D.

*All correspondence/inquiries to:*
440 Barrett Parkway
Suite 55
Kennesaw, Georgia 30144
(770) 421-8005

5671 Peachtree Dunwoody Road NE
Suite 900
Atlanta, Georgia 30342

203 Woodpark Place
Building A100
Woodstock, Georgia 30188

West Paces Office
3200 Downwood Circle
4th Floor
Atlanta, Georgia 30327

1380 Milstead Avenue
Suite D
Conyers, Georgia 30207

320 Hospital Road
Canton, Georgia 30114

575 Professional Drive
Suite 420
Lawrenceville, Georgia 30045

August 13, 1999

*I have a copy B ?!*

Brenda Smith
C/o WCW
P.O. Box 105366
Atlanta, GA 30348-5366

RE: Bounthan Saengsiphan

Dear Ms. Smith:

Patient returns today for follow up ACL deficiency right knee. Arthroscopic debridement and bone grafting was performed on 6/3/99. When last seen on 7/21/99 it was felt that his bone grafts were healing and that we can proceed and order an allograft. He returns today stating that at this point in time he cannot afford financially to pursue further surgery, which would necessitate further release from work. He wants to be able to pursue work at this time rather than proceeding with surgery. I have cleared him to pursue medium to heavy work allowing the use of a brace if it is strenuous work. We will see him back again in three months.

Thank you for the referral of this patient and allowing me to participate in his care.

Sincerely yours,

William S. Armstrong, M.D.
WSA:klp
(DICTATED BUT NOT PROOFREAD TO AVOID DELAY IN CORRESPONDENCE)

WCW 018770
CONFIDENTIAL



**RESURGENS℠ ORTHOPAEDICS**

**EMPLOYEE WORK STATUS REPORT PHYSICIAN'S EVALUATION**

EMPLOYEE'S NAME: Bounthan Sangsipha    DATE: 8-13-99

EMPLOYER: WCW ___ CONTACT: ___

TELEPHONE #: ___ FAX #: ___ DOI: ___

DIAGNOSIS: S/P Knee SX

TREATMENT PLAN: ___

NEXT VISIT ON: 11/5/99 @ 4:15pm

## WORK STATUS

RETURN TO REGULAR DUTY ON: ___ NO WORK UNTIL: ___

RETURN TO WORK WITH MODIFICATIONS (SEE LIST OF MODIFICATIONS BELOW)

FROM: 8-14-99    TO: next visit

## MODIFIED WORK DESCRIPTIONS

☐ **NO LIFTING**
☐ **SEDENTARY WORK**
  Lifting 10 lbs. Maximum and occasionally lifting and/or carrying of such articles as dockets, ledgers, and small tools. A certain amount of standing and walking is often necessary in carrying out job duties.
☐ **MODERATE WORK**
  Lifting 20 lbs. Maximum with frequent lifting and/or carrying of objects weighing up to 10 lbs. May involve sitting with a degree of pushing and pulling of arm or leg controls.
☐ **MEDIUM WORK**
  Lifting 50 lbs. Maximum with frequent lifting and/or carrying of objects weighing up to 25 lbs.
☒ **MEDIUM HEAVY WORK**
  Lifting 65 - 70 lbs. Maximum with frequent lifting and/or carrying of objects weighing up to 40 lbs.
☐ **HEAVY WORK**
  Lifting 100 lbs. Maximum with frequent lifting and/or carrying of objects weighing up to 50 lbs.
☐ **VERY HEAVY WORK**
  Lifting of objects in excess of 100 lbs. With frequent lifting and/or carrying of objects weighing up to 50 lbs.

In an eight hour workday employee can stand/walk:
  ☐ None   ☐ 1-4 hours   ☐ 4-6 hours   ☒ 6-8 hours
In an eight hour workday employee can sit:
  ☐ 1-3 hours   ☐ 3-5 hours   ☒ 5-8 hours
Employee can use hands for:
  ☒ Simple grasping   ☒ Pushing & Pulling   ☒ Fine manipulation
Employee can use feet for repetitive movement as in operating foot controls:
  ☒ Yes   ☐ No

Employee is able to:

|  | Not at all | Occasionally | Frequently | Constantly |
|---|---|---|---|---|
| Bend | ☐ | ☐ | ☒ | ☐ |
| Squat | ☐ | ☒ | ☐ | ☐ |
| Climb | ☐ | ☒ | ☐ | ☐ |
| Work at shoulder level | ☐ | ☐ | ☒ | ☐ |
| Perform overhead work | ☐ | ☐ | ☐ | ☒ |

Additional Restrictions: Avoid twisting R Knee allow brace if strenuous work

Physician's Signature: ___

Physician's Name Printed: ___

WCW 018771
CONFIDENTIAL



**RESURGENS™
ORTHOPAEDICS**
An affiliate of OrthoLink Physicians Corporation

Freddy A. Achecar Jr., M.D.
Jeffrey J. Albert, M.D.
William S. Armstrong, M.D.
Eduardo A. Baetti, M.D.
Herschel I. Beker, M.D.
Joseph B. Chandler, M.D.
George Cierny III, M.D.
Richard W. Cohen, M.D.
Alfred O. Colquitt III, M.D.
Paul V. Conescu, M.D.
Tapan K. Daftari, M.D.
Thomas L. Dopson, M.D.
Christopher R. Edwards, M.D.
Paul L. Flicker, M.D.
John C. Garrett, M.D.
William S. Gibbons, M.D.
John R. Gleason, M.D.
William H. Greenwood, M.D.
Bradley E. Henderson, M.D.
Edward H. Holliger, M.D.
Frank R. Joseph, M.D.
Robert A. Kelly, M.D.
D. Kay Kirkpatrick, M.D.
Richard M. Klaus, M.D.
Scott G. Kleiman, M.D.
John D. Knox Jr., M.D.
Kenneth J. Kress, M.D.
G. Dale Lane, M.D.
Scott M. Levere, M.D.
Allan N. Levine, M.D.
Joseph A. Martino, M.D.
James B. Madeley, M.D.
Drew V. Miller, M.D.
Marvin M. Mitchell, M.D.
Mark S. McBride, M.D.
Howard A. McMahan, M.D.
W. Kehne Moeller, M.D.
Scott M. Morrell, M.D.
C. Michael Morris, M.D.
Keith D. Osborn, M.D.
Thomas E. Price, M.D.
Byron D. Rosenstein, M.D.
Thomas I. Ross, M.D.
Roy M. Rubin, M.D.
Russell L. Sabrin, M.D.
David G. Scott, M.D.
Gary S. Simon, M.D.
Jonathan S. Swift, M.D.
Rafael V. Urrutia, Jr., M.D.
William J. Vanderyt, M.D.
Steven B. Wertheim, M.D.
Stuart P. Wetzel, M.D.
M. Shay Womack, M.D.
Blane A. Woodfin, M.D.

November 5, 1999

Debbie Henderson
C/o WCW
P.O. Box 105366
Atlanta, GA 30348-5366

**RE: Bonathan Saenziphan**

Dear Ms. Henderson:

The patient underwent arthroscopic debridement on 06/03/99. The patient states his knee is feeling good, and he is not having any significant instability, but he is wearing his brace when he does anything strenuous.

**PHYSICAL EXAMINATION:**    Range of motion is good. He still has instability to the anterior cruciate ligament.

**X-RAYS:**    X-rays were obtained, which shows that the femoral drill hole appears to have healed in from the bone graft.

**PLAN:**    We discussed proceeding with the ACL reconstruction at this time, but the patient does not seem to be interested. He is to stay on work restrictions, and we will see him back again in two months.

He may elect not to have the procedure, at which case he is nearing maximum medical improvement. We will consider assessment of permanent impairment on the next visit.

Thank you for the referral of this patient and allowing me to participate in his care.

Sincerely yours,

William S. Armstrong, M.D.
WSA:klp
(DICTATED BUT NOT PROOFREAD TO AVOID DELAY IN CORRESPONDENCE)

WCW 018772
CONFIDENTIAL

440 Barrett Parkway, Suite 55, Kennesaw, GA 30144   (770) 421-8005



World Championship Wrestling
A Division of Turner Sports
One CNN Center
Box 105366
Atlanta, GA 30248-0366

# **Work Status Form**

DATE: 2-14-00

Patient Name: Bounthen Saengsiphun

Doctor's Office Name: Dr Armstrong

Doctor's Office Numbers: Phone: 770-421-8005

Date of Visit: 2-14-00    Fax: _____

Diagnosis: (R) Kull Scope

Next Visit Date and Time: _____

X Return to Work With **NO** Restrictions on: 2/15/00
___ Return to Work **WITH** Restrictions:
From: _____ To: _____
What are the Specific Restrictions From Work?: (no wrestling, jumping, stretching, picking up others, running, etc.)  With Face Brace.
_____
_____
_____

***Expected Amount of Time Out of Work OR Release Date:**
_____

Is **Light Duty OK** If Not Released? _____ YES _____ NO
(Light Duty:PR Appearances, Traveling, Autograph Signing, Etc.)

Physician's Signature: _____

Physician's Name Printed: _____

Physician's Asst.'s Name: _____

(Please fax to Debbie Henderson after appointment at (404) 603-4017)
Any Questions Please contact Debbie at (404) 603-3118

A Time Warner Company

WCW 019898
CONFIDENTIAL



**RESURGENS[rx]**
**ORTHOPAEDICS**
An affiliate of OrthoLink Physicians Corporation

Freddy A. Achecar Jr., M.D.
Jeffrey J. Albert, M.D.
William S. Armstrong, M.D.
Eduardo A. Baetti, M.D.
Herschel I. Beker, M.D.
Joseph B. Chandler, M.D.
George Cierny III, M.D.
Richard W. Cohen, M.D.
Alfred O. Colquitt III, M.D.
Paul V. Conescu, M.D.
Tapan K. Daftari, M.D.
Thomas L. Dopson, M.D.
Christopher R. Edwards, M.D.
Paul L. Flicker, M.D.
John C. Garrett, M.D.
William S. Gibbons, M.D.
John R. Gleason, M.D.
William H. Greenwood, M.D.
Bradley E. Henderson, M.D.
Edward H. Holliger, M.D.
Frank R. Joseph, M.D.
Robert A. Kelly, M.D.
D. Kay Kirkpatrick, M.D.
Richard M. Klaus, M.D.
Scott G. Kleiman, M.D.
John D. Knox Jr., M.D.
Kenneth J. Kress, M.D.
G. Dale Lane, M.D.
Scott M. Levere, M.D.
Allan N. Levine, M.D.
Joseph A. Martino, M.D.
James B. Madeley, M.D.
Drew V. Miller, M.D.
Marvin M. Mitchell, M.D.
Mark S. McBride, M.D.
Howard A. McMahan, M.D.
W. Kehne Moeller, M.D.
Scott M. Morrell, M.D.
C. Michael Morris, M.D.
Keith D. Osborn, M.D.
Thomas E. Price, M.D.
Byron D. Rosenstein, M.D.
Thomas I. Ross, M.D.
Roy M. Rubin, M.D.
Russell L. Sabrin, M.D.
David G. Scott, M.D.
Gary S. Simon, M.D.
Jonathan S. Swift, M.D.
Rafael V. Urrutia Jr., M.D.
William J. Vanderyt, M.D.
Steven B. Wertheim, M.D.
Stuart P. Wetzel, M.D.
M. Shay Womack, M.D.
Blane A. Woodfin, M.D.

William S. Armstrong, M.D.
WSA:klp  (DICTATED BUT NOT PROOFREAD TO AVOID DELAY IN CORRESPONDENCE)

February 14, 2000

Debbie Henderson
C/o WCW
P.O. Box 105366
Atlanta, GA 30348-5366

RE:  Bounthan Saengsiphan

Dear Ms. Henderson:

The patient returns today.  The patient had previous ACL reconstruction with a reinjury on 05/11/99.  At the time of the reinjury of 05/11/99 he felt and heard a pop.  When seen for followup it was determined that he had ruptured his ACL graft.

He was taken to the operating room on 06/03/99 with a ruptured ACL graft.  Unfortunately, the previous screw in the femur prohibited us from proceeding with an ACL reconstruction (revision ACL reconstruction) at the time of that surgery.  The screw was removed and bone grafting to the defect was performed.

The patient has been followed since that time to determine when the bone graft had healed enough to proceed with repeat surgery.

At this point in time, the patient has sought employment outside of the wrestling arena.

The patient states that his knee does not feel normal although, it does not completely give out on him he will feel some looseness to the knee.

PHYSICAL EXAMINATION:     There is no swelling.  There is increased laxity to Lachman testing.  He also has healed incisions.

X-RAYS:     X-rays were performed and show an incorporation of the bone grafting to the femur.

ASSESSMENT:     **ACL deficient right knee, status post ACL reconstruction with secondary injury.**

WCW 019874
CONFIDENTIAL

440 Barrett Parkway, Suite 55, Kennesaw, GA 30144   (770) 421-8005

Bounthan Saengsiphan
TOWN CENTER OFFICE
02/14/00
Page-2-

RECOMMENDATIONS:    At this point in time, the bone graft is healed enough to
proceed with ACL reconstruction.  However, the patient does not to pursue the surgery at
this time.

With a brace, I feel the patient can pursue normal activities.  It is a condition although,
there is increased risk with an ACL deficiency with a brace many people can pursue
rigorous sports.

At this point in time, I feel that he has reached maximal medical improvement if he were
to elect not to have the ACL reconstruction (I have recommended that he pursue ACL
reconstruction, however.)  According to the Guides to Evaluation of Permanent
Impairment, Fourth Edition, an ACL deficiency that he has would equate to
approximately 30% impairment to the lower extremity.  A partial medial meniscectomy
would equate to a 4% impairment to the lower extremity.  According to the combined
values chart a 30% plus a 4% would equate to a 31% impairment to the lower extremity.

Of course this value would change if he would elect to proceed with the ACL
reconstruction.

We have released him to full duty work with the brace.  Otherwise, we will see him back
again in three months on a p.r.n. basis.

Thank you for the referral of this patient and allowing me to participate in his care.

Sincerely,

William S. Armstrong, M.D.
WSA/kp (DICTATED BUT NOT PROOFREAD TO AVOID DELAY IN CORRESPONDENCE)
(TOWN CENTER OFFICE)

WCW 019875
CONFIDENTIAL

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

BOUNTHAN SAENGSIPHAN,                    )
                                         )
                    Plaintiff,           )
                                         )        CIVIL ACTION FILE
v.                                       )
                                         )        NO. 1:00-CV-1719-CC
WORLD CHAMPIONSHIP WRESTLING, INC.,)
TURNER SPORTS, INC. and TURNER           )
BROADCASTING SYSTEM, INC.,               )
                                         )
                    Defendants.          )

### CERTIFICATE OF SERVICE

This is to certify that I have this day served a copy of this ***APPENDIX OF DEPOSITION EXCERPTS*** upon the interested parties by hand delivery to:

> Cary Ichter
> Kelly Jean Beard
> Charles Gernazian
> Michelle M. Rothenberg-Williams
> MEADOWS, ICHTER AND BOWERS, P.C.
> Fourteen Piedmont Center, Suite 1100
> 3535 Piedmont Road
> Atlanta, GA  30305

This 30th day of January, 2003.

_____
Evan H. Pontz
TROUTMAN SANDERS LLP
Suite 5200, Bank of America Plaza
600 Peachtree Street, N.E.
Atlanta, GA  30308-2216
(404) 885-3000

1108360_1.DOC